# RABINO DEPOSITION

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

RICARDO ARREDONDO, RICHARD )
RABINO AND MARIO TORREZ,   )
    Plaintiffs,        )
                    )
VS.                        )CA NO. 2:14-cv-00170
                    )
WEATHERFORD INTERNATIONAL, )
LLC and JOEY ESTRADA,      )
    Defendants.        )


ORAL AND VIDEOTAPED DEPOSITION OF

RICHARD KARL RABINO - VOLUME 1

April 22, 2015


        Oral and videotaped deposition of
RICHARD KARL RABINO was taken on April 22, 2015, in The
Law Office of Thomas J. Henry, 521 Starr Street, Corpus
Christi, Texas, from 5:20 p.m. to 8:13 p.m., before
Dickie Zimmer, Certified Shorthand Reporter, pursuant to
Notice and the Federal Rules of Civil Procedure and
under the following agreement of counsel for the
respective parties that:

        The deposition may be signed by the witness
before any Notary Public or officer authorized to
administer oaths.

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:
       The Law Office of Thomas J. Henry
 4     521 Starr Street
       Corpus Christi, Texas  78401
 5     Phone:  361.985.0600
       Fax:  361.985.0601
 6     Email:  gteeter@thomasjhenry.com
         By:  Greggory A. Teeter
 7

 8
     FOR THE DEFENDANT, WEATHERFORD INTERNATIONAL,
 9   LLC:
       Jackson Walker L.L.P.
10     1401 McKinney Street, Suite 1900
       Houston, Texas  77010
11     Phone:  713.752.4200
       Fax:  713.752.4221
12     Email:  nspiliotis@jw.com
         By:  Nickolas G. Spiliotis
13            Angeles Garcia

14

15   ALSO PRESENT:
       Mario Torrez
16     John Garza, Videographer

17

18       *   *   *   *   *   *   *   *   *   *   *

19

20

21

22

23

24

25
```

3

```
1                         INDEX

2

3    TESTIMONY OF:   RICHARD KARL RABINO

4    EXAMINATION BY:                                    PAGE

5        Mr. Spiliotis..........................     4

6

7                        EXHIBIT INDEX

     NO.                 DESCRIPTION                    PAGE
8
     1      Letter Dated 5-10-11 To Rabino From
9            Mora (Weatherford0000093-94)..........     28
     2      Weatherford Enterprise Excellence
10           Policy Dated 11-1-10 Employee Consent
             Form (Weatherford0000070).............     36
11   3      Weatherford Enterprise Excellence
             Policy Dated 10-1-97 Harassment
12           (Weatherford0001149-51)...............     37
     4      Handbook Acknowledgement - Employee
13           Copy Dated 5-31-11 (Weatherford
             0000063)..............................     57
14   5      Weatherford Handbook for US Employees
             Dated 1-1-11 (Weatherford0001109-48)..     59
15   6      Code of Conduct Policy Acknowledgement
             Dated 5-41-11 (Weatherford0000058)....     81
16   7      Weatherford Code of Business Conduct
             (Weatherford0000001-36)...............     84
17   8      Listen Up Safe Communication
             (Weatherford0000332)..................     97
18   9      Discrimination or Harassment?  What
             to do at Weatherford (Weatherford
19           0000339)..............................    100
     10     Plaintiffs' Amended Complaint........    103
20   11     Weatherford Coveralls (Not Attached)..    136

21

22

23

24

25
```

```
 1      A.   No, sir.

 2      Q.   Okay.  Did you, also, work at Wal-Mart?

 3      A.   Yes.

 4      Q.   Okay.  Do you remember when you worked at

 5  Wal-Mart?

 6      A.   No.  The month, no, I don't.  I don't remember.

 7      Q.   Okay.  Do you know why you left Wal-Mart?

 8      A.   No, I don't.

 9      Q.   Okay.  Have you ever been terminated from any

10  position at all?

11      A.   No.

12      Q.   So, if you've left, you've always left

13  voluntarily?

14      A.   Yes.

15      Q.   Can you -- you said you started at Weatherford in

16  May 2011?

17      A.   Yes, sir, 2011.

18      Q.   Okay.  And when did your employment with

19  Weatherford end?

20      A.   I want to say April of 2012.

21      Q.   Okay.  And how did you hear about the Weatherford

22  job?

23      A.   I had attended a birthday party -- a close

24  friend's birthday party.  He had already previous --

25  previously working for that company as a -- he just kind
```

1    think --

2        Q.  Okay.  Now, this exhibit, also, says that you

3    were hired for the position of warehouse attendant,

4    correct?

5        A.  Yes.

6        Q.  And you were reporting to Andrew Hughes.  Was

7    Andrew a white hat?

8        A.  I never heard of that name.

9        Q.  Okay.  And all the time you worked for

10   Weatherford, were you always a warehouse attendant?

11       A.  No, sir.

12       Q.  So, you became an EO at some point?

13       A.  Yes, sir.

14       Q.  Okay.  Do you remember when that was?

15       A.  That would be June or July of the same year.  I

16   know it was summertime.  It was hot.

17       Q.  And that would have been of --

18       A.  The same year.

19       Q.  2011?

20       A.  The same year, yeah.

21       Q.  So, within a month or two --

22       A.  Yeah.

23       Q.  -- of being hired?

24           Is that a "yes"?

25       A.  Yes, yes.  I'm sorry.

1    Q.   -- a part of the same crew?

2    A.   They would change if they got fired --

3    Q.   Okay.

4    A.   -- and rehired.

5    Q.   Okay.  So, you always worked with the same crew

6    members --

7    A.   Yes, your crew that you were assigned to, the

8    same employees, as far as equipment operators, and the

9    exact same supervisors every day.

10    Q.   Okay.  Did you ever -- strike that.

11         Did your -- your crew assignment ever change?

12    A.   No.

13    Q.   Okay.  And when you were first hired at

14    Weatherford, did you participate in any new hire

15    orientation?

16    A.   Yes, I did.

17    Q.   Okay.  Was it in a classroom environment?

18    A.   Yes.

19    Q.   Okay.  Do you remember where it took place?

20    A.   In the yard of Alice, Texas.

21    Q.   Was it in a building?

22    A.   A trailer.

23    Q.   Did you go through orientation with other

24    individuals?

25    A.   Yes, I did.

1    Q.  Who were they?

2    A.  Other individuals.

3    Q.  Was any of them a part of your crew?

4    A.  When I got hired, I was a warehouse attendant;

5 so, no.

6    Q.  Okay.  Were any of them -- did any of them work

7 with you as warehouse attendants?

8    A.  No.

9    Q.  Were any of those individuals that attended

10 training with you -- strike that.

11       Did you know the names of any of those

12 individuals?

13    A.  No, I didn't.

14    Q.  Did you ever work with any of those other

15 individuals?

16    A.  No.

17    Q.  How many people went through training?

18    A.  About 20.

19    Q.  Okay.  And were those 20 people assigned to work

20 the Swift fleet?

21    A.  I wouldn't know, sir.

22    Q.  It makes a large number, right, 20 people?

23    A.  But I wasn't assigned to the Swift fleet when I

24 got hired.

25    Q.  Okay.  Did you go through training on your first

1    Q.   Okay.  What is that evidence?

2    A.   I'd say it's in the paperwork, the lawsuit.

3    Q.   So, you are just referring to your Amended

4    Complaint, generally?

5    A.   (Witness nods head.)

6    Q.   Had you ever -- have you ever filed a complaint

7    with Weatherford human resources?

8    A.   Yes, I have.

9    Q.   Okay.  I'm asking have you in the past.

10   A.   Oh, oh.  What was your question?

11   Q.   Did you ever file a complaint with the human

12   resources -- Weatherford human resources?

13   A.   I did not file it, no.

14   Q.   Okay.  Did -- do you know of anyone who did file

15   a complaint with Weatherford human resources?

16   A.   I can't remember his name, though.  Yes, I do

17   know who filed -- he filed the complaint, you know.

18   Q.   And who was that?

19   A.   The initials are J. D.  I know he was an e-tech

20   for the company.  I do not know his last name.

21   Q.   Okay.  Is he the only individual you know that

22   filed a complaint with human resources?

23   A.   No.

24   Q.   Do you know of others?

25   A.   Uh-huh.

1    Q.  Okay.  And who are those people?

2    A.  Ricardo Arredondo.

3    Q.  And who else?

4    A.  I think that might be it.  From what I recall

5    right now, from what I can remember, I think that might

6    be it.  I'm not certain if that's the only ones.

7    Q.  But you yourself never filed a complaint with

8    Weatherford human resources?

9    A.  I never filed a complaint.  I was involved in a

10   complaint, but I never filed it.

11   Q.  Okay.  And do you know --

12       You said J. D. --

13   A.  Uh-huh.

14   Q.  -- filed a complaint?

15   A.  Yes.

16   Q.  Do you know what the effect of him filing the

17   complaint was?

18   A.  Meaning -- what you do mean "the effect of him"?

19   Q.  Who did he file the complaint on?

20   A.  He filed a compliant on Joey Estrada.

21   Q.  Okay.  And did that result in Mr. Estrada's

22   termination?

23   A.  No.

24   Q.  Okay.  So, it did not result in his termination?

25   A.  Of Joey's termination?  Eventually, yes.

1    Q.  Do you know how long after he filed his complaint

2  with Weatherford HR Mr. Estrada was terminated?

3    A.  No, sir, I don't know how long it took.  Until

4  Joey Estrada was fired, I do not know how long it took,

5  no.

6    Q.  You said you know that he filed a complaint with

7  Weatherford HR --

8    A.  Yes.

9         MR. TEETER:  Objection, form.

10   Q.  (By Mr. Spiliotis)  Well, You know -- you

11  testified that you know he filed a complaint with

12  Weatherford human resources, correct?

13        MR. TEETER:  Objection, form.

14   A.  That what?

15   Q.  (By Mr. Spiliotis)  He filed a complaint with --

16   A.  Uh-huh.

17   Q.  -- Weatherford HR?

18   A.  Uh-huh.

19        MR. TEETER:  Objection, form.

20   Q.  (By Mr. Spiliotis)  Okay.  What about Ricardo

21  Arredondo, Jr., who did he file a complaint against?

22        MR. TEETER:  Objection, form.

23   A.  He filed a complaint to what we all thought was

24  HR, Sanchez, the safety guy.

25   Q.  (By Mr. Spiliotis)  Okay.  And who was he --

```
 1            MR. SPILIOTIS:   -- in the Weatherford human
 2   resource department?
 3            MR. TEETER:  Can I get a running objection
 4   on that, and I won't object each time?  That's all I'm
 5   asking.
 6            MR. SPILIOTIS:  Okay.
 7      Q.  (By Mr. Spiliotis)  Mr. --
 8            MR. TEETER:  Is that a "yes"?
 9            MR. SPILIOTIS:  That's fine.
10      Q.  (By Mr. Spiliotis)  Mr. Rabino --
11      A.  Uh-huh.
12      Q.  -- when I'm referring to "Weatherford human
13   resources" --
14      A.  Uh-huh.
15      Q.  -- I'm referring to people who are officially in
16   the Weatherford --
17      A.  Oh --
18      Q.  -- human resources department.  Do you understand
19   that?
20      A.  It changes --
21      Q.  Did you understand that?
22      A.  No, I didn't understand that.  It changes a lot
23   of things.
24      Q.  What does that change?
25      A.  Apparently, we didn't file an HR complaint, then.
```

1    Q.  Okay.  So, you never -- y'all never filed a

2  complaint; is that what you are saying?

3    A.  If you're referring to HR as the legal title HR,

4  human resources, then, no.

5    Q.  Okay.  Like, when you say "legal title HR, human

6  resources," I mean, do you understand that Weatherford

7  has a human resources department?

8    A.  When I got hired, I did not know that.

9    Q.  So, you didn't know that Weatherford actually had

10  a human resources department --

11    A.  Huh-uh.

12    Q.  -- at the time of your hire?

13       Is today the first time you're learn that

14  Weatherford has --

15    A.  No.

16    Q.  -- a human resources department?

17    A.  No.

18    Q.  Okay.  When did you first learn that Weatherford

19  has a human resource department?

20    A.  A department -- that's pretty open, as well.  I

21  knew of the department a good while into my job.

22          (Mr. Mario Torrez entered the room)

23    Q.  (By Mr. Spiliotis)  Okay.  Do you -- and what did

24  you know about the department?

25    A.  It was there -- the department was there to, not

1   necessarily protect the employee, but to have someone

2   they feel comfortable to bringing their problems, if

3   they didn't feel comfortable talking to their

4   supervisor.

5       Q.   Okay.   Do you know where they were at --

6       A.   No.

7       Q.   -- or located?

8       A.   No.

9       Q.   You didn't know how to go about contacting them?

10      A.   Huh-uh.

11      Q.   But you knew that there was a department that

12  existed that was there for employees to talk about

13  issues that they were having?

14      A.   Towards the end of my career at Weatherford,

15  yeah.

16      Q.   Okay.

17      A.   I think the last two months of my employment at

18  Weatherford is the only time I knew about HR.

19      Q.   Okay.   So, during the last two months of your

20  employment?

21      A.   Uh-huh.

22      Q.   Okay.   And in this policy Section 5.2 --

23      A.   Uh-huh.

24      Q.   -- it provides, "Weatherford will retain, in

25  confidence, information and documentation of all

1    Q.  Where would you actually clock in at the Alice

2  yard?

3    A.  At the dispatch office.

4    Q.  Okay.  In the dispatch office, isn't there a

5  breakroom there?

6    A.  There's a restroom area and lockers, but that's

7  not a breakroom.

8    Q.  Okay.  Is there -- is there a bulletin board

9  within the dispatch area?

10    A.  Yeah, there's -- when you walk in, there should

11  be a bulletin, I'm remembering, at the dispatch.  Yeah.

12    Q.  Okay.  And did you ever look at any of the

13  documents that were put on the bulletin?

14    A.  No, the only one I can remember is the Federal

15  Labor Law.

16    Q.  Okay.

17    A.  That's the only one I remember.

18    Q.  What do you remember about that?  Did you read

19  it?

20    A.  I think I may have, doing correction of law, not

21  all of it.  Just -- I was more interested on, like,

22  potential raises or, like, income or whatever.

23    Q.  Okay.  Do you -- I mean, what do you remember

24  that bulletin to provide?

25    A.  It just said current status of the Federal Labor

 1  Law was, like, at 7.25 an hour.

 2      Q.  Okay.  So --

 3      A.  It was that blue-and-white one.

 4      Q.  Minimum wage posting?

 5      A.  Yeah.  Yeah, that one.

 6      Q.  Okay.  You don't remember any other bulletin?

 7      A.  Nah.  I remember, like, a big old bulletin.  The

 8  only thing I remember on there was that, because it's on

 9  the far corner.  When you use the restroom, it was

10  always right there when you'd walk by.

11      Q.  Was it in color?

12      A.  Blue and white.

13      Q.  And how large was it?

14      A.  Not too large, probably about this sized paper

15  (indicating).

16      Q.  And you said it was blue and white?

17      A.  Yeah.  It was laminated, though, I remember that.

18      Q.  Now, if you'll look a little further down,

19  there's a section on the page that's titled "Listen-Up

20  Service."

21          Have you ever heard of Listen Up?

22      A.  No, sir.

23      Q.  So, during your employment with Weatherford, you

24  didn't know what Listen Up meant?

25      A.  No, sir, I did not know.

1    Q.  Did anyone ever tell that there was a hotline,

2    specifically, that you could call to voice complaints?

3    A.  No.  No, sir, not at all.

4    Q.  And no one told you that there was a 24-hour

5    service where you could call and report complaints of

6    harassment?

7    A.  It would have been nice if I'd have known.

8    Q.  Okay.  And if you would have known, would you

9    have reported complaints of harassment?

10   A.  If I had known about the hotline -- that's what

11   you're asking me, right?

12   Q.  Yes.

13   A.  If I had known about the hotline, yeah.

14   Q.  Okay.  And when would you have communicated your

15   complaints?

16           MR. TEETER:  Objection, form.

17   A.  It states in my -- when I got -- you know, that's

18   probably not true, either.  A few other times.  But if I

19   had known that there was a hotline where it couldn't be

20   traced back to me and I could just actually speak

21   freely, you know, about the stuff I didn't like about,

22   you know, some of the stuff that was happening on our

23   sites, I would have used it.

24   Q.  (By Mr. Spiliotis)  Okay.

25   A.  But I never -- that's --

1    Q.  And that's only if you would have known about it,
2  right?
3    A.  That's correct.
4    Q.  Okay.  Now, you testified earlier you received a
5  handbook.  Do you know what you did with the handbook
6  when you received it?
7    A.  I remember I got a bunch of books.  Oh, shit,
8  No -- yeah, we had a bunch of books.  At the end of the
9  day they told us -- we signed a stack of forms that they
10  wanted us to sign.  We took them -- I took them to my
11  vehicle.  I had a -- shit, what did I have?  Oh, a black
12  Dodge.  That's right.  And I put it in my truck.
13    Q.  Okay.  Did you keep it in your truck?
14    A.  No, I think -- I think, when I actually got home
15  on my days off that weekend, I think I took it in the
16  house.
17    Q.  Okay.
18    A.  Because I was always cleaning my truck; so, I'm
19  pretty sure.
20      The only thing that I kept that stayed in the
21  truck was the -- was the orange book that's hazards.
22  Because I worked in chemicals, I had to have that on me.
23  And that green book showing -- it was a hazmat book.
24  There was one on chemicals and labels and placards, and
25  another one with hazmat materials.  And I remember my

 1  to the Listen Up, again, isn't there?

 2      A.  Yes, it says Listen Up was a 24-hour service.

 3      Q.  Okay.  And you testified earlier that, if you had

 4  known about Listen Up --

 5      A.  Uh-huh.

 6      Q.  -- you would have called that hotline, right?

 7      A.  Uh-huh.

 8              MR. TEETER:  Objection, form.

 9      Q.  (By Mr. Spiliotis)  And you testified that you

10  actually received a copy of this, correct?

11      A.  Yes, sir.

12      Q.  Okay.  So, if you had opened up and read the

13  actual policy, you would have been -- or this actual

14  exhibit, you would have been made aware of the Listen Up

15  option, correct?

16              MR. TEETER:  Objection, form.

17      A.  If I'd read it.

18      Q.  (By Mr. Spiliotis)  Okay.

19              MR. SPILIOTIS:  We can go off the record.

20              THE VIDEOGRAPHER:  The time is 6:55 p.m.,

21  and we're off the record.

22              (Recess from 6:55 p.m. to 7:06 p.m.)

23              THE VIDEOGRAPHER:  The time is 7:06 p.m.,

24  and we are back on the record.

25      Q.  (By Mr. Spiliotis)  Mr. Rabino --

1    Q.  Okay.  And I think we went over earlier briefly
2  about the setup in the Alice yard.
3    A.  Yes.
4    Q.  Okay.  And we talked about a bulletin board --
5  bulletin boards.
6    A.  Board.
7    Q.  A bulletin board?
8    A.  Uh-huh.
9    Q.  Okay.  Do you know on the entire premises of the
10 Alice yard how many bulletin boards you had seen there?
11   A.  I only seen that one with dispatch, sir.
12   Q.  Okay.  And that was in dispatch?
13   A.  Yes, sir.
14   Q.  And how often would you go into dispatch?
15   A.  Clock in/clock out.
16   Q.  Okay.  So, on a daily basis?
17   A.  Yes, every day we went to work we clocked in and
18 clocked out.
19   Q.  Okay.  And where was that bulletin board you
20 remember seeing?
21   A.  It was -- as soon as you walked into dispatch,
22 you opened the door; and it was right there --
23   Q.  So --
24   A.  -- on the wall.
25   Q.  -- right in front of you, when you walked in?

 1    A.  Yes, sir.

 2    Q.  Okay.  And you testified earlier that you

 3  remember reading a bulletin board about labor?

 4    A.  Federal labor law, like, minimum wage, hours and

 5  stuff like that.  It was three columns.

 6    Q.  Okay.  And you, specifically, saw that, correct?

 7    A.  Yes, sir, blue and white.

 8    Q.  Okay.  And do you recall any other postings that

 9  you saw there?

10    A.  Nah.  No, sir.

11            THE WITNESS:  Bless you.

12            MR. TEETER:  Thank you.

13    Q.  (By Mr. Spiliotis)  And how long did you work at

14  Weatherford, sir?

15    A.  Right under a year.  I think it was about 11

16  months, to be exact.

17    Q.  Okay.  In the entire 11 months that you were

18  employed with Weatherford, did you see any other

19  postings, other than that blue labor code one?

20    A.  Not that I recall, no, sir.

21                 (Exhibit 8 marked)

22    Q.  (By Mr. Spiliotis)  Okay.  Let me hand you what's

23  marked as Exhibit 8 of your deposition.

24    A.  Yes, sir.

25    Q.  Let me --

1    Q.  Okay.  Now, between the time you were hired and

2    this January 19, 2012 alleged assault, were you subject

3    to any harassment of any kind by Joey Estrada?

4    A.  Verbally or physically or --

5    Q.  Any --

6    A.  -- anything that I took offense to?

7    Q.  Exactly, anything that you took offense to.

8    A.  Not that I can recall at this moment, no, sir.

9    Q.  Okay.  So, for that eight-month period of time,

10   would you -- strike that.

11        During that eight-month period of time, can you

12   think of any complaints you had with the conduct of

13   Mr. Estrada?

14   A.  That I felt like some of his contact was

15   inappropriate, yes, sir.

16   Q.  During that first eight-month period of time --

17   A.  (Witness nods head.)

18   Q.  -- prior to the incident on January 19th, 2012?

19   A.  Yes, sir.

20   Q.  Okay.  And what are those instances?

21   A.  Some of the way he would talk to people is

22   real -- I took it as real friendly, maybe a little too

23   friendly the way he would grab other employees.  He was

24   the boss.  So, when I say employees or hands, me, the

25   equipment operators.

1    him -- during one of our JSA meetings, I've seen him put

2    him in a choke hold and continuously nub him all around

3    his head --

4        Q.  Okay.

5        A.  -- like that (indicating).

6        Q.  You're making reference to "nub" and "nubbing" --

7        A.  I'm sorry.  Yes, sir.

8        Q.  What are you referring to?

9        A.  There was a -- he had a finger that was

10   different, the way it looked it -- one of his fingers.

11   I don't know which hand, or whatever.  I just know that

12   it was right at the knuckle.  He referred to it as his

13   nub.  It was a half a finger.

14       Q.  Okay.

15       A.  And I don't know what hand it was.

16       Q.  Do you know how -- approximately, how long his

17   nub was?

18       A.  No, I wouldn't know how long.

19       Q.  You said it was right at the knuckle, though,

20   right?

21       A.  Yeah.

22       Q.  Okay.  So, I mean, is it fair to say that's

23   approximately about an inch?

24            MR. TEETER:  Objection, form.

25       A.  No, I wouldn't say it's fair to say.

1    Complaint where you allege that on or about January 19th
2    you were sexually assaulted by Mr. Estrada, right?
3              MR. TEETER:  Objection, form.  To the --
4        A.   That's what it says, yes, sir, on January 19th,
5    by Estrada.
6        Q.   (By Mr. Spiliotis)  And it talks about other
7    Weatherford employees restraining you; is that correct?
8        A.   Yes, sir.
9        Q.   Okay.  So, prior to January 19th, 2012, had you
10   ever been restrained by any Weatherford employees?
11       A.   Prior to that, no, sir.
12       Q.   Now, you say you stayed away from Mr. Estrada?
13       A.   Yes.
14       Q.   And that was during the period from when you
15   witnessed him nub Mr. Arredondo on the head and before
16   January 19th, 2012, right?
17       A.   That was the whole time of my career.
18       Q.   Okay.  Did you get along with Mr. Estrada?
19       A.   Yeah, he was my boss.  If he told me to do
20   something, I did it.
21       Q.   Okay.  Did you have a good working relationship
22   with him?
23       A.   Yes, there was nothing -- nothing between us.  He
24   was my boss.
25       Q.   Okay.  And, I mean, was he respectful to you

1    A.  I never did it -- I never saw -- if you're a line

2  boss, you never did that to another line boss.  That

3  wasn't cool.  But water, sand or rocks is pretty normal.

4    Q.  Grease, or anything like that?

5    A.  Nah.  You know how hard grease is to get off your

6  clothes?

7    Q.  Okay.  Now, you can continue on.

8         MR. TEETER:  "Continue on" -- objection,

9  form.

10   A.  I was already -- oh, that's right.  I didn't tell

11 anybody from the day that it was my birthday.  I didn't

12 want nobody to know, especially Joey.  I'd already

13 witnessed him do the thing with Popeye on his head.  And

14 I was actually in fear of something -- a stupid prank

15 was going to happen to me.  So, I just stayed quiet.  I

16 did my job that day.  Running my blender.

17        Towards the end of my shift, Nugget got on my

18 blender; and I had acquired a chip that had January 19th

19 on it.  And it was just something to me personally.  I

20 just wanted -- I liked it.  It was birthday and just --

21 you know, I wished -- I wished I was off.  So, I don't

22 know why, it was just kind of that connection to my

23 family.  So, I had that chip on me.  And that ended up

24 being the last day, and I put it on the console of the

25 blender operating machine.  And when Nugget jumped on

1  didn't see Trini.  I was, like, shit, something is up.
2  So, I just played it cool, walked over there.
3        As soon as I was, maybe, a few feet from that
4  tent, someone grabbed me from behind, bear hugged me,
5  locked it in, locked me in the position where my hands
6  were down; and he had grabbed perfectly right around the
7  elbows where they bend, and I couldn't move.  If I was
8  going to bend, I was going to go like this (indicating);
9  and I couldn't do nothing.  At this time, as soon as he
10  grabbed me, I noticed -- I couldn't get a face, but I
11  noticed they threw all of the stuff off of one of the
12  tables.  So, I'm still thinking, okay, you know, fuck
13  it, they are going to do something stupid, water or
14  something like that.  But when he they threw me face
15  down and chest down on that table, and I hear it; and I
16  hear people chanting, "The nub is coming," "The nub is
17  coming."  Oh, fuck.
18        So, I hear Joey in the background.  I didn't see
19  what was he was doing.  I didn't know what he was doing.
20  I know the nub was coming.  And prior knowledge of the
21  nub and my position where I was getting pinned down on
22  that table, I knew what was going to happen.  And this
23  bastard did it.  He put that nub in my ass.  Held me
24  down.  Had one guy hold me down.  I felt him get closer
25  in between my legs.  He was grabbing my calves and my

1    A.   I was on pad.

2    Q.   Do you remember where the pad was or --

3    A.   Oh, no, just a normal pad, another frac pad.

4    Q.   Okay.  And what exactly did you hear Richard

5  Castillo say?

6    A.   "Hey, it's Richard's birthday."  "It's Rabino's

7  birthday, boss."

8         And I heard a few people -- you know, like I

9  said, people said, "Happy birthday, Rich," which was

10  cool, you know.  I didn't want anybody to find out, but

11  I was pretty surprised some of the guys -- you know, it

12  was my birthday.  I didn't --

13    Q.   So, in some, you know, sick way was this them

14  giving you kind of like their version of a birthday

15  present?

16         MR. TEETER:  Objection, form.  Who is

17  "they"?

18    A.   Like, "they" as in, like, Joey --

19    Q.   (By Mr. Spiliotis)  Was this --

20    A.   -- or my crew?

21    Q.   Would they have done this to you, if it hadn't

22  been your birthday?

23    A.   Who's to say.

24    Q.   Okay.  But you think your birthday instigated the

25  incident, the fact that it was your birthday instigated

1    Q.   Okay.  And how were they arranged?

2    A.   Just on the corners.  You know, you would have --

3  like, say this is a tent; and you would have one here,

4  one here, one here, one here (indicating).

5    Q.   Okay.  So, before you got to the tent you saw --

6    A.   Uh-huh.

7    Q.   -- Mr. Marty Valdez?

8    A.   Yes, underneath the tent.

9    Q.   Okay.  He was underneath the tent?

10    A.   Yeah.

11    Q.   Okay.  When you first saw him, had you been

12  grabbed from behind by --

13    A.   No.

14    Q.   -- by Chusco?

15    A.   No.

16    Q.   Okay.

17    A.   When I noticed everybody in their position they

18  were in and how they were nice and quiet, I knew

19  something was up.

20    Q.   Okay.  So, everyone was kind of hanging around

21  the tables; is that right?

22    A.   Yeah, like they planned it.

23    Q.   Okay.  And whenever you were grabbed from behind

24  by Chusco, you said you were very close to the tables,

25  correct?

1      A.   Yes.

2      Q.   And were you pushed forward facing down on the

3   table?

4      A.   Yeah.

5      Q.   Okay.  Was your -- was your head or face pushed

6   against the table?

7      A.   He had his whole -- yes, he had -- my -- it was

8   my left side of the cheek, I remember it like it was

9   yesterday.  He had his whole entire torso, front torso,

10  a 300-pound kid all -- from this all the way down, all

11  on my back, my head, everything.

12     Q.   Okay.  So, could you -- could you actually see

13  who was involved in the incident?

14     A.   Other than Chusco?  I didn't know it was -- like

15  I said earlier, it didn't know it was Chusco until he

16  let me go.

17     Q.   Okay.  Then, you could actually see --

18     A.   Yeah --

19     Q.   -- or hear --

20     A.   -- I could hear his voice, and I figured it was

21  either Chusco or another employee.  But when everything

22  was done, the only one I knew 100 percent sure that was

23  violating me at that time was Joey Estrada; and that's

24  because the left side of my face was pinned down with

25  the rest of my torso and my arms underneath, and I was

1    the difference, if you're doing this (indicating).

2        Q.   No, I'm not saying the actual act, sir.  I'm just

3    saying when he --

4        A.   Yeah.

5        Q.   -- whenever he made those comments, "I'm going to

6    give you the nub," at that point you just had no vision

7    of what was going on --

8        A.   That's correct.

9        Q.   -- but you could hear the voices?

10       A.   Yeah, that's correct.

11       Q.   Okay.

12            Okay.  And what were you wearing at the time?

13       A.   Coveralls, sir.

14       Q.   Okay.  And what kind of coveralls were these?

15       A.   Just the issued coveralls.  I don't -- I wasn't

16   that detailed or knowledgeable that it -- I didn't even

17   know they had different type of coveralls out there.

18                     (Exhibit 11 marked)

19       Q.   (By Mr. Spiliotis)  Okay.  Well, let me hand you

20   what's marked as Exhibit 11 of your deposition.

21            Are these the coveralls you were wearing?

22       A.   No.

23       Q.   Okay.  And what's the difference --

24       A.   My coveralls didn't have zippers.

25       Q.   What's the difference between the coveralls you

1          THE VIDEOGRAPHER:  The time is 9:01 a.m.,

2   and we are back on the record.

3                    RICHARD KARL RABINO,

4    having been previously sworn, testified as follows:

5                    EXAMINATION (Continued)

6   BY MR. SPILIOTIS:

7     Q.  Now, Mr. Rabino, yesterday we were talking about

8   an incident that occurred to you on January 19th, 2012,

9   correct?

10    A.  Yes, sir.

11    Q.  Okay.  And you went -- we -- we went over that

12  incident.  And my question to you is:  Did any other

13  incidents -- or strike that.

14          Did Mr. Estrada assault you on any other times

15  after January 19th, 2012?

16    A.  Not that I can recall, no, sir.

17    Q.  Okay.  Did he harass you in any way after

18  January 19th, 2012?

19    A.  Yes, sir.

20    Q.  Okay.  And how did he do that?

21    A.  It was still verbal harassment.

22    Q.  Okay.  And do --

23    A.  He would -- real disrespectful.  He would still

24  make fun of what he did to me.  He'd always made it a

25  point, if I ever -- and the most embarrassing part was,

1  if I ever did anything good at my job on location that

2  day, he would always say, "Well, you're still my bitch,

3  don't you forget that."  And I wouldn't -- I wouldn't

4  ever respond.  I was, like, whatever.

5      Q.  And you already testified you didn't report --

6      A.  Yeah.

7      Q.  -- that incident to human resources, correct?

8      A.  That's correct.

9      Q.  And do you recall how many times he would

10  verbally harass you after January 19th, 2012?

11     A.  Nah, I never kept count.

12     Q.  Okay.  Was it -- was it on a weekly basis?

13     A.  Yeah, definitely, a weekly basis.

14     Q.  Okay.  So, from January 19th, 2012, he began to

15  verbally harass you?

16     A.  Not begin.

17          MR. TEETER:  Objection, form.

18     Q.  (By Mr. Spiliotis)  Okay.

19     A.  It's been happening.

20     Q.  Okay.  And did that verbal harassment continue up

21  until the time you were terminated?

22     A.  I didn't get terminated from the job.

23     Q.  Okay.  But until -- up until the time you left

24  Weatherford?

25     A.  Yeah, until, then -- say that one more time.

1    or nubbed on the head?

2        A.   A lot of them.   It was still when -- when Ric

3    Arredondo was still there -- after my incident he was

4    still there for -- I don't know how long a period of

5    time.   He continued to do it to him.   I mean, I've seen

6    lick his ear and nub Isaac Davila, Mario Torrez, other

7    people in the crew.   I couldn't -- I just remember Isaac

8    Davila, because he got really upset with it.   That --

9    that culture --

10       Q.   Do you remember when those incidents occurred?

11       A.   No, I know it was after my incident.

12       Q.   It was after your incident?

13       A.   Yeah.

14       Q.   Okay.   So, how many times did you witness him do

15   those acts to Isaac Davila?

16       A.   That I can recall, just that one time.

17       Q.   Okay.   And what about --

18       A.   Mario Torrez?

19       Q.   Yeah, Mario Torrez.

20       A.   Numerous times.

21       Q.   Okay.   And could you describe what those acts

22   consisted of, again?

23       A.   Oh, it was a physical act.   He would nub Mario

24   Torrez on his head or on his back region, his ear.

25   There was something about that nub he just loved.

1  no, you just take a few days off, expect a phone call,

2  don't" -- "don't leave Alice."

3       I said, "Okay."

4    Q.  Okay.  And after that incident where he said

5  expect a phone call, don't leave Alice, did you ever

6  work for Weatherford again?

7    A.  Like, as far as getting paid?

8    Q.  As far as actually performing work, showing up to

9  work and working.

10   A.  No, I didn't do that -- I don't believe so.

11   Q.  Okay.  Did anyone tell you that you could be

12  reassigned to a different crew?

13   A.  Yes, they did offer reassignment of a different

14  crew.

15   Q.  Who offered that?

16   A.  Lisa Mora.

17   Q.  Okay.

18   A.  It was the same fleet, different shift.

19   Q.  Same position?

20   A.  Same position.

21   Q.  Same salary?

22   A.  I wasn't salary.

23   Q.  I mean, same hourly rate?

24   A.  Oh, yeah, that was one of the options that she

25  had given me.

1    Q.   Okay.  What other options did she give you?

2    A.   She had -- the only -- she had mentioned a crew

3    swap.  It was the same fleet; so, I was still going to

4    see the same group of gentlemen, the same supervisors

5    that were on my current -- my current crew.  She

6    offered -- she, also, recommended -- or not recommended,

7    she offered to go to, like, a different position, if I

8    was interested -- whatever I was interested in -- in

9    wireline.  She had mentioned I could go to an office

10   job.  I didn't know what she meant by that.  I didn't

11   know anything other than swinging hammer at this time.

12   I knew about wireline, obviously, because I was, you

13   know, one of the line bosses of my crew; but --

14   Q.   Okay.  Tell me this:  Did your discussions with

15   Ms. Mora take place before or after the incident

16   involving Joey Estrada where he rubbed his genitals and

17   put it on Mario Torrez' face?

18   A.   The discussion of where she was going to move me

19   around -- when she was asking me to move?

20   Q.   Yes.

21   A.   Oh, that was after.

22   Q.   Okay.  So, let's talk about the incident with

23   Mr. Torrez and Mr. Estrada.

24       Do you remember when that occurred?

25   A.   No, sir, I don't.

1    A.   Yeah.

2    Q.   -- is that correct?

3         Can you explain why you took that video?

4    A.   Honestly, I just, whenever -- I had already

5    started the video a few seconds after I realized they

6    were duct taping his legs.  And then, at that point, I

7    thought it was just to that point.  Because I heard

8    everybody, they were shouting, "Oh," you know, "it's a

9    going away present."  You know, "Just so you don't

10   forget who your family is back home."  Which is our

11   crew, we called our crew a family.

12        So, I decided I was just going to get it on video

13   and just have it to look at later, you know, and make

14   fun of him every now and then.  "Hey, remember when they

15   duct taped you."  But at that certain point I did not

16   under -- I did not know the intentions of what was about

17   to happen.

18   Q.   Okay.

19   A.   I had no recollection of what was going to

20   happen.

21   Q.   Okay.  Now, you said that you all felt like a

22   family, correct?

23   A.   Uh-huh.

24   Q.   Okay.  And would you agree that everyone in your

25   crew considered each other to be family members?

1    A.   No.

2    Q.   Okay.  So, why did you say, you know, we were a

3    family?

4    A.   The guys that I was -- I considered close

5    friends, we saw each other more than we saw our family.

6    You got to remember, the oilfield is not a normal job

7    just 8:00 to 5:00.  It's a job you where work 18 hours a

8    day in deadly, deadly, deadly, you know, environment.

9    And it's not -- it's not a paper cut, it's where you

10   could get killed in a split second.  So, the friends

11   that I had made there I considered them close family

12   members.  It wasn't just family, but the whole crew --

13   the whole crew wasn't like that.  You had some guys that

14   just showed up, just do their job and go home.  And, you

15   know, some people didn't see each other that way.

16        But as far as me and the guys that -- I believed,

17   yeah, we considered each other close family members --

18   Q.   Okay.

19   A.   -- in each other's family.

20   Q.   You said you spent a lot of time out there

21   together?

22   A.   Oh, yeah.

23   Q.   Okay.  So, because you were spending a lot of

24   time, would you say you got to become fairly intimate

25   with the other workers?

1          MR. TEETER:  Objection, form.

2     A.  "Intimate"?  I don't know what you mean by

3  "intimate."

4     Q.  (By Mr. Spiliotis)  Okay.  You'd become -- you

5  became close friends with them, right?  Knew about their

6  families, knew who they were, got to know them better

7  than you normally would, if you weren't --

8     A.  Not with everybody.

9     Q.  -- spending that much time --

10         MR. TEETER:  Objection, form.

11    Q.  (By Mr. Spiliotis)  Excuse me.  Just let me

12  finish my question.

13    A.  Oh, I'm sorry.

14    Q.  But you said you spent up to 18 hours a day --

15    A.  Uh-huh.

16    Q.  -- correct?

17        "Yes"?

18    A.  Yes.

19    Q.  Okay.  And did occasionally you guys pull pranks

20  on each other?

21    A.  Just the -- from last -- yesterday's deposition,

22  sand in the pocket, rocks, water, spraying water bottles

23  at each other.  I consider those -- those pranks.

24    Q.  Okay.  And you just testified that when you

25  started the video, they were -- they were taping him up,

1    correct?

2       A.   Uh-huh.

3       Q.   Okay.  And at that point in time you didn't know

4    what their intentions were, correct?

5       A.   No, sir, I did not know.

6       Q.   Okay.  But you thought it was a joke, correct,

7    when you started the videotaping?

8       A.   Yeah, you could say that.

9       Q.   Okay.  And at that point, had he already had tape

10   on him?

11      A.   Yeah.

12      Q.   Okay.  Now, you -- your attorney has produced a

13   video to us.

14      A.   Uh-huh.

15      Q.   Did you provide to them that video?

16      A.   Yes, I took the video.

17      Q.   Okay.  Did you edit the video in any way before

18   turning it over to your attorneys?

19      A.   I'm not that smart.

20      Q.   Excuse me?

21      A.   No, I'm not that smart.  I don't know how to do

22   any of that.

23      Q.   Okay.  What do you mean you're not that smart?

24      A.   I'm not very intelligible about video chopping or

25   anything like that or -- I don't know how to do any of

1    A.   Okay.   Thank you.

2    Q.   But I'm going to press play now.

3              (Video started and stopped)

4    Q.   (By Mr. Spiliotis)   Okay.   Now, we just played

5    the video --

6              (Video started and stopped)

7    Q.   (By Mr. Spiliotis)   Now, we just played the

8    video, correct?

9    A.   Uh-huh.

10   Q.   Is that a true and accurate copy of the video you

11   gave your attorneys?

12   A.   Yes.

13   Q.   Okay.   Now, we can replay it, if necessary; but

14   in the video does Mario Torrez say, "Rabino, you're

15   supposed to be my friend"?

16   A.   Uh-huh.

17   Q.   Okay.   And do you know why he told you that?

18   A.   He probably wanted me to help him get un-duct

19   taped.   I wouldn't know why he would say that.   We were

20   friends, I mean, I know that.

21   Q.   Okay.   So, in the video, though, he -- he calls

22   out, "Rabino, you're supposed to be my friend," correct?

23   A.   Yes, he does say that.

24   Q.   Okay.   And at the end of the video someone in the

25   video says, 60,000 for the video --

1    A.  Yeah.

2    Q.  Okay.  And are you making that comment towards

3  Mr. Torrez?

4    A.  No, I just said it out.  Because I know those

5  other people are already saying, you know, it's going to

6  get real bad about it and stuff like that.

7    Q.  Okay.  And when were they saying that?

8    A.  There in the video.

9    Q.  Okay.  But you had just taken the video, correct?

10    A.  Yeah, I -- I recorded it.

11    Q.  You had just recorded it, and you were -- you

12  were recording it when the incident occurred, right?

13    A.  Yes, sir.

14    Q.  And then, at the end of the incident with Mario

15  Torrez, you call out "50,000 for the video"?

16    A.  Uh-huh.

17    Q.  Okay.  Were you joking around?

18    A.  Yeah, I didn't -- it was just something, because

19  I heard Mario say something about harassment; and I

20  just -- I threw that out there, just joking around with

21  him.

22    Q.  Okay.  But did he say anything about harassment

23  during the video?

24    A.  Yeah, you could -- replay it, if you like.

25    Q.  And what does he say?

1    A.  "This has to be some kind of harassment,"

2  verbatim.  It says it in the video.

3    Q.  Okay.  We'll let the video speak for itself on

4  that, but tell me this:  The -- at the beginning of the

5  video --

6    A.  Uh-huh.

7    Q.  -- did someone call out, "Hey, you sure you want

8  to leave"?

9    A.  Yeah.

10    Q.  Okay.  Do you remember who said that?

11    A.  Yeah, I think I -- I said that to him.

12    Q.  Okay.  And -- and why did you say that to him?

13    A.  Because that day he had told me he had finally

14  got flight tickets to Michigan to go see his kids.

15    Q.  Okay.  So, he was -- do you know whether he was

16  intending to return to Michigan permanently?

17    A.  No, I didn't know -- I don't know if he was going

18  to stay there or not.

19    Q.  Okay.  So, you didn't know whether he was just

20  going to go there to see his kids and come back to work,

21  and whether he was returning to Michigan permanently?

22    A.  No, that day he told he was going to see his

23  kids, come back to work.

24    Q.  Okay.  Did he tell you what -- did he tell you

25  when he was going to come back to work?

1    was doing?

2       A.  No.

3       Q.  Did you feel bad about what was happening to

4    Mr. Torrez at the time of the incident?

5       A.  Yes.

6       Q.  Had you ever harassed Mr. Torrez prior to that

7    incident?

8                MR. TEETER:  Objection, form.

9       A.  No, depending on if he took it as harassing or

10   not.  I don't think so.

11      Q.  (By Mr. Spiliotis)  Okay.  So, you don't think

12   so, because you don't know whether he took it as --

13      A.  Yes --

14      Q.  -- harassing?

15      A.  -- I can't say if he took it as harassing.

16      Q.  What type of things did you do to him?

17      A.  Well, we would prank each other on sand and water

18   and rocks and -- we both ended being line boss together.

19   I was already A line boss, and he joined my crew as the

20   line boss.  So, we would -- you know, rocks or water.

21      Q.  Okay.  And that would be, what, throwing --

22   putting rocks in somebody's shoes, or --

23      A.  Not throwing.  No, I never threw rocks.

24      Q.  Okay.

25      A.  That's against the rules.

1    Q.  So, just describe those pranks.

2    A.  Oh, you know, if he was walking in front of me,

3    just grab a few rocks on the ground and throw them in

4    his -- put them in his pocket.  Sand, if -- you know, if

5    we needed to help out and shovel sand in the back of the

6    location, just grab a handful of sand and put it in his

7    pocket.  Now, water, that was -- that was a tricky one.

8    You would just grab a bottle of water, put a little hole

9    in it and turn it upside down.

10    Q.  Okay.  Tell me this:  After the incident

11    occurred, did somebody untape Mr. Torrez?

12    A.  Yeah, I did -- I did.

13    Q.  Did anyone else help you?

14    A.  No.

15    Q.  Okay.  And were you on site when that incident

16    occurred?

17    A.  Was I what?

18    Q.  Were you on site, like, outside -- outside of the

19    Alice yard when that incident occurred?

20    A.  Oh, yes, sir, we were on location.

21    Q.  Okay.  And did you return from that location to

22    the Alice yard?

23    A.  Yeah, our crew was -- reported to the -- to and

24    from the yard, yes, sir.

25    Q.  Okay.  And who would take you out on site?  Was

1    A.  No.  As far as I can remember, I can't tell you

2  for sure.

3    Q.  Okay.  So, this incident happened in 2012,

4  correct?

5    A.  That is -- that's correct, yeah.

6    Q.  Okay.  And it happened after your January 19th,

7  2012 incident, right?

8    A.  Yes, sir.

9    Q.  Okay.

10    Okay.  Now, after the incident, you didn't report

11  that incident to Weatherford human resources, did you?

12    A.  I did not report it, no, sir.

13    Q.  Okay.  Did you talk to Mario Torrez about the

14  incident after it occurred?

15    A.  Not really.  We just had a cigarette after I

16  untaped him.  I mean, we were both there.  There wasn't

17  much to talk about.

18    Q.  Okay.  In what state of mind was Mario Torrez in

19  after the incident?

20    A.  He wasn't happy.

21    Q.  Okay.

22    A.  No.

23    Q.  Now, the video shows him laughing during the

24  incident; is that right?

25    A.  That's what it shows, yes, sir.

1    A.  After that incident with Mario -- I can't

2  remember how many days, it could have been a week, I

3  can't remember -- I got a call on location.  I was told

4  by my supervisor, Joe I -- yeah, Joe I.

5         He told me, "Hey, you need to get into safety" --

6  "You need to get into one of the supervisor's trucks,

7  safety is going to take you to the yard.  They want you

8  in the yard now."

9         "Yes, sir."

10        So, I got in the truck.  I showed up to yard.  I

11 went to go clock out, and dispatch told me I was -- he

12 actually told me I was terminated.  It was later on

13 another gentleman -- like I said, prior to that, another

14 gentleman came into the dispatch office and told me,

15 "No, no, just you're going to be off for a few days" --

16 he might have said suspension; but, "Wait here in Alice,

17 wait for a phone call."

18    Q.  Okay.  Did they tell you why you were being taken

19 off site?

20    A.  No.

21    Q.  Did they tell you -- they told you nothing about

22 why you needed to leave and take a few days off?

23    A.  Huh-uh.  The only thing I know, before I left

24 that location, Lisa Mora had called me.  And I didn't

25 know who she was, never met the lady.  She had called me

1   asking about that incident with Mario Torrez.

2       Q.  Okay.  Did you -- when she called you, did you

3   speak to her live on the phone, or did she leave you a

4   voice message?

5       A.  I believe I talked to her on the phone.

6       Q.  Okay.  And was that the first time you had spoken

7   with Lisa Mora from the date you first started at --

8       A.  Yeah.

9       Q.  -- or --

10      A.  Yes, sir.

11      Q.  -- strike that.

12      A.  Oh, I'm sorry.

13      Q.  Just let me finish my question.

14      A.  Sorry.

15      Q.  Is that the first time you had ever spoken with

16  Lisa Mora?

17      A.  Yes.

18      Q.  Okay.  Did -- and did she tell you that she was

19  with Weatherford human resources?

20      A.  No.

21      Q.  Okay.  Well, you testified earlier that she was

22  with Weatherford human resources --

23      A.  Uh-huh.

24      Q.  -- right?

25      A.  Now -- I know that now, yeah.

1    Q.  Okay.  But at the time you didn't know --

2    A.  No.

3    Q.  -- who she was with?

4    Did she tell you she worked for Weatherford?

5    A.  Yes, yes, she did tell me she worked for

6 Weatherford.

7    Q.  Okay.  And what did she ask you about the

8 incident?

9    A.  She called me, and she just asked, "Was there an

10 incident with Mario Torrez?"

11    I said, "Yes, ma'am."

12    And she goes, "Okay.  Well, there's been a

13 complaint filed; and we're" -- "we have reason to

14 believe that you have a video in your possession."

15    And I just said, "No comment."

16    And shortly after that conversation, I had called

17 Mario.  And I was, like, "Mario, did you" -- "did you

18 file a complaint after all?"

19    And he didn't -- he said, "No."  He goes, "No, I

20 didn't" -- "I didn't do anything.  I didn't do nothing

21 like that."  He said, "The weird thing is Lisa Mora just

22 called me, too."

23    I said, "Oh, shit."  I said, "So, now, you know,

24 more people are getting involved."  And so, I said, "You

25 know what, if you could do me a favor, I don't want to

1   A.  Oh --

2   Q.  -- and Mr. Estrada had occurred --

3         MR. TEETER:  Objection, form.

4   Q.  (By Mr. Spiliotis)  -- since Lisa called you?

5   A.  No, sir, I don't.

6         MR. TEETER:  Same objection.

7   A.  I can't remember.

8         MR. TEETER:  If you can let, just let me get

9 my objection --

10        THE WITNESS:  Sorry.

11        MR. TEETER:  -- let me get my objection in.

12        Same objection.

13   Q.  (By Mr. Spiliotis)  Okay.  So, you don't know how

14 many days passed from the Mario Torrez incident up until

15 the time Lisa Mora called you?

16        MR. TEETER:  Objection, form.

17   A.  No.

18   Q.  (By Mr. Spiliotis)  Now, you testified earlier

19 that Lisa Mora asked you or told you that she had reason

20 to believe you had a video, correct?

21   A.  Yes, sir.

22   Q.  And that was during the call that she made to

23 you?

24   A.  Yes, sir.

25   Q.  Okay.  And what was your response?

1    A.  I told her I didn't have any -- I told her, "No

2  comment."  I said, "I don't want to talk about that."

3    Q.  Now, when Lisa Mora first contacted you, did you

4  record that conversation?

5    A.  No.

6    Q.  Okay.  And did -- after that conversation, did

7  you talk to Lisa Mora, after that call?

8    A.  Yes, sir, I did.

9    Q.  And how many additional times did you speak with

10  her?

11    A.  I couldn't tell you how many times.

12    Q.  Okay.  Did you ever meet with her in person?

13    A.  Yes, sir, I did.

14    Q.  Okay.  And when was that?

15    A.  I couldn't tell you when.  All I could tell you

16  is it was after the incident.

17    Q.  Okay.  Was it the day after she called you on the

18  phone?

19    A.  I can't tell you.

20    Q.  Did she make any arrangements to meet with you in

21  person?

22    A.  Yes.

23    Q.  Okay.  And did she initiate that meeting?

24    A.  What do you mean by "initiate"?

25    Q.  Is she -- is she the one that asked to meet with

1   you --

2       A.  Oh, yes, sir --

3       Q.  -- in person?

4       A.  -- yes, sir.

5       Q.  Okay.  When Lisa Mora first called you on the

6   telephone, were you represented by counsel at that time?

7       A.  No, sir.

8       Q.  And you said that at some point in time you met

9   with Lisa Mora in person, correct?

10      A.  That's correct.

11      Q.  Okay.  Were you represented by counsel at that

12  time?

13      A.  No -- no, sir, I don't believe I was.

14      Q.  When you met with her in person, did you audio

15  record that meeting?

16      A.  Yes, sir, I did.

17      Q.  Okay.  And did you turn over that audio recording

18  to your attorneys?

19      A.  Yes, sir.

20              MR. TEETER:  Did you have it transcribed; is

21  that what you're about to --

22              MR. SPILIOTIS:  Yes.

23              MR. TEETER:  Do you have a copy of that?

24              MR. SPILIOTIS:  Yeah.

25              MR. TEETER:  Okay.

1    A.  I couldn't tell you how many recordings I had and

2    what they were, sir.

3    Q.  Did you turn over all those recordings to your

4    attorneys?

5    A.  Yes, sir, I did.

6    Q.  Okay.  And you had said, "that I'm suspended

7    because I'm involved, they believe it."

8        So, are you saying that they -- your coworkers

9    believed you were suspended at the time?

10   A.  Yes, sir, that's what it says.

11   Q.  Okay.  And you testified earlier you had never

12   been suspended, correct?

13   A.  That's correct.

14   Q.  Okay.  And then, on Line 18, that same page,

15   Ms. Mora says, "Are you willing to share that with me

16   here or do we need to go to a different office?"

17       And you replied, "I don't know."

18       Okay.  So, was she requesting you to share that

19   information you had?

20   A.  That's what it says, yes, sir.

21   Q.  And what was your response to her?

22   A.  As it states, it says, "I don't know."

23   Q.  Okay.  If you'll turn the page to Page 12.  We'll

24   look at Lines 3 through 14.  And you said, "I just -- I

25   just want to -- I -- I'm scared coming to work.  If

1   statement to Ms. Mora.  "And so -- and he doesn't want

2   to talk about it no more.  He's just, like, 'Dude, we're

3   going to go through HR.'"

4          So, who are you referring to there?

5      A.  I believe, Mario Torrez.

6      Q.  Okay.  So, are you telling Ms. Mora that Mario

7   Torrez wanted to go through the HR process?

8      A.  To go --

9          MR. TEETER:  Objection, form.

10     A.  To go through it, that's what it says, yeah.

11     Q.  (By Mr. Spiliotis)  Okay.  And then, on Lines 13

12  through 15 you, also, say, "But I -- I got to tell you

13  right here, between me and you, that I'm already --

14  we're already represented"; is that correct?

15     A.  Yes, sir, that's what it says.

16     Q.  Okay.  So, at the time you said this, had you

17  already spoken to an attorney?

18     A.  Yes -- yes, sir, I had spoken to one.

19     Q.  Okay.  Do you know which attorney?

20     A.  I believe it was this firm.

21     Q.  Okay.  Do you recall the name of the attorney?

22     A.  No, sir.

23     Q.  Did you know if Mario Torrez had spoken to the

24  attorney?

25     A.  No, I don't know that, sir.

1    Q.   Okay.  How did you find out about an attorney?

2    A.   I asked -- I called around.  I saw -- I remember

3  hearing a radio infomercial about Thomas J. Henry.

4    Q.   Okay.  So, you -- but did -- you contacted Thomas

5  J.  Henry?

6    A.   That's correct.

7    Q.   Okay.  And at that time, do you know if Mario

8  Torrez had contacted Thomas J. Henry?

9    A.   I'm not sure.

10    Q.   Okay.  And then, on Line 16 through 19 you, also,

11  say, "I mean, it's devastating.  When I think about

12  it -- I -- I haven't thought about it in a long time

13  because nobody brought it up or anything like that."

14         Okay.  What are you -- what hadn't you thought

15  about in a long time?

16    A.   Let me read the rest of it.

17         It's hard to say -- it's hard to remember if it's

18  about the incident with Mario or my incident.

19    Q.   Okay.  So, it possibly was you hadn't thought

20  about the incident that happened to you in a long time?

21         MR. TEETER:  Objection, form.

22    A.   No, I don't agree with that.

23    Q.   (By Mr. Spiliotis)  Okay.  And why don't you

24  agree with that?

25    A.   Because it doesn't say, you know, exactly what I

1    Q.   Okay.  And if you'll turn the page, Page 18,

2    Lines 2 through 5, Ms. Mora says, "If you're not

3    comfortable here, we can go to my office in Corpus.  I

4    mean, I'll put gas in your car to go over there.

5    Whatever you need."

6         Is that correct?

7    A.   That's correct.

8    Q.   Do you recall her offering to pay for your gas in

9    order to see the evidence that you had?

10   A.   Yes, sir.

11   Q.   Okay.  And then, on Lines 6 through 11, you say,

12   "Yeah.  That's what the lawyer was saying.  I'll -- I'll

13   just have to call them and, then....  Because he said,

14   you know, 'Now, if you're going to give any kind of

15   evidence out, you can't do anything' -- 'you can't do

16   anything without let' -- 'let' -- 'notifying me first.'"

17        Do you recall telling her that?

18   A.   Yes, sir.

19   Q.   Okay.  And do you remember which attorney told

20   you that?

21   A.   No, sir, I don't.

22   Q.   Okay.  Is that the reason why you didn't want to

23   give Lisa the information you had?

24   A.   Is that -- is that the reason, because of what I

25   said the lawyer said so?

1    Q.  -- at that time?

2    A.  I'm sorry.  No, sir.

3    Q.  But you had spoken with the attorney prior to

4   recording this tape, hadn't you?

5    A.  I believe so.

6    Q.  Okay.  And if you're telling Ms. Mora that he

7   told you not to pass any evidence on until he was

8   notified, isn't that him instructing you not to pass on

9   evidence?

10            MR. TEETER:  Objection, form.

11   A.  No, sir, I said that because I didn't trust

12  Ms. Lisa Mora.

13   Q.  (By Mr. Spiliotis)  Okay.

14   A.  I never met the woman.

15   Q.  Okay.  If you'll look at Line 25, Page 20 through

16  Line 5 on Page 21.

17   A.  Uh-huh.

18   Q.  You state, "I'm not demanding a firing

19  (inaudible).  Me personally, yeah.  I mean, they got

20  to -- something.

21            The hands alone, fire them.  I would say get rid

22  of them, the guys that need to be -- and it's only a

23  group of guys, and I'll tell you who it is."

24            Do you see that?

25   A.  Yes, sir.

1    guys who laughed about it, joked and watched; but never

2    participated, correct?

3    A.  Yes, sir.

4    Q.  Okay.  Had you ever joked about it and laughed

5    about any of the incidents that you witnessed at

6    Weatherford?

7    A.  Total incidents, or just those two?

8    Q.  Did you laugh during the Mario Torrez incident?

9    A.  No, sir.

10    Q.  Did you laugh during any incidents involving

11    harassment by Joey Estrada of Mr. Arredondo, Jr.?

12    A.  I may have chuckled, and I know I laughed when he

13    was getting taped up.  I do recall that.

14    Q.  Okay.  And were you laughing because you thought

15    it was all going to be a joke?

16    A.  I thought the taping -- the first initial taping

17    of him, of Mr. Mario Torrez, I thought that that was

18    just going to -- I thought it was going to stay at that.

19    Q.  Okay.  And do you remember what names you

20    provided to Ms. Mora?

21    A.  It says right here, sir.

22    Q.  Okay.  Which ones?

23    A.  It says David Gonzalez, Joey Estrada, Animal and

24    Nugget.  Animal being Ruben Garcia and Nugget being

25    Richard Castillo.

1 other employees?

2     A.  No, I don't know anything -- any policies.

3     Q.  Okay.  If you'll turn to Page 24, Line 23 through

4 25.

5     A.  Lined 23, sir?

6     Q.  Uh-huh.

7     A.  Oh, okay, okay.  Yes, sir.

8     Q.  Ms. Mora says, "Well, I'm going to keep you on --

9 on paid suspension.  Everyone else thinks it's unpaid

10 suspension."

11       Do you recall her telling you that?

12     A.  Yes, sir.

13     Q.  Okay.  And was she going to keep you on

14 suspension so that the other employees thought you were

15 being suspended?

16     A.  I believe so, yes, sir.

17     Q.  Okay.

18       Okay.  And if you'll look at Page 25, Lines 10

19 through Page 26, Line 2, Ms. Mora says, "But I really

20 need to know if -- are you willing to share anything

21 with me?"

22       And you said, "As far as pictures and videos?

23 Yeah.  If you can give me 15 minutes."

24       And Ms. Mora says, "I'll give you all the time

25 you want.  Yeah."

1          And then, you say, "Just make the phone call

2     so -- you know."

3          And Ms. Mora says, "Okay."

4          And then, you state, "Then, we'll figure out from

5     there."

6          And Ms. Mora says, "Okay."

7          And then, you say, "I don't see any problem with

8     it because I know you're doing your job.  It's

9     different.  Now, if I was talking to Rudy or anything,

10    I'd be like, 'Nope.'

11         But the way I -- thing I get from you, you really

12    are trying to protect me and Mario."

13         And then, on Line 3, she says, "I -- I am.

14    That's my job."

15         Do you recall that interaction with Ms. Mora?

16    A.   That's what it says, yes, sir.

17    Q.   Okay.  So, did -- in your conversation with her,

18    did you get a sense that she was trying to protect you

19    and Mario?

20    A.   No.

21    Q.   Okay.  Then, why did you say I am?

22    A.   Because I didn't trust anything that woman said.

23    That's why I didn't take any evidence with me to that

24    meeting.  I didn't trust her.  I heard -- I let her --

25    to what I believed, I let her hear what she wanted to

1    hear for I could leave.

2        Q.   Okay.  And then, you actually say you don't see

3    any problem with sharing the evidence with her, correct?

4        A.   Uh-huh.

5        Q.   Okay.  And then, on Line --

6             Okay.  Had she ever done anything that would

7    cause you to believe that she was untrustworthy?

8        A.   Yeah, I didn't know who she was.

9        Q.   Okay.  But had she ever done anything to you

10   or -- to make you believe that she was an untrustworthy

11   person?

12       A.   I just didn't know who she was.  She claimed to

13   be HR.  And at that time, I'd already been in the

14   company almost a year and never even heard of her, never

15   saw her.  So, all of a sudden when everything was out of

16   the bag, here comes a lady saying, "I'm here, I'm here

17   to protect you."  No, I don't believe in that.

18       Q.   Okay.  And then, on Page 26, Lines 4 through 16,

19   you provide, "So -- and I know it seems obvious to

20   protect Weatherford, but you can't really protect them

21   when there's video on it.  Two videos --"

22            And Ms. Mora said, "Essentially, that is

23   protecting Weatherford."

24            And then, you say, "Yeah.  For you, yeah.  Yeah.

25            So, let me call --"

1       And Ms. Mora says, "Okay."

2       And then, you say, "-- and then I'll be right

3   back in here."

4       And Ms. Mora says, "Okay."

5       And then, you say, "Okay."

6       And, there again, you're referring to two videos.

7   Were there two videos in existence at the time?

8       A.  No, sir.

9       Q.  Okay.  So, were you -- were you lying to Ms. Mora

10  at the time?

11      A.  (Witness nods head.)

12      Q.  Is that a "yes"?

13      A.  Yes, sir, definitely.

14      Q.  Okay.  So, you admit that you were lying to her

15  when you met with her?

16      A.  About the two videos.

17      Q.  Okay.  And why would you tell her there were two

18  videos?

19      A.  It was just -- I don't know why I did that.  I

20  was real careful what I told -- what I wanted her to

21  know and what I wanted her to believe was true.

22      Q.  Okay.  And then, you tell her that you'll be

23  right back, correct?

24      A.  That's correct.

25      Q.  You wanted to make a call; is that correct?

1    A.  That's what it says.

2    Q.  Okay.  Did you make a call?

3    A.  I can't remember.

4    Q.  Okay.  Did you come back into the meeting with

5  Ms. Mora?

6    A.  I don't think I did.

7    Q.  Okay.  And did you ever hand over any videos

8  of -- or any -- strike that.

9        Did you ever hand over the video of the Mario

10  Torrez incident to Lisa Mora?

11    A.  No.

12    Q.  Did you ever hand over a photograph to her?

13    A.  I don't believe so.

14    Q.  Okay.  Did you ever hand over any evidence of

15  what you believed to be harassment of -- strike that.

16        Did you ever hand over to her any evidence that

17  you believed supported that there had been harassment at

18  Weatherford?

19    A.  Not to Ms. --

20          MR. TEETER:  Objection, form.

21          THE WITNESS:  Sorry.

22    A.  Not to Ms. Lisa Mora, no.

23    Q.  (By Mr. Spiliotis)  Okay.  Did you ever meet with

24  her, again, in person?

25    A.  I don't believe so, sir.

1    A.  That's not my opinion.  I don't know if he knew

2  or not.  It's not -- that's -- I believe he did, yes.  I

3  believe he knew what was going on.

4    Q.  Okay.  So, what did you mean by telling him did

5  anybody tell Marty what really happened?

6              MR. TEETER:  Objection, form.

7    A.  I would have to listen to the tape to really get

8  the feel for it and see if I remember it.

9    Q.  (By Mr. Spiliotis)  Okay.  And that response by

10  Mr. Castillo, "No," did that -- was that an indication

11  that Marty did not know anything about the incident?

12              MR. TEETER:  Objection, form.

13    A.  I don't know, sir.  I don't know if Mr. Castillo

14  was telling the truth or not.

15    Q.  (By Mr. Spiliotis)  Okay.  And then, I'll repeat,

16  Lines 18 through 20, you say, "I mean -- I mean, did you

17  and Joey tell Marty what really happened?  And that way,

18  he could try and, kind of, cover it up for everybody,

19  you know?"

20       My question is:  Why would you encourage Trini to

21  talk to Joey Estrada to have the issue covered up?

22    A.  I didn't encourage him.  I told him to ask.

23    Q.  Okay.  But didn't you want Lisa Mora to

24  investigate the allegations you and Mario were bringing?

25    A.  I didn't want to.  I didn't report it.

1    Q.  Okay.  So, you didn't want Lisa Mora to actually

2    investigate the incident --

3    A.  No --

4    Q.  -- involving Mario Torrez?

5    A.  After she was already involved, it was -- it was

6    already there.  It was happening.  It's a done deal.

7    She was involved.  Whether I wanted her to or not, she

8    was going to do it.  It was her job.

9    Q.  Okay.  But did you want her to actually

10   investigate the incident involving Mario Torrez?

11   A.  It didn't matter what I wanted.

12   Q.  Okay.  Let's go to Page 10, Lines 5 through 8.

13   Mr. Castillo says, "A list that -- they gave him a list.

14   And the list -- he called Chusco.

15        I'm like, 'Why did you call Chusco?  Chusco was

16   not even there.'"

17        Okay.  So, this conver --

18        So, you testified that you did provide Ms. Lisa

19   Mora with some names, correct?

20   A.  Yes, sir, I did.

21   Q.  Did you provide her the name of Chusco?

22   A.  I can't recall.  I believe so.

23   Q.  Okay.  Was Chusco present during the incident

24   with Mario Torrez?

25   A.  I don't remember.

1    A.  No.

2    Q.  (By Mr. Spiliotis)  Okay.  So, you had not

3  actually made any contact with Popeye?

4    A.  No.

5    Q.  Okay.  After -- and Popeye left back in January

6  2012, correct?

7    A.  Roughly, I can't tell you the month.

8    Q.  Okay.  When was the next time you spoke with

9  Mr. Arredondo, Jr., Popeye?

10           MR. TEETER:  Objection, form.

11    A.  I think it was in the summertime, whenever I got

12  let go with Weatherford.

13    Q.  (By Mr. Spiliotis)  Okay.  So, do you remember,

14  was it the early part of the summer or the later part?

15    A.  I couldn't tell you.  I know it was hot.  Yeah.

16    Q.  Okay.  If you'll turn to Page 30, Lines 13

17  through 16.

18    A.  30?  Sorry.

19    Q.  You provide, "Because, man, we fucked with

20  Pop-eye all the time, dude.  You guys held him down, I

21  think, a couple of times.  Remember Joey nubbed him on

22  the head with his fucking finger."

23           Did I read that correct?

24    A.  Yes, sir.

25    Q.  Do you recall telling Mr. Castillo -- making that

1  statement to Mr. Castillo?

2          MR. TEETER:  Objection, form.

3     A.  Mr. Castillo talking to Mr. Castillo?

4     Q.  (By Mr. Spiliotis)  Do you remember telling --

5  making that statement --

6     A.  Oh --

7     Q.  -- that I just read to Mr. Castillo?

8     A.  I would have to listen to the video.

9     Q.  Okay.  And if you're looking at the actual

10  statement, it says, "Because, man, we fucked with

11  Pop-eye all the time, dude."

12     A.  Uh-huh.

13     Q.  Do you see that?

14     A.  I see it on paper, yes, sir.

15     Q.  Okay.  And it says, "we" fucked with him,

16  correct?

17     A.  It does say that.

18     Q.  And "we" meaning including yourself, correct?

19     A.  Yes.

20          MR. TEETER:  Objection, form.

21          THE WITNESS:  Sorry.

22     Q.  (By Mr. Spiliotis)  Mr. Rabino --

23     A.  Yes, sir.

24     Q.  -- what damages have you suffered as a result of

25  Weatherford's alleged conduct?

1    spirited with the -- with the crews, the other crews

2    I've been with, in fear that it was going to happen

3    again.

4        Q.  Okay.  Do you think Weatherford intended to harm

5    you?

6        A.  Definitely.

7        Q.  Okay.  And do you -- do you know of any

8    individuals at Weatherford that you believe intended to

9    harm you?

10       A.  The company.

11       Q.  Okay.  And you say "the company," why do you

12   think the company intended to harm you?

13       A.  Because the people that harmed me were the

14   company.

15       Q.  Okay.  And who harmed you, again?

16       A.  A bunch of them, mentally, physically.  The

17   company harmed me.

18       Q.  Okay.  Do you have any reason to believe that

19   Lisa Mora intended to harm you?

20       A.  Yes.

21       Q.  Okay.  Well, why do you think she intended to

22   harm you?

23       A.  I honestly believe she wasn't there to help us.

24       Q.  Okay.  So, you don't think she was trying to help

25   you?

1    A.  As I sit here today, no.  When I first,

2  initially, spoke with her, she seemed like she was --

3  wasn't really looking after her job.  She was more into,

4  like, I'm going to do my job, because what happened to

5  you guys was -- was wrong; and I believed her at that

6  moment.  Sitting here today, hell, no.

7    Q.  Okay.  And do you know whether Mr. Estrada was

8  terminated as a result of her investigation?

9            MR. TEETER:  Objection, form.

10    A.  I didn't keep up with it, sir.  I have no idea.

11    Q.  (By Mr. Spiliotis)  Okay.  So, you don't know

12  that Joey Estrada got terminated?

13            MR. TEETER:  Objection, form.  Asked and

14  answered.

15    A.  I answered you already.

16            MR. TEETER:  I'll state the objections; but,

17  yeah.

18    Q.  (By Mr. Spiliotis)  Do you know if any of your

19  coworkers at Weatherford got suspended as a result of

20  what happened to Mr. Mario Torrez?

21    A.  No, sir, I don't know 100 percent sure they did.

22  I heard about it.  Hearsay.

23    Q.  Okay.  So, you heard that they got suspended?

24    A.  Yeah, but I don't know if they did.

25    Q.  Okay.

```
 1        PRO SE:
            Joey Estrada
 2          561 FM 2508
            Alice, Texas  78332
 3          Phone:  361.701.0853
            Email:  jose.estrada@ftsi.com
 4
 5        That the amount of time used by each party at the
 6   deposition is as follows:
 7
          Mr. Spiliotis -- 5 hours, 39 minutes
 8
 9        I further certify that I am neither counsel for,
10   related to, nor employed by any of the parties or
11   attorneys in the action in which this proceeding was
12   taken, and further that I am not financially or
13   otherwise interested in the outcome of this action.
14        Certified to by me this 4th day of May, 2015.
15
16
17        _____
          Dickie Zimmer, Texas CSR 1954
18        Expiration Date:  December 31, 2015
          Firm Registration No. 150
19        O'Neal*Probst*Wells
          P.O. Box 60769
20        Houston, Texas  77205
          713.521.1314
21
22
23
24
25
```

```
 1          PRO SE:
             Joey Estrada
 2           561 FM 2508
             Alice, Texas  78332
 3           Phone:  361.701.0853
             Email:  jose.estrada@ftsi.com
 4

 5          That the amount of time used by each party at the

 6     deposition is as follows:

 7

 8          Mr. Spiliotis -- 2 hours, 44 minutes

 9          I further certify that I am neither counsel for,

10     related to, nor employed by any of the parties or

11     attorneys in the action in which this proceeding was

12     taken, and further that I am not financially or

13     otherwise interested in the outcome of this action.

14          Certified to by me this 4th day of May, 2015.

15

16

17          _____
             Dickie Zimmer, Texas CSR 1954
18           Expiration Date:  December 31, 2015
             Firm Registration No. 150
19           O'Neal*Probst*Wells
             P.O. Box 60769
20           Houston, Texas  77205
             713.521.1314
21

22

23

24

25
```