# ARREDONDO DEPOSITION

```
           IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
                  CORPUS CHRISTI DIVISION

RICARDO ARREDONDO, RICHARD )
RABINO AND MARIO TORREZ,   )
       Plaintiffs,         )
                           )
VS.                        )CA NO. 2:14-cv-00170
                           )
WEATHERFORD INTERNATIONAL, )
LLC and JOEY ESTRADA,      )
       Defendants.         )
```

ORAL AND VIDEOTAPED DEPOSITION OF

RICARDO ARREDONDO, JR.

April 22, 2015

Oral and videotaped deposition of

RICARDO ARREDONDO, JR. was taken on April 22, 2015, in

The Law Office of Thomas J. Henry, 521 Starr Street,

Corpus Christi, Texas, from 9:03 a.m. to 4:47 p.m.,

before Dickie Zimmer, Certified Shorthand Reporter,

pursuant to Notice and the Federal Rules of Civil

Procedure and under the following agreement of counsel

for the respective parties that:

        The deposition may be signed by the witness

before any Notary Public or officer authorized to

administer oaths.

Ricardo Arredondo, Jr.    4/22/2015

2

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:
       The Law Office of Thomas J. Henry
 4     521 Starr Street
       Corpus Christi, Texas   78401
 5     Phone:  361.985.0600
       Fax:  361.985.0601
 6     Email:  gteeter@thomasjhenry.com
         By:  Greggory A. Teeter
 7

 8

     FOR THE DEFENDANT, WEATHERFORD INTERNATIONAL,
 9   LLC:
       Jackson Walker L.L.P.
10     1401 McKinney Street, Suite 1900
       Houston, Texas   77010
11     Phone:  713.752.4200
       Fax:  713.752.4221
12     Email:  nspiliotis@jw.com
         By:  Nickolas G. Spiliotis
13            Angeles Garcia

14

15   ALSO PRESENT:
       Richard Rabino
16     Mario Torrez
       John Garza, Videographer
17

18         *   *   *   *   *   *   *   *   *   *   *

19

20

21

22

23

24

25
```

Ricardo Arredondo, Jr.   4/22/2015

3

```
 1                        INDEX

 2

 3    TESTIMONY OF:  RICARDO ARREDONDO, JR.

 4

 5    EXAMINATION BY:                              PAGE

 6        Mr. Spiliotis...........................    5
          Mr. Teeter.............................  286
 7

 8

 9                    EXHIBIT INDEX

10    NO.              DESCRIPTION                 PAGE

11    1     Employment Consent Form (Weatherford
            0000121).............................   34
12    2     Weatherford Corporate Policy/Procedure
            Effective 8-1-99 (Weatherford
13          0001152-54)..........................   37
      3     Handbook Acknowledgement - Employee
14          Copy Dated 6-9-10 (Weatherford0000111)  50
      4     Weatherford Handbook for US Employees.  52
15    5     Weatherford Learner Training Date.....  69
      6     Weatherford Code of Business Conduct
16          (Weatherford0000001-36)..............   71
      7     Listen Up Safe Communication
17          (Weatherford0000332-33)..............   82
      8     Discrimination or Harassment?  What
18          to do at Weatherford (Weatherford
            0000339).............................   87
19    9     Plaintiffs' Amended Complaint........   89
      10    Weatherford Coveralls (Not Attached)..  141
20    11    Email Dated 1-25-12 To Trevino From
            Espinosa (Weatherford0000928)........  163
21    12    Fax Dated 6-25-12 To Minks From
            Goldberg (Weatherford0000417-420).....  179
22    13    Plaintiff Arredondo's First
            Supplemental Objections..............  210
23    14    UV Logistics Records.................  211
      15    Oil States Energy Services Records....  217
24    16    Warrior Energy Service Records........  227
      17    Coil Tubing Solutions Records.........  231

25
```

Ricardo Arredondo, Jr.   4/22/2015

4

```
 1                EXHIBIT INDEX (Continued)

 2    NO.                DESCRIPTION              PAGE

 3    18     Charge of Discrimination Dated 6-4-12
             Weatherford0000394)...................   248
 4    19     Letter Dated 6-5-12 To Minks From
             Goldberg (Weatherford0000418-20)......   255
 5    20     Letter Dated 8-30-12 To Ahlstrom
             From Goldberg (Weatherford0000399-400)   261
 6    21     EEOC Notice of Charge of
             Discrimination (Weatherford0000395)...   262
 7    22     Facebook Posts.......................   263
      23     Records of Dr. Lozano................   274
 8    24     Records of Christus Spohn Alice.......   276

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Ricardo Arredondo, Jr.   4/22/2015

1    Q.  And how many workers would you say worked in the

2  Swift fleet while you were at Weatherford?

3    A.  There was two shifts, day and night, about 14 to

4  18 per crew.

5    Q.  Okay.  So, approximately, 40 employees in total

6  on the Swift crew?

7    A.  Give or take.

8    Q.  Okay.  And do you remember what times the shifts

9  ran?

10    A.  6:00 to 6:00.

11    Q.  Did you work both days and evenings?

12    A.  We rotated.

13    Q.  Okay.  So, could you describe a little bit more

14  about how the schedule actually worked?

15    A.  The schedule was a seven/three, seven days on and

16  three days off.

17    Q.  So, were there just -- were there individual

18  crews within the fleet?

19    A.  Two crews, day and night.

20    Q.  Just day and night, and whatever crew you were

21  on?

22    A.  Yes, sir.

23    Q.  Okay.  And when you first started working for

24  Weatherford, who did you -- do you remember who you

25  reported to?

Ricardo Arredondo, Jr.   4/22/2015

28

1    A.  Rudy Espinosa and Fabian.  I can't remember -- I

2  recall his last name, but it was Rudy Espinosa and

3  Fabian.  They were both supervisors.

4    Q.  Okay.  But you don't recall -- you testified

5  earlier you didn't recall what Rudy Espinosa's position

6  was when you first interviewed?

7    A.  When I first -- yeah.

8    Q.  When you first started working for --

9    A.  He was a supervisor, a line supervisor.

10    Q.  What was that?

11    A.  A line supervisor.

12    Q.  Line supervisor?

13    A.  Or the field supervisor.

14    Q.  Was anyone beneath him, but above you --

15        MR. TEETER:  Objection --

16    Q.  (By Mr. Spiliotis)  -- in job position?

17        MR. TEETER:  Objection, vague.

18    Q.  (By Mr. Spiliotis)  Was anyone -- strike that.

19    Could you just explain the hierarchy within the

20  actual crew?

21    A.  The supervisors and hands.  Supervisors being in

22  charge of the hands, and the hands being the hands.

23  That's how it worked.  Plain and simple.

24    Q.  Okay.  How many supervisors would there have

25  been?

Ricardo Arredondo, Jr.   4/22/2015

32

1    A.  At the time that I --

2    Q.  -- at Weatherford?

3    A.  At that time that I was there, yeah, I believe

4  so.  Unless Monaco -- Monaco Gonzales, I think was his

5  name.  Monaco Gonzales, but he was only there for a

6  short time as a supervisor.

7    Q.  Okay.  Do you know, approximately, what dates

8  those supervisors were your supervisor?

9    A.  No, sir.

10   Q.  But you just know the general order, correct?

11   A.  Yes, sir.

12   Q.  Okay.  So, Rudy, Fabian, then Adrian Trevino,

13 Joey Estrada, Trinidad Castillo and Joey Ibanos?

14   A.  Joe Ibanos.

15   Q.  Joe Ibanos.  How do spell his name, do you know?

16   A.  No.

17   Q.  So, tell me this:  When you first started at

18 Weatherford, did you undergo new hire orientation?

19   A.  Yes, sir.

20   Q.  Okay.  Was it in a classroom environment?

21   A.  Yeah -- yes, sir.

22   Q.  Okay.  Were there other new hires in the

23 classroom with you?

24   A.  Yes, sir.

25   Q.  Okay.  Who were those individuals?

Ricardo Arredondo, Jr.   4/22/2015

1   went through orientation?

2      A.  No, sir.

3      Q.  Okay.  Do you remember reviewing the actual

4   sexual harassment policy at the time?

5      A.  No, sir.

6      Q.  Okay.  So, you didn't actually review the policy,

7   even though you signed that you had received a copy?

8              MR. TEETER:  Objection --

9      A.  Correct.

10             MR. TEETER:  Objection -- let me object.

11             Objection, argumentative; and, objection,

12   asked and answered in part.

13     Q.  (By Mr. Spiliotis)  Did you read the sexual

14   harassment policy?

15     A.  No.

16     Q.  Was there a reason why you didn't read the

17   policy?

18     A.  They asked us to sign it and turn in the sheet of

19   paper.

20     Q.  So, they only handed you this --

21     A.  No, they handed us a book with it; and they had

22   told to go to the last page, sign the last page, rip it

23   out and turn it in with the packet.

24     Q.  Okay.  So, you're saying that this form was

25   actually a part of a book?

Ricardo Arredondo, Jr.   4/22/2015

37

1    A.  I believe so, uh-huh.

2    Q.  Okay.  Did they give you a copy of the book?

3    A.  They gave -- they put a copy in the packet; but,

4  I mean, I didn't read it.

5    Q.  Okay.  So -- but did they physically give you the

6  book for your own personal use?

7         MR. TEETER:  Objection, form -- or, sorry --

8  objection, vague as to "personal use."

9    A.  Yes, sir.

10    Q.  (By Mr. Spiliotis)  Okay.  So, did you take the

11  book -- the book that they gave you home with you?

12    A.  Yes, sir.

13              (Exhibit 2 marked)

14    Q.  (By Mr. Spiliotis)  I think I asked you, but was

15  there any particular reason why you didn't read the

16  book?

17    A.  No, sir.

18    Q.  Okay.  Let me hand you what's marked as Exhibit 2

19  of your deposition.

20         MR. TEETER:  Thank you.

21    Q.  (By Mr. Spiliotis)  Take a look at this.  Do you

22  recognize this policy?

23         MR. TEETER:  You can review it, sir.  That's

24  why he's handing it to you.

25    A.  Oh, okay.

Ricardo Arredondo, Jr.    4/22/2015

46

1     A.  No, sir.

2              MR. TEETER:  Objection, vague.

3     Q.  (By Mr. Spiliotis)  Okay.  At the time you

4   started, did you have any reason to believe that the

5   Weatherford human resources manager, the vice president

6   of human resources or the corporate legal department

7   would not take appropriate corrective action to remedy

8   violations of the sexual harassment policy, Exhibit 2 --

9              MR. TEETER:  Objection, compound --

10    Q.  (By Mr. Spiliotis)  -- of your deposition?

11             MR. TEETER:  Objection, compound question.

12  Objection, vague.

13    A.  At the time I --

14             MR. TEETER:  And, objection, asked and

15  answered.

16    A.  At the time I started, no.

17    Q.  (By Mr. Spiliotis)  Okay.  And at the time you

18  started working for Weatherford, did you have any reason

19  to believe that any Weatherford supervisors would not

20  take appropriate corrective action if you complained of

21  sexual harassment?

22    A.  Again, at the time I started, no.

23    Q.  Okay.  Now, sitting here today, do you have any

24  evidence to suggest that a Weatherford human resources

25  manager does not promptly and thoroughly investigate and

Ricardo Arredondo, Jr.   4/22/2015

47

1    remedy violations of the policy?

2            MR. TEETER:  Objection, vague.  Objection,

3    calls for legal conclusions.  And, objection, vagueness

4    as to is it thoroughly and promptly.

5       A.  I can't -- can you -- I can't understand that

6    question.  Can you ask me the question, again?

7       Q.  (By Mr. Spiliotis)  Okay.  So, sitting here

8    today, do you have any evidence to suggest that the

9    Weatherford human resources manager does not investigate

10   complaints of sexual harassment?

11      A.  Do I have any --

12           MR. TEETER:  Same objection.

13      A.  Do I have any evidence, no.

14      Q.  (By Mr. Spiliotis)  Okay.  So, meaning right here

15   today, you have no evidence that a Weatherford human

16   resources manager does not or will not investigate

17   complaints of sexual harassment?

18      A.  I have no evidence, no.

19      Q.  Okay.  And sitting here today, do you have any

20   evidence to suggest that a vice president of human

21   resources does not investigate complaints of sexual

22   harassment?

23           MR. TEETER:  Same objection.

24      A.  Sitting here today, no.

25           MR. SPILIOTIS:  Counsel, do you want to go

Ricardo Arredondo, Jr.   4/22/2015

48

```
 1   just go to "objection, form," go by the Texas Rules,
 2   instead of --
 3              MR. TEETER:  That's fine.
 4              MR. SPILIOTIS:  -- stopping and --
 5              MR. TEETER:  I asked you -- that's why I
 6   asked you at the beginning; but, yeah, I'll go to
 7   "objection, form."
 8              MR. SPILIOTIS:  I think I was just referring
 9   to that one, but it's fine.
10              MR. TEETER:  I understand.  Okay.  The
11   record speaks for itself.  But, okay, that's fine.  I'll
12   go to "objection, form."
13              MR. SPILIOTIS:  Did he answer the question?
14              (Requested testimony read)
15     Q.  (By Mr. Spiliotis)  Okay.  And sitting here
16   today, do you have any evidence to suggest that the
17   corporate legal department at Weatherford does not
18   investigate complaints of sexual harassment?
19              MR. TEETER:  Objection, form.
20     A.  No.
21     Q.  (By Mr. Spiliotis)  Have you ever asked anyone at
22   Weatherford any questions about the sexual harassment
23   policy?
24     A.  No.
25     Q.  Now, you testified that they gave you a book when
```

Ricardo Arredondo, Jr.   4/22/2015

49

1  you went through orientation; is that correct?

2       A.  Yes, sir, that's correct.

3       Q.  Okay.  Was that the Weatherford employee

4  handbook?

5       A.  They gave us a few sheets and a couple of -- a

6  book or two, yeah, to sign.  You rip off the sheets and

7  turn it in.  I can't -- I can't tell you exactly what it

8  was.

9       Q.  Right, but you actually got a book for your

10  own -- they actually -- strike that.

11          They actually gave you a book for yourself,

12  correct?

13      A.  Correct.

14      Q.  Okay.  And do you know if one of those books was

15  the employee handbook?

16      A.  No, I don't know.

17      Q.  Okay.  What did you do with the books?

18      A.  What everybody else does, put them in the truck;

19  and --

20      Q.  Could you repeat that?

21      A.  Well, I mean, I don't know what I did with the

22  book.  I just got it, put it in my pickup with the

23  regular packet.  I --

24      Q.  Did you take the book home?

25      A.  I took it home, yes, sir.

Ricardo Arredondo, Jr.   4/22/2015

1    Q.  Okay.  Do you still have a copy of the book?

2    A.  No.

3    Q.  Okay.  What happened with the book?

4    A.  I don't know.  Trashed it.

5    Q.  Okay.

6                  (Exhibit 3 marked)

7    Q.  (By Mr. Spiliotis)  Let me hand you what's marked

8  as Exhibit 3 of your deposition.  Take a look at that.

9    A.  Do you want me to read it?

10   Q.  No, just -- just review it, first.

11   A.  Oh, okay.

12   Q.  You can take as much time as you want reviewing

13 the documents when I hand them to you.

14   A.  Oh, okay.

15   Q.  Okay.  Is this your signature on the form?

16   A.  That's my signature, yes.

17   Q.  Okay.  In the second paragraph -- well, what

18 is -- what is the actual form?

19            MR. TEETER:  Objection, best evidence.  The

20 document speaks for itself.

21            MR. SPILIOTIS:  "Objection, form."  Just --

22 you can just respond "objection, form," Counsel.

23   A.  What was your question?

24   Q.  (By Mr. Spiliotis)  What -- what is this form?

25   A.  It says "Handbook Acknowledgment- Employee Copy."

Ricardo Arredondo, Jr.   4/22/2015

54

1   Q.  Okay.  And you didn't recognize that handbook,

2   did you?

3   A.  No, sir.

4   Q.  Okay.  And your testimony was you had never seen

5   that handbook --

6              MR. TEETER:  Objection --

7   Q.  (By Mr. Spiliotis)  -- is that correct?

8              MR. TEETER:  Objection, form.

9   A.  I mean, not that I never seen it; but I didn't

10  pay attention to it, if I did see it --

11  Q.  (By Mr. Spiliotis)  Okay.

12  A.  -- correct.

13  Q.  Right.  And that's because you got the handbook,

14  whatever was given to you at the new hire orientation;

15  and you said you put it in your truck, correct?

16  A.  Correct.

17             MR. TEETER:  Objection, form.  Misstates

18  prior testimony.

19             MR. SPILIOTIS:  Okay.  Counselor, you can

20  just object to form --

21             MR. TEETER:  I generally --

22             MR. SPILIOTIS:  -- and not narrate as much.

23             MR. TEETER:  I generally do, unless it

24  misstates it or becomes confusing; so -- but it is the

25  Federal Rules.  I can -- I can state the objections.

Ricardo Arredondo, Jr.   4/22/2015

70

```
 1  training program --
 2            MR. TEETER:  Objection, form.
 3     Q.  (By Mr. Spiliotis)  -- at Weatherford?
 4            MR. TEETER:  Objection, form.
 5     A.  I never heard of it as "Learner Training Date";
 6  but we did some stuff on the computer, correct.
 7     Q.  (By Mr. Spiliotis)  Okay.  So, you did actually
 8  take computer training?
 9            MR. TEETER:  Objection, form.
10     A.  I can't specify what training it was, but it
11  was -- we did -- we did do -- how do I put it -- like,
12  stuff on the computer, correct.
13     Q.  (By Mr. Spiliotis)  You did what?  I'm sorry.
14     A.  Like, things, like, little classes or whatever on
15  the computer, correct.
16     Q.  Okay.  And would you have to affirm that you had
17  actually received training?
18            MR. TEETER:  Objection, form.
19     A.  Like, at the end of the -- yeah, but you would
20  just click through it and get done with it.  Correct,
21  yeah.
22     Q.  (By Mr. Spiliotis)  Okay.  And you say you would
23  just click through the actual training program to get
24  done with it, correct?
25     A.  Correct.
```

Ricardo Arredondo, Jr.    4/22/2015

79

```
 1   question.
 2              MR. TEETER:  What was the question?  I'm
 3   sorry, I didn't know you finished.  Pardon me.
 4       Q.  (By Mr. Spiliotis)  I asked while he was
 5   employed -- while you were employed at Weatherford, sir,
 6   did you ever hear of the Listen Up hotline?
 7       A.  No, sir.
 8       Q.  Okay.  Let's go off the record.
 9              THE VIDEOGRAPHER:  The time is 10:51 a.m.,
10   and we're off the record.
11              (Recess from 10:51 a.m. to 11:14 a.m.)
12              THE VIDEOGRAPHER:  The time is 11:14 a.m.,
13   and we are back on the record.
14       Q.  (By Mr. Spiliotis)  Mr. Arredondo, after you
15   began your employment with Weatherford, where did you
16   report to on a daily basis?
17       A.  On a daily basis, to the Alice yard.
18       Q.  Okay.  And were there any buildings within the
19   yard or any kind of trailers or --
20       A.  There was a small building.
21       Q.  Okay.  Was that referred -- was that the
22   maintenance building?
23       A.  No, it was just the regular Alice yard.  I mean,
24   we went, we checked in with our supervisors; and they
25   gave us our daily duties.
```

1  talking about.

2     Q.  (By Mr. Spiliotis)  Okay.  As a part of this

3  lawsuit, are you claiming that anything Joey Estrada did

4  to you between June 2010 -- strike that.

5        Are you alleging that any acts of Joey Estrada

6  between June 2010 and May 8th, 2011 form the basis of

7  this lawsuit?

8              MR. TEETER:  Object to the form.

9              I'm going to instruct him not to answer to

10  the extent you're calling for a legal conclusion.  He

11  can tell you what the acts were.  He won't understand

12  the legal import of them, and it's not fair to ask him

13  that.

14     Q.  (By Mr. Spiliotis)  Okay.  So, go ahead and just

15  tell me what -- what forms of harassment or conduct that

16  you found unwelcome, just between June 2010 leading up

17  to May 8th, 2011.

18     A.  He would -- he would say stupid comments, like,

19  "Are you going to be my bitch" or "You want to be my

20  bitch" or "Are you ready to get finger fucked?"  "Do you

21  want to get nubbed," just like that.

22        On May 8th, he just went to the extreme.

23     Q.  Okay.  So -- but your allegation is that, after

24  you were hired, he started to verbally abuse you; is

25  that correct?

Ricardo Arredondo, Jr.    4/22/2015

94

1    A.  Correct.

2              MR. TEETER:  Objection, form.

3    Q.  (By Mr. Spiliotis)  Okay.  When was the first

4    time you felt you were being harassed by Joey Estrada?

5    A.  I can't remember the first time.

6    Q.  Was it within the first month of your employment?

7              MR. TEETER:  Objection, form.

8    A.  I can't remember.  As soon as -- as soon as he

9    took over -- I'd say as he took over leadership to the

10   crew.

11   Q.  (By Mr. Spiliotis)  Okay.  And do you know when

12   he took over leadership to the crew?

13   A.  No, I don't.

14   Q.  And when you say "leadership to the crew," do you

15   mean when he became the service supervisor?

16   A.  No, I mean, when he became, like -- what do I

17   say -- lead supervisor of the crew or a supervisor,

18   period.  When he took -- when it was -- before it was

19   Rudy and Fabian.  After they -- after they got

20   whatever -- changed titles, or whatever, and he came

21   onboard, that's when it started.  It's, like, as if he

22   got a -- he got, like, a -- like, it got to his head --

23   the supervisor part, it got to his head.

24   Q.  Was he an equipment operator --

25   A.  No.

Ricardo Arredondo, Jr.  4/22/2015

95

1    Q.  -- prior to becoming a supervisor?

2    A.  No, I remember him just being a supervisor.

3    Q.  Was that your first interaction with Joey

4  Estrada?

5    A.  I'm not sure.

6    Q.  Had you ever met before he became your

7  supervisor?

8    A.  I mean, again, I'm not sure.  I mean, I don't

9  remember if I ever saw him as a hand or not.

10    Q.  Okay.  But when --

11    A.  I don't want to answer something that's going

12  to --

13    Q.  Right, taken.  But while he was -- before he

14  became your supervisor, had he ever harassed you?

15    A.  No.

16    Q.  Okay.  And it's your testimony that whenever he

17  became your supervisor, shortly thereafter he began to

18  harass you; is that correct?

19          MR. TEETER:  Objection --

20    A.  That's correct.

21          MR. TEETER:  -- form.

22    Q.  (By Mr. Spiliotis)  Okay.  And you don't remember

23  when that was, correct?

24    A.  Correct.

25    Q.  And you don't remember when the first incident of

O'Neal Probst Wells - 713-521-1314
Houston/Galveston   Dallas/Fort Worth   Austin/San Antonio   Bryan/College Station   Corpus Christi

Ricardo Arredondo, Jr.    4/22/2015

1    Q.   Okay.  And do you recall when he told you that?

2    A.   I don't recall.  It was plain and simple, if I

3  was going to be around him, he was going to say

4  something stupid like that.

5    Q.   Okay.  Do you remember how many times he told you

6  that prior to May 8th, 2011?

7    A.   During the week, maybe -- three or four times

8  during the week, whenever we would brush shoulders

9  whenever we were under the tent doing the fire or job

10 safety meetings or whatever.

11   Q.   Okay.  So, is it your testimony that he would

12 call -- ask you "Do you want to be my bitch" three or

13 four times a week?

14   A.   No, not exactly like that; but, I mean, other

15 stupid comments, like, "Do you want to be my bitch," "Do

16 you want to get nubbed," "Who is your daddy," yeah,

17 stuff like that, yeah.

18   Q.   Okay.  Now, prior to May 8th, 2011, had you ever

19 been nubbed?

20        MR. TEETER:   Objection, form.

21   A.   Yes, but not to that extent.  Like, he would,

22 like, punch you in your back, punch you in your chest,

23 rub your -- rub your back.  And he'd just tell you,

24 "Hey, do you want to be my bitch"; and you'd just get

25 away from him to go to work, you know.

Ricardo Arredondo, Jr.   4/22/2015

100

 1     Q.  (By Mr. Spiliotis)  Okay.  So, prior to May 8th,
 2  2011, he would punch you in the back?
 3     A.  Pretty much, yeah.
 4          MR. TEETER:  Objection, form, misstates the
 5  testimony.
 6     Q.  (By Mr. Spiliotis)  Okay.  How often did he punch
 7  you in the back?
 8     A.  I can't recall.  I would be lying to you if I
 9  said I knew exactly when.
10     Q.  So, you don't know when he punched you in the
11  back?
12     A.  I didn't -- no, I didn't count them.  I didn't
13  count the times that he did it.
14     Q.  And how often or how many times, in total, do you
15  think he punched you in the back, prior to May 8th,
16  2011?
17     A.  Numerous times.
18     Q.  "Numerous" meaning more than five?
19     A.  More than five, correct.
20     Q.  More than ten?
21     A.  Maybe more than 20.
22     Q.  Okay.  So, it's your testimony that you may have
23  been punched in the back more than 20 times?
24     A.  During the time I was there and during the time
25  he was supervisor, correct.

Ricardo Arredondo, Jr.   4/22/2015

101

1    Q.   Okay.  But, specifically, prior to May 8th, 2011?

2    A.   Prior, you're asking from the time he became

3    supervisor to May 8th; and I'm answering you, right.

4    Q.   Just in that time period, correct?

5    A.   Correct.

6    Q.   Okay.  And you testified that he would say, "Do

7    you want to be nubbed"; is that correct?

8    A.   Nubbed, finger fucked.  "You want to be" -- "You

9    want my pepper corn to go in your mouth," and things

10   like that, correct.

11   Q.   Okay.  So, what did he -- what was he referring

12   to when you say "nubbed"?

13   A.   His -- his middle finger was cut in half.

14   Q.   Okay.  Which finger was it?

15   A.   His middle finger, I believe.  The middle finger.

16   Q.   Okay.  On which one hand?

17   A.   Right hand.

18   Q.   His right or his left?

19   A.   Right hand.

20   Q.   His right hand and the middle finger?

21   A.   I think his right hand, yeah.

22   Q.   Okay.  And you say it was cut in half?

23   A.   Yeah.

24   Q.   Okay.  So, did he refer to his cut finger as his

25   nub?

1   A.   Yeah, you could refer to that as that.

2   Q.   -- finger, that could be a nubbing?

3   A.   Yeah.   10-4.

4   Q.   Okay.   Now, tell me this:   When he would make

5   these verbal comments towards you --

6   A.   Uh-huh.

7   Q.   -- did you ever report those to Weatherford human

8   resources?

9   A.   No.

10   Q.   You never reported any of those incidents?

11   A.   No.

12        MR. TEETER:   Objection, form.

13   Q.   (By Mr. Spiliotis)   And you said that, after he

14   became your supervisor, he would make these type of

15   verbal comments three or four times a week; is that

16   correct?

17   A.   Correct.

18   Q.   Okay.   And was there a reason why you didn't

19   report the comments?

20   A.   Man, the way we saw it on the field and location

21   was either you get -- you get along to go along -- you

22   go along to get along.   Do you know what I'm saying?   If

23   you were going to report incidents like that, you were

24   either going to be suspended, sent home, or moved to a

25   different crew.   It was going to cost you money on your

Ricardo Arredondo, Jr.    4/22/2015

104

1  paycheck.  They were just going to send -- they were

2  going to find a reason to send you home.  Okay.  So,

3  with things like that, you didn't want to report it.  If

4  you had -- if it was stress to have -- to have money at

5  the time to work, you weren't going to see little things

6  like that and report it.  Do you know what I mean?

7      Q.  (By Mr. Spiliotis)  Okay.

8      A.  You were going to try to push through it, turn

9  the other cheek and get back to work.

10          MR. SPILIOTIS:  Objection, nonresponsive.

11      Q.  (By Mr. Spiliotis)  Now, you said that, if you

12  reported it, you would be retaliated against?

13      A.  10-4.

14      Q.  Okay.  And when these -- when Joey Estrada became

15  your service supervisor, were you aware of anyone who

16  had been retaliated at Weatherford for reporting verbal

17  harassment?

18      A.  Well, not for verbal harassment; but there was

19  situations before where, if there would be a fight or

20  something on location and they'd complain about it, they

21  would usually get fired.

22      Q.  Okay.  And you said --

23      A.  They would find a way to get rid of them.

24      Q.  So, it's your belief that, if somebody reported

25  any of those incidents, they would be retaliated

Ricardo Arredondo, Jr.   4/22/2015

108

1    a while.

2       Q.   Okay.  And Monaco Gonzales?

3       A.   Supervisor.

4       Q.   Okay.  So, from June 2010 until May 8th, 2011,

5    you allege that Joey Estrada made verbal comments

6    towards you that you found --

7       A.   Around those other supervisors, that's correct.

8       Q.   -- around those other supervisors, right?

9            And it's correct that you never reported any of

10   those comments to Weatherford human resources, correct?

11      A.   Correct.

12           MR. TEETER:   Objection, form.

13      Q.   (By Mr. Spiliotis)  Okay.  And earlier you had

14   testified that Joey Estrada physically rubbed up against

15   you during that time period; is that right?

16      A.   Correct.

17      Q.   Okay.  And how many instances do you recall that

18   happening?

19      A.   Man, I can't -- I can't recall how many times.

20      Q.   More than one?

21      A.   I'd say more than one, yeah.

22      Q.   More than two?

23      A.   I mean, you're asking me more than one; so, I'd

24   say more than five.

25      Q.   Okay.  And can you explain what rubbing up

Ricardo Arredondo, Jr.    4/22/2015

109

1   against you means?

2   A.   Hand going down your back, saying, "What's up,"

3   "Who's your daddy," "Get to work," Stop fucking around

4   before you get nubbed, before you become my bitch,"

5   things like that, yeah.

6   Q.   So, he would rub your back?

7   A.   Yeah.

8   Q.   Now, you were talking about Trinidad Castillo,

9   Adrian Trevino, Joe Ibanos and Monaco Gonzales

10  witnessing the verbal comments towards you by Joey

11  Estrada, correct?

12  A.   Correct.

13  Q.   Did they, also, witness the rubbing up against

14  you incidents?

15  A.   I'm pretty sure they did, yeah.  Yes, I'm pretty

16  sure they did.

17  Q.   Okay.  Who, specifically?

18  A.   I mean, I can't -- I mean, you would have to ask

19  all of them.  But I'm pretty sure, if you'd ask them,

20  they'd be, like, yeah.

21  Q.   Okay.  But I'm asking you who do you remember --

22  A.   Adrian --

23  Q.   -- being there --

24  A.   Adrian Trevino, for sure.

25  Q.   What about Trinidad Castillo?

Ricardo Arredondo, Jr.   4/22/2015

112

1    employee?

2      A.   To terminate an employee?  I don't think they had

3    the authority to -- not that I -- not that I know of,

4    that they had the authority.

5      Q.   Okay.  What about a supervisor?

6      A.   Yeah, it was always said at -- on meetings that,

7    if you had any problems with a supervisor or a

8    supervisor had any problems with you, they could

9    either -- they could fire you or suspend you or whatever

10   they see fit.

11     Q.   Okay.  So, he think that power rested directly

12   with the supervisor?

13             MR. TEETER:  Objection, form.

14     Q.   (By Mr. Spiliotis)  That's your testimony,

15   correct?

16     A.   Correct.

17     Q.   Had you ever been restrained by any Weatherford

18   employees before May 8th, 2011?

19     A.   I don't -- I don't understand your question.

20     Q.   Okay.  I'm asking --

21     A.   I don't know what you mean.

22     Q.   -- did any Weatherford employees ever retrain

23   you?  Did they hold you, tie you up or anything like

24   that?

25     A.   You mean, like, horseplay?  Horseplay, yeah.

Ricardo Arredondo, Jr.   4/22/2015

113

Horseplay, yeah.

1

   Q.   And what would that consist of?

2

   A.   Just like a squeeze on the back and a little

3

shake and let you go, yeah.

4

   Q.   Okay.  Did you find those offensive?

5

   A.   Do I find those offensive?  I mean, it's

6

horseplay.  I know what -- I know the difference between

7

horseplay and sexual assault, sexual harassment or

8

whatever you're talking about, you know.

9

   Q.   Okay.  So, tell me this:  How does punching you

10

in the head entail sexual assault?

11

   A.   Because of what he'd make -- what he would make

12

you believe about his finger.  You understand what I'm

13

saying?  What he would put in your head that he would do

14

with his finger, if you wouldn't cooperate, you know.

15

   Q.   Okay.  What was -- and -- but these were all

16

verbal threats, correct?

17

   A.   Verbal.

18

   Q.   And then, he would actually punch you in the head

19

with this finger?

20

   A.   That's right.  Correct.

21

   Q.   Okay.  But the act of punching you, what is

22

sexual about that?

23

   A.   That's not what was sexual about that --

24

        MR. TEETER:  Objection, form.

25

Ricardo Arredondo, Jr.   4/22/2015

1   A.   -- it was sexual what he did on May 8th.  That's

2   what sexual about it.  Getting -- getting held up in the

3   air by four or five guys and him shoving his finger up

4   your ass.  That's what I consider sexual assault, sexual

5   harassment.

6   Q.  (By Mr. Spiliotis)  Okay.  And we'll --

7   A.  Go like that with a finger to your asshole

8   (indicating).

9   Q.  And I understand --

10          MR. SPILIOTIS:  Objection, nonresponsive.

11   Q.  (By Mr. Spiliotis)  And we'll go into the

12   May 8th, 2011 incident; but right now we're still

13   focusing on the prior incidents leading up to May 8th,

14   2011.

15       So, we've talked about the verbal comments and

16   you articulated the types of statements that he made

17   towards you, sir.  And then, we talked about him

18   physically rubbing against you and nubbing you, which

19   entailed poking you with or punching you with his nub,

20   correct?

21   A.  Correct.

22   Q.  Okay.  Were there any other types of conduct by

23   Joey Estrada that you found offensive during that time

24   period?

25   A.  Just his verbal -- just his verbal comments.

Ricardo Arredondo, Jr.  4/22/2015

1    Q.  Okay.  Prior to May 8th, 2011, had you ever known

2    of any employee to report harassment by Joey Estrada to

3    human resources at Weatherford?

4              MR. TEETER:  Objection, form.

5    A.  Not that I can recall --

6         Can you repeat the question, please?

7    Q.  (By Mr. Spiliotis)  Okay.  So, prior to May 8th,

8    2011, do you know of any employees who complained to

9    Weatherford human resources specifically about Joey

10   Estrada?

11   A.  Not that I can recall, no.

12   Q.  Okay.  Or specifically about his conduct?

13   A.  No.

14             MR. TEETER:  Objection, form.

15   Q.  (By Mr. Spiliotis)  Okay.  So, do you know of any

16   Weatherford employees that complained to HR about Joey

17   Estrada prior to May 8th, 2011?

18   A.  No.

19             MR. TEETER:  Objection, form.

20   Q.  (By Mr. Spiliotis)  Is that a "no"?

21   A.  That's a "no."

22   Q.  Okay.  If you didn't know of any employees who

23   had complained to HR prior to May 8th, 2011, can you say

24   what would have happened if they had complained to HR?

25   A.  It had -- it had --

```
 1     A.   10-4.
 2     Q.   Okay.  Did you sue Joey Ibanos in this lawsuit?
 3          MR. TEETER:  Objection, form.
 4     A.   No.
 5     Q.   (By Mr. Spiliotis)  Okay.  Is there a reason why
 6  you didn't sue him?
 7     A.   He didn't sexually harass me.
 8          MR. TEETER:  Objection, form.
 9     A.   I mean, I don't -- I don't understand what you're
10  trying to get at.
11     Q.   (By Mr. Spiliotis)  Well, why didn't you sue Joey
12  Ibanos, if you had a problem with his conduct?
13     A.   Because his conduct -- his conduct wasn't sexual
14  harassment or sexual assault.
15     Q.   Okay.  So, you believe that Joey Estrada is the
16  only individual whose conduct was considered sexual
17  harassment or sexual assault?
18     A.   Towards me.
19          MR. TEETER:  Objection, form.
20     Q.   (By Mr. Spiliotis)  Okay.  And from May 8th -- or
21  June 2010 up until May 8th, 2011, did you witness any
22  other employees get sexually assaulted or harassed by
23  Mr. Estrada?
24     A.   After May 8th?
25     Q.   No, up until May 8th --
```

Ricardo Arredondo, Jr.   4/22/2015

1    A.  No.

2    Q.  -- from June --

3        So, you never saw any other employees get --

4    A.  I saw -- I saw him nub other people, like, punch

5    them, or stuff like that; but not -- not the way he

6    would -- not the way he would carry himself with me.

7    Q.  Okay.  So, are you saying that he specifically

8    treated you differently than other employees?

9    A.  Somewhat, a little bit, yeah.

10   Q.  Okay.  So, he treated you differently than all

11   the other equipment operators?

12   A.  Yeah.

13   Q.  Okay.  So, was he -- strike that.

14       Do you think he specifically sought you out for

15   this kind of treatment?

16           MR. TEETER:  Objection, form.

17   A.  I don't know if he did or he didn't, but it

18   seemed like he gave me more attention towards that

19   manner.

20   Q.  (By Mr. Spiliotis)  Okay.  And all the other

21   equipment operators, were they male?

22   A.  Correct.

23   Q.  Okay.  There were no female operators on site?

24   A.  Not operator.  There was a female engineer at one

25   point, but she wasn't an operator.

Ricardo Arredondo, Jr.   4/22/2015

120

1    Q.  And was she on site?

2    A.  Yeah.

3    Q.  How often was she on site?

4    A.  Man, I don't know probably during the whole week,

5  I don't know.  It depended on her schedule.  She was an

6  engineer, she wasn't a hand; so, I couldn't tell you

7  exactly.

8    Q.  Okay.  And was she out on the field with you?

9    A.  Inside the data van.  Not out --

10    Q.  Excuse me?

11    A.  Inside the data van.  Not outside with the guys,

12  no.  Inside the data van with the company man.  No, not

13  outside with the general -- with the general equipment

14  operators.

15    Q.  Okay.  And you said earlier that during that

16  period from June 2010 up until May 8th, 2011, you saw

17  Joey Estrada nub other coworkers?

18    A.  Correct.

19    Q.  Okay.  Did he -- what things did you see?

20        MR. TEETER:  Objection, form.

21    A.  Anywhere from punches in the back to, like,

22  punches in the head, punches in the stomach.  I don't

23  know, or he would wait for people to fall asleep; and

24  then, he would get his finger and rub their mouths

25  and -- or put his -- put his finger in their drinks.

Ricardo Arredondo, Jr.    4/22/2015

130

```
 1   that's for today; but we need to --
 2             MR. TEETER:  Are you saying we won't be able
 3   to get through his today?
 4             MR. SPILIOTIS:  Well, it just depends.  I
 5   mean, we need the six hours; and if we don't get through
 6   it, then, we don't get through it.  And that wasn't our
 7   agreement.  Our agreement was that we would begin him
 8   today, this afternoon; and then, conclude him.
 9   Actually, he's noticed for 1:00, I believe.
10             MR. TEETER:  I thought it was 4:00.
11             MR. SPILIOTIS:  That's why Torrez was
12   noticed for the afternoon.  I thought that's what our
13   agreement was.  Because, if you note, he was noticed at
14   11:00.
15             MR. TEETER:  I'll talk to him on the next
16   break and see what his availability is.
17             MR. SPILIOTIS:  Okay.
18             MR. TEETER:  Let's just keep working
19   through.
20             MR. SPILIOTIS:  Okay.
21        Q.  (By Mr. Spiliotis)  Mr. Arredondo, I want to go
22   ahead and discuss the incident of May 8th, 2011.  Do you
23   recall what day of the week that was?
24        A.  No, I don't.
25        Q.  Okay.  Can you explain to me what happened?
```

Ricardo Arredondo, Jr.    4/22/2015

131

1    A.   Yeah, we were on -- we were on location.  I think
2   it was either for a rig up or for a rig down.  It was an
3   early day.  I can't remember whether it was a rig up or
4   rig down.  But we -- whichever one it was, we rigged up
5   or we rigged down; and then, we headed back to the
6   hotel.  And we decided to have a -- like, a barbecue
7   under the shedded area.
8        So, we were getting -- we went, and we got meat
9   for the barbecue and some beer.  And then, we started --
10  the guys started cooking.  I think Joey was one of the
11  guys cooking.  And we were there all sitting there in
12  the -- in the picnic area in the picnic -- around the
13  picnic tables.
14       And as he was cooking, I remember him giving me,
15  like, a little smirk, like, a little -- like, a little
16  glance, like, he was going to -- fixing to do something,
17  you know.  Like -- like, that look, you know, that look
18  you, you know, give somebody or whatever.
19       So, anyway, the next thing I know I had two guys
20  grab my shoulders, two guys grab my -- one leg each, and
21  lift me up in the -- in the air.  And while I was
22  squirming, Joey came around to my -- I want to say my
23  right side -- yeah, up in the air to my right side.
24       And he said, "Are you ready?"
25       And I was, like, "Ready for what?  Get the fuck

1  away" -- I started screaming, "Get the fuck away."

2        And he was, like, "You ready to be my bitch?"

3        I was, like, "Get the fuck away"; and I'm

4  kicking, and two guys were holding my legs.  And that's

5  when he just started punching and turning and putting it

6  in and turning it and putting it in and turning it.

7    Q.  Okay.  Now, you said that you were -- you were on

8  location.  Where on location?

9    A.  No, this wasn't on location.  This was on the --

10  this was the shedded area at the hotel.

11    Q.  Okay.  But -- I understand that.

12        But you began your testimony with you had -- you

13  were on location, you rigged up or you rigged down; and

14  then, you --

15    A.  No, it was one or the other.  I can't remember if

16  it was a rig up or a rig down; but it was an early day.

17    Q.  Okay.

18    A.  So, I'm thinking it was a rig up; and we didn't

19  have to be there until the next day on location.  So,

20  that's why we went back the hotel and decided to start

21  barbecue and make a run for beers.

22    Q.  So, tell me this:  As an equipment operator, were

23  you paid salary or hourly?

24    A.  Hourly.

25    Q.  Okay.  And you went back to the hotel; is that

Ricardo Arredondo, Jr.   4/22/2015

133

1    correct?

2        A.   Correct.

3        Q.   Okay.   Do you remember what hotel you stayed at?

4        A.   No, I don't.

5        Q.   Okay.   Where -- what town was this in?

6        A.   Hallettsville, Texas.   There's only two there.   I

7    just can't remember the name.

8        Q.   Okay.   Was it, like, a motel?

9        A.   It was a two-story hotel.

10       Q.   Okay.   And you testified somebody left, and y'all

11   went and got the meat; is that correct?

12       A.   Meat and beer, correct.

13       Q.   Okay.   And that was after you arrived to the

14   hotel, y'all left the hotel to go get the meat and beer?

15       A.   Meat and beer, correct.

16       Q.   Okay.   And so, technically, you had finished

17   working at that time, correct?

18       A.   Correct.

19       Q.   And you -- you had -- tell me this, how would you

20   clock out or --

21       A.   You wouldn't.

22       Q.   -- keep track of your hours?

23       A.   You wouldn't clock out, the supervisors would.

24       Q.   Okay.   So, they would supervise -- they would

25   actually report when work had stopped and --

Ricardo Arredondo, Jr.   4/22/2015

135

1    go get the meat was the safety, J. D. Rivera.

2       Q.   Okay.   And do you know how long it took you to go

3    to leave the hotel and pick up the beer and come back?

4       A.   Yeah, about five to ten minutes.   The store was

5    right next door.

6       Q.   Okay.   And when you get -- when you got to the

7    hotel from the -- being on site, did you check into the

8    hotel?

9       A.   The rooms were already checked in.

10      Q.   Okay.   So, you had already -- you were there

11   already checked in?

12      A.   Yeah.

13      Q.   Okay.   Did you change out of your work clothes

14   and get into --

15      A.   No.

16      Q.   -- plain clothes?

17      A.   No.

18      Q.   Okay.   Did you at least go into your hotel room

19   and --

20      A.   Make a phone call and charge the phone, yeah.

21      Q.   Okay.   And did anyone --

22           How many people, total, were staying at the hotel

23   from Weatherford?

24      A.   The whole crew, day and night.   So, what, 18 --

25   about -- roughly, about 18 and 18, about 36 people.

Ricardo Arredondo, Jr.   4/22/2015

136

1    Q.  Okay.  And was every -- strike that.

2         So, you said that you had an early day --

3    A.  Uh-huh.

4    Q.  -- did that mean that you were on the 6:00 a.m.

5    to 6:00 p.m. crew shift?

6    A.  No, early day period is either we did a -- we did

7    a rig up; so, it was both crews day and night.  Either

8    we rigged up or we rigged down, I can't remember exactly

9    what it was; but we finished early.  I think it was

10   around -- I don't know, I can't give you an exact time.

11   But maybe around, roughly, 2:00.  Before 5:00, for sure.

12   Q.  Okay.  So, both crews had actually finished their

13   work, correct?

14   A.  Correct.

15   Q.  And had people begun to change into their plain

16   clothes?

17   A.  Yeah -- you could say, I guess, yeah.

18   Q.  Okay.  And I'd asked you if -- who was cooking

19   the meat, and I believe you had testified that Joey was

20   cooking?

21   A.  Joey -- yeah, Joey was one of them cooking,

22   anyway.

23   Q.  Okay.  So, y'all were -- y'all were barbecuing?

24   A.  Yeah.

25   Q.  And do you remember what --

Ricardo Arredondo, Jr.   4/22/2015

137

```
 1      A.  I can't --

 2      Q.  -- what kind of meat you were barbecuing?

 3      A.  I can't remember that, no.

 4      Q.  Okay.  And when you returned from doing your beer

 5  run, did you begin to drink the beer?

 6      A.  Well, we iced it down.  I mean, we drank a few, a

 7  couple of beers maybe, yeah.

 8      Q.  Okay.  Had you drunk, you know, a couple of beers

 9  prior to the incident with Mr. Estrada?

10      A.  No.

11      Q.  So, you hadn't had any --

12      A.  No --

13      Q.  -- beer?

14      A.  -- huh-uh.  I don't think so, no.

15      Q.  Okay.  Do you know so --

16      A.  No.

17      Q.  -- or you just don't recall?

18      A.  No, I don't think so.  No, I hadn't.

19      Q.  Okay.  And had anyone else begun to drink the

20  alcoholic beverages?

21      A.  Well, the crew that was there, yeah.  I mean,

22  that's what the beer was for.

23      Q.  Okay.  Did -- do you know if Joey Estrada was

24  drinking?

25      A.  I don't think he drank.
```

Ricardo Arredondo, Jr.    4/22/2015

141

1     A.  No, it wasn't a poke.  It was more like a push

2 and turn over and over again, over and over again.

3     Q.  Do you remember how many times he pushed and

4 turned?

5     A.  No, I don't remember times, man.

6     Q.  Do you know how long it lasted?

7     A.  No, I don't.

8     Q.  I mean, it lasted more than -- more than a

9 minute?

10     A.  Yeah.

11     Q.  The entire incident?

12     A.  The entire incident, about -- I don't know, man,

13 about five to ten minutes.

14     Q.  So, from the time they actually grabbed your

15 shoulders until the incident was done --

16     A.  Uh-huh.

17     Q.  -- it was five to ten minutes?

18     A.  Five to ten minutes.

19     Q.  Okay.  What were you wearing at the time?

20     A.  Coveralls.

21                  (Exhibit 10 marked)

22     Q.  (By Mr. Spiliotis)  I hand you what's marked

23 as --

24     A.  Not those, man.  Those are -- those are the

25 regular -- the regular coveralls, because the ones I was

Ricardo Arredondo, Jr.    4/22/2015

143

1    Q.  Is there a label inside the coveralls?

2    A.  Yeah, there's a label inside the coveralls.

3    Q.  What does it say?

4    A.  Walls FR.

5    Q.  Excuse me?

6    A.  Walls FR.  Flame resistant work gear, work wear.

7    Q.  Okay.  So, were the coveralls that you were

8  wearing flame resistant?

9    A.  Yeah.

10    Q.  Okay.  But what you're saying is that these

11  were -- these are thicker than the ones you actually

12  had?

13    A.  Correct.

14          MR. SPILIOTIS:  Okay.  You can inspect this,

15  if you want; but we're going to -- we're going to keep

16  it in our possession.

17          MR. TEETER:  If they are not the ones he was

18  wearing, you know.

19          MR. SPILIOTIS:  Well, he says they are not;

20  but we have to find out.

21          MR. TEETER:  I'm sorry.  Hold on.  Are you

22  saying those are his coveralls?

23          MR. SPILIOTIS:  No, I'm handing him and

24  asking him whether they were his coveralls; and he's

25  testified that they were not the coveralls he was

Ricardo Arredondo, Jr.   4/22/2015

1    A.  I don't know what animosity means.

2         MR. TEETER:  Objection, form.

3    Q.  (By Mr. Spiliotis)  Okay.  Out of hate?

4    A.  I don't know what you want to call it.  I mean, I

5  can't put a thing to it.  I just know what he did.

6    Q.  Had you ever seen him do that to any other

7  Weatherford employees prior to May 8th, 2011?

8    A.  Prior to May, not like that, no.  And that's what

9  I'm telling you, that's the first time I'd ever seen him

10  take it that far.

11   Q.  Okay.  And when you say "take it that far,"

12  you're referring to specifically touching somebody's

13  behind, buttocks or a genital part?

14   A.  Correct.

15   Q.  Okay.  Did he physically injure you during the

16  incident?

17        MR. TEETER:  Objection, form.

18   A.  Did he what?

19   Q.  (By Mr. Spiliotis)  Did he physically injure you?

20  Did you sustain a physical injury during the incident?

21        MR. TEETER:  Objection, form.

22   A.  Are you asking me if it hurt?

23   Q.  (By Mr. Spiliotis)  Did you experience pain

24  during the incident?

25   A.  Yeah, I did.

Ricardo Arredondo, Jr.   4/22/2015

1       Now, he had -- you said he had actually witnessed

2   the incident, correct?

3       A.   Correct.

4       Q.   Okay.  Did you speak first, or did he speak

5   first?

6       A.   I spoke first.

7               MR. TEETER:   Objection, form.

8       Q.   (By Mr. Spiliotis)  Okay.  And what did you

9   speak?

10      A.   I asked --

11      Q.   What did you tell him?

12      A.   I asked him, "What do you think I should do?  Do

13  you think I should report him?"

14       And he was, like, "Ah, man, you know that's just

15  Joey, the nub, man."

16      Q.   Okay.  When you said do I think I should report

17  him, who were you referring to?

18      A.   To HR.

19      Q.   Okay.  So, you kind of understood that you could

20  bring the complaint to HR, correct?

21      A.   Take it higher, yeah.

22      Q.   Okay.  And was that because you thought that HR

23  could -- could do something about it?

24      A.   No, it wasn't that.  It was that I was just tired

25  of his acts.  I mean, every time somebody would go

Ricardo Arredondo, Jr.   4/22/2015

152

1   specific supervisor, because they all had the same

2   intention.

3       Q.  Okay.  So --

4       A.  They would all say the same shit.  It was like a

5   brotherhood to be a supervisor.  Okay.  Do you see what

6   I'm --

7       Q.  So --

8       A.  I mean, I can't explain it any better.  But every

9   time, like, something would happen, they would always

10  say "What happens here, stays here."  "If you've got a

11  problem with one of us, we'll take care of it inhouse;

12  and that way it won't go any further."  They never

13  wanted you to go above their heads.

14      Q.  Okay.  But when you approached J. V. Rivera --

15      A.  Uh-huh.

16      Q.  -- you knew that the option existed to go to HR,

17  right?

18      A.  But what was the point of going above, if you

19  already knew what was going to happen.  Either I was

20  going to get suspended or get fired.

21      Q.  Okay.  So, it's your subjective belief that you

22  would have been suspended if you went to HR, or you

23  would have been fired?

24          MR. TEETER:  Objection, form.

25      A.  It was a what?

Ricardo Arredondo, Jr.   4/22/2015

157

1    Q.   So, from May 8th, 2011 until January 2012, did

2  you experience any other harassment by Mr. Estrada?

3    A.   Yeah.   He was always just telling me, "You want

4  to get nubbed again?"   "You want to be my bitch, again?"

5  Something like that.   Verbal, not physical, if that's

6  what you're asking.

7    Q.   Okay.   So, he never actually touched you?

8    A.   Do what he did on May 8th, again?   No.

9    Q.   Okay.   But he --

10   A.   He would always bring it up, like, "Hey, you want

11  it to happen again?"   "You want to be my bitch again."

12   Q.   And that was all in a verbally offensive

13  comments, correct?

14   A.   Correct.

15   Q.   Okay.   How often did he make those type of

16  comments?

17   A.   I'd say it was about three or four times a week.

18  Whenever we'd brush shoulders, or whatever.

19   Q.   How often were you on the same shift as

20  Mr. Estrada during that time period?

21   A.   Well, he was the supervisor for the shift, for

22  the crew.

23   Q.   So, you saw him on a daily basis?

24   A.   On a -- on a daily basis, except for his days

25  off.   I tried to stay away from him as much as I could;

Ricardo Arredondo, Jr.    4/22/2015

159

```
 1      Q.  Mr. Ibanos --
 2      A.  Oh --
 3      Q.  -- pushing you, shoving you.
 4      A.  Trinidad Castillo, and -- I can't remember who
 5  else, man.  That's it.  For right now, that's all I can
 6  remember.
 7      Q.  Okay.  And you testified that he shoved you a
 8  couple of times.
 9      A.  Yeah.
10      Q.  Was it one incident or multiple incidents?
11      A.  The same -- the same timeframe, multiple
12  incidents.
13      Q.  So, did they all occur on the same day?
14      A.  Yeah.
15      Q.  So, he shoved you multiple times on the same day?
16      A.  Uh-huh.
17      Q.  Do you know why he shoved you?
18      A.  Yeah.
19      Q.  Okay.  Why did he shove you?
20      A.  There was a job going on with raining -- it was
21  raining and lightning within 100 yards.  The lightning
22  was within 100 yards.  And he had a -- he had asked a --
23  it was an orange hat, which is a new guy, to get a
24  stripe of sand.  And it was raining real hard, and the
25  guy was telling him he didn't have a harness; and he
```

Ricardo Arredondo, Jr.   4/22/2015

```
 1   told him, "Give me a stripe of sand anyway."  So, I went
 2   on the radio; and I said get off the -- get off the Sand
 3   King.  It's not safe for you to be up there, if you fall
 4   and break your back, do you know what I mean, it's
 5   dangerous.  So, the company man heard me and the company
 6   man shut the job down.  And as we were walking to the --
 7   to the front to the tent, I saw the data van door swing
 8   open.  And when it swung open, I saw him come out; and I
 9   knew he was coming, and I go -- I had put my hands in my
10   coveralls, and he shoved me.
11        And I said, "Bro, don't touch me again."  I tell
12   him that.
13        And he goes, "Hey, who the fuck do you think you
14   are overriding me?"
15        I told him, "Hey, bro, it wasn't safe for him to
16   be up there."  And he shoved me, again; and that was it.
17   Q.  Okay.  So, are you saying he shoved you two
18   times?
19   A.  Yeah.
20   Q.  Okay.  And it's your testimony that that incident
21   that you just described where he shoved you occurred
22   prior to Mr. Rabino's birthday of 2012?
23   A.  Yeah, I don't know if it's the exact same date;
24   but I'm thinking -- I'm thinking it was.  Yeah, I'm not
25   sure.  I'm not 100 percent sure on that.
```

Ricardo Arredondo, Jr.    4/22/2015

161

1    Q.  Okay.  Did you complain to HR about Mr. Ibanos

2  shoving you?

3    A.  I got to the yard, and I told -- they told me to

4  talk to John Sanchez, which was the -- which I knew was

5  the head of safety; and -- but I was made to believe,

6  too, that he was HR.

7        And I remember -- I remember telling him.  And he

8  was, like, "Oh, we'll take care of it?"  "We'll take

9  care of it."

10        I told him that I wanted to do a report on it;

11  and he told me, "We'll take of it here."  "I'll take

12  care of it."  "I've got it taken care of."  He goes,

13  "You're good."

14        So, when I left to go pump fuel to go home for

15  the day, I got a -- I got a phone call from the

16  operations -- not the operations manager -- from the

17  field manager operations, which is -- which is Rudy

18  Espinosa.

19        And he told me, "Hey, come back to the yard, I

20  need to talk to you."

21        And when I went -- when I went back to the yard,

22  that's when he told me, "Hey," whatever happened.  And I

23  told him about the -- what happened with Joe, and he

24  didn't want to hear it.

25        He was, like, "You have no right talking to a

Ricardo Arredondo, Jr.    4/22/2015

1  supervisor that way."  He wasn't hearing my side of the

2  story.  "You have no right talking to a supervisor like

3  that."

4      I go, "Well, I guess I've got to leave.  Here's

5  my two weeks."

6      And he was, like, "Fuck your two weeks.  Get the

7  fuck out of here.  You're a liability to the company."

8    Q.  Okay.  Now, what happened after that?  Did you

9  leave?

10   A.  Yeah.

11   Q.  Did you ever come back to the worksite?

12   A.  No, I called -- no, I didn't.  I called John

13  Sanchez, because they told me he was HR at the time and

14  safety.  And he told me he was going to take care of me,

15  and he would get me my job back; and he never called.

16  He never took care of nothing.

17   Q.  Okay.  So, if -- if that incident happened prior

18  to Mr. Rabino's birthday in January 2012, how did you

19  witness Mr. Rabino's --

20   A.  That's what I --

21   Q.  -- the incident involving Mr. Rabino --

22   A.  That's what I told you, I wasn't sure about the

23  dates.

24   Q.  So, it could have happened after --

25   A.  Yeah.

Ricardo Arredondo, Jr.    4/22/2015

1    Q.   (By Mr. Spiliotis)   Could you read the e-mail

2   from Rudy Espinosa to Lisa Mora and Marisol Trevino?

3    A.   Yeah, I can read it.  Do you want me to read it?

4   (Reading), Hi, Mari, I want to tell you that Albert

5   Gonzales is transferring to the logistic department

6   Bruce has accepted and he will be starting with them on

7   Friday.  I might need another -- what, R-E-C, I don't

8   know what that means -- to open as far for Ricardo

9   Arredondo, Jr. he told me he is putting his 2 weeks in

10   so I will get his letter of resignation.

11    Q.   Okay.  So, that e-mail from Rudy states that you

12   were putting in your two weeks notice of resignation,

13   correct?

14    A.   That's what it says.

15    Q.   Okay.  And you testified earlier that --

16    A.   That's not the way --

17    Q.   -- you told -- right --

18    A.   I understand what you're saying.

19    Q.   -- excuse me --

20         MR. TEETER:   Just answer his questions.

21         MR. SPILIOTIS:   Objection, nonresponsive.

22    Q.   (By Mr. Spiliotis)   You told me earlier that you

23   told Mr. Espinosa, "Well, you can have my two weeks,"

24   correct?

25    A.   Correct.

Ricardo Arredondo, Jr.    4/22/2015

166

1    Q.   Okay.  So, do you agree you voluntarily resigned
2  from Weatherford?
3           MR. TEETER:   Objection, form.
4    A.   It was -- it was a -- an angry part, because he
5  wasn't having it, because the supervisors were getting
6  their way; and he wasn't listening to me in response.
7  But that's not the -- that's not the way it ended.
8           I was like, "Well, here's my two weeks."
9           And he was, like, "Fuck your two weeks.  Get the
10 fuck out of here.  You're nothing but a liability."
11   Q.   (By Mr. Spiliotis)  Okay.  And I had understand
12 your testimony.  But is it accurate to say that you told
13 Rudy Espinosa, "Here's my two weeks"?
14   A.   Yeah, but the way he answered it he was, like, "I
15 don't need your two weeks."
16   Q.   Okay.  And what did you understand that to mean?
17   A.   "You're fired, get out of here."
18   Q.   Okay.  And that was in response, though, to your
19 "Here's my two weeks" comment, correct?
20   A.   Correct.
21   Q.   Okay.  And you talked a little bit about why you
22 told him "Here's my two weeks," right?
23           MR. TEETER:   Objection, form.
24   A.   I don't understand.  What did I say?  You said I
25 talked about -- what are you talking about?

Ricardo Arredondo, Jr.   4/22/2015

167

1           MR. SPILIOTIS:  Objection, nonresponsive.

2       Q.  (By Mr. Spiliotis)  I'll just restate the

3    question.

4           Now, you talked earlier about being involved in

5    an altercation with -- who was it?

6       A.  Joe Ibanos.

7       Q.  Right, Joe Ibanos.

8           And you talked about that incident, and it had to

9    do with -- I think it was your decision to shut down an

10   operation; is that correct?

11      A.  Correct.

12          MR. TEETER:  Objection, form.

13      Q.  (By Mr. Spiliotis)  Okay.  Could you describe

14   that, again, that incident?

15      A.  They always told us, if there was lightning

16   within 100 yards or if it was raining real bad and it

17   was unsafe, that anybody had the right to shut down the

18   job.  And I didn't get on the radio and say, "Hey, let's

19   shut down the job."  All I did was tell the guy, "Hey,

20   it's raining and you don't have a harness, get off the

21   Sand King."  The company man overheard.  The company man

22   shut the job down.

23      Q.  Okay.  And was it -- was it raining really hard

24   at the time?

25      A.  It was -- it was lightning within 100 yards.

Ricardo Arredondo, Jr.    4/22/2015

176

1  exactly what I told him.  Do you know what I mean?

2      Q.  Okay.  Well, what did you tell --

3      A.  I told him not to shove me --

4      Q.  -- Joe Ibanos?

5      A.  I just remembering telling him, "Don't shove me

6  again," because I remember him shoving me.  I put my

7  hands -- I go, "My hands are in my pockets, don't touch

8  me again."  He did.

9          And he was, like, "What the fuck are you going to

10  do?"

11          I said, "Do you think" -- I remember telling him,

12  "Do I'm scared of you, or what?"

13          And he was, like -- he just shoved me again.  He

14  goes, "I'll kick your ass."  And I can't remember -- I

15  mean, if I told you too much -- I can't remember, I

16  can't remember exactly what was said.  It was just a

17  heated little discussion.

18      Q.  Okay.  And -- but you don't remember exactly what

19  you told him?

20      A.  No, I don't.

21      Q.  Did you swear at him?

22      A.  Did I swear at him?  I probably did.

23      Q.  Okay.  Did you shove him, as well?

24      A.  No, my hands were in my pockets the whole time.

25  There's lots of witnesses for that one.

Ricardo Arredondo, Jr.    4/22/2015

182

1   to Pioneer crew."

2        And I was, like, "I don't to" -- I think I was,

3   like, "I don't want to go to the Pioneer crew.  I've

4   been with Swift since the beginning."

5        And that's when he told me, "You don't tell me

6   what the fuck to do with my company" -- "You don't tell

7   me what to do with my company."  "This is" -- "you're

8   going to go."

9        And I was, like, "No, all that stuff happened."

10  And I said, "This is my two weeks"; and that's when he

11  said what he said.

12    Q.  Okay.  And you said he was going to transfer to

13  Piney company?

14    A.  Pioneer.  I think it was Pioneer.

15    Q.  Pioneer.  Is that a different fleet?

16    A.  Yeah.

17    Q.  Okay.  So, do you know why he offered you that

18  transfer?

19            MR. TEETER:  Objection, form.

20    A.  No, I don't.

21    Q.  (By Mr. Spiliotis)  Okay.  And was that to be an

22  equipment operator on the Pioneer fleet?

23    A.  I think it was -- I think it was to be a pump

24  champ on that fleet.

25    Q.  Okay.  And was that going to be the same pay?

Ricardo Arredondo, Jr.   4/22/2015

183

```
 1      A.  Yeah, the same pay.

 2      Q.  Okay.  And you told him that you didn't want to

 3   transfer to the Pioneer fleet?

 4      A.  I told him I had been with Swift since the

 5   beginning, why was he going to transfer me instead of

 6   Joe Ibanos, when Joe Ibanos was the one that put his

 7   hands on me --

 8      Q.  Okay.

 9      A.  -- If I'm correct.

10      Q.  So, you actually wanted to stay in the Swift

11   fleet?

12      A.  10-4.  Correct.

13      Q.  Okay.  And is that because you had established

14   friendships in the Swift fleet?

15      A.  No, I just had -- I just had been there since the

16   beginning.  I mean, I felt comfortable with -- with my

17   guys and coworkers, the crew.

18      Q.  Okay.  And you said that it was to be a pump

19   champ.  And you had been a pump champ before, correct?

20      A.  10-4.  Correct.

21      Q.  And were you -- you were a pump champ at the

22   time, correct?

23      A.  No, they had me switching back to senior

24   operator, equipment operator.

25      Q.  Okay.  And is it in --
```

Ricardo Arredondo, Jr.   4/22/2015

187

1    A.  Not -- no, like -- I mean, you could tell real
2  quick what the -- what the demeanor behind it is.
3    Q.  Correct.
4    A.  You get what I'm saying?
5    Q.  Right.
6    A.  I mean, how are you going to go from rubbing up
7  on somebody sexually to saying, "Hey, man, what's up" to
8  that being sexually.  Do you know what I mean?
9    Q.  Okay.  So, you didn't personally find somebody
10 coming up and just giving you a quick squeeze offensive,
11 did you?
12   A.  No, you can shake somebody's hand and give them a
13 hug with it at the same.
14   Q.  Or a forearm or fisting somebody?
15   A.  Yeah.
16   Q.  Okay.  Now, did the horseplay also involve vulgar
17 language?
18   A.  Vulgar language?  Like, what -- I'd say, yeah.
19   Q.  Okay.  So, like, do you have any -- do have any
20 examples of kind of what you would consider to be
21 horseplay language?
22   A.  Yeah, "What's up, motherfucker," something like
23 that.
24   Q.  Would that, also, consist of "What's going on,
25 bitch"?

Ricardo Arredondo, Jr.   4/22/2015

188

```
 1      A.  Yeah.
 2      Q.  Okay.  Or "I'll fuck you, bitch"?
 3      A.  No, I don't know about all of that.
 4      Q.  Okay.  So --
 5              MR. TEETER:  That's a "no"?
 6      A.  That's a "no."
 7      Q.  (By Mr. Spiliotis)  Okay.  Had you ever, you
 8  know, patted somebody on the behind out on the crew?
 9      A.  No.
10      Q.  Okay.  Had you ever, like, reached to grab
11  somebody's crotch area --
12      A.  No.
13      Q.  -- out on the -- while you were an employee for
14  Weatherford?
15      A.  No.
16      Q.  What about after you were employed for
17  Weatherford, have you reached for somebody -- a friend's
18  crotch --
19      A.  No.
20      Q.  -- in joking, in jest?
21      A.  No.
22      Q.  Okay.  So, you would agree that there is a
23  certain amount of vulgarity that occurs out on the
24  oil --
25      A.  On location?  Yeah.
```

Ricardo Arredondo, Jr.   4/22/2015

195

```
 1    have his job description in front of me; but all I know
 2    is how can that be part of his job description.
 3        Q.  (By Mr. Spiliotis)  Okay.  Do you have any
 4    evidence to believe that Weatherford instructed
 5    Mr. Estrada to do what he did to you on May 8th, 2011?
 6            MR. TEETER:  Objection, form.
 7        A.  I don't understand what your question is.
 8        Q.  (By Mr. Spiliotis)  Like, do you think anyone --
 9    any supervisors or the company, Weatherford,
10    specifically instructed Joey Estrada to go do what he
11    did to you on May 8th, 2011?
12            MR. TEETER:  Objection, form.
13        A.  Why would they instruct him to do that?
14        Q.  (By Mr. Spiliotis)  Okay.
15            Now, would you agree that Weatherford had a
16    mechanism in place that you could report the conduct of
17    Mr. Estrada?
18        A.  I don't --
19            MR. TEETER:  Objection, form.
20        A.  I don't agree.
21        Q.  (By Mr. Spiliotis)  You don't agree?
22        A.  Huh-uh.
23        Q.  Okay.  Why don't you agree?
24        A.  I -- I just don't agree.
25        Q.  Okay.  Do you believe you could have reported it
```

Ricardo Arredondo, Jr.    4/22/2015

1    to HR?

2        A.  Do I believe I could have reported it HR?

3        Q.  Uh-huh.

4        A.  I might have been able to report it to HR, but I

5    didn't know the consequences that would come with it

6    afterwards.

7        Q.  Okay.  Did you have any reason to believe that

8    going -- that your complaint to HR wouldn't be kept

9    confidential?

10               MR. TEETER:  Objection, form.

11       A.  Everybody just talked about everything with each

12   other.  So, I didn't think it was the right thing to do,

13   the safe thing to do for my job -- for the purposes of

14   keeping my job.

15       Q.  (By Mr. Spiliotis)  Okay.  Now, we went over a

16   number of policies earlier that said you could report to

17   human resources, if you had complaints, correct?

18               MR. TEETER:  Objection, form.

19       A.  Correct, but you're talking about paperwork, man.

20   You're not talking about out in the field and the way

21   that the rules out in the field are.

22       Q.  (By Mr. Spiliotis)  Okay.  And how are the rules

23   out on the field?

24       A.  We could talk about paperwork all day; but until

25   you're out in the field, and you understand the way the

Ricardo Arredondo, Jr.   4/22/2015

198

1      A.  Well, I mean, working out in the --

2              MR. TEETER:  Objection, form.

3      A.  Working out in the field and you read a paper

4    that says go ahead and come to HR, we're going to take

5    care of it confidentially; but you knowing that, if you

6    go to HR and they hear about it, you're going to get

7    fired, what do you think you're going to do?

8      Q.  (By Mr. Spiliotis)  Okay.  Well, we testified

9    earlier you didn't actually know of anyone who went to

10   HR and made a complaint about Mr. Estrada, do you?

11     A.  With Mr. Estrada, no, no.

12     Q.  And some of that paperwork actually included that

13   you could go to the legal department, as well; isn't

14   that correct?

15             MR. TEETER:  Objection, form.

16     A.  What legal department?

17     Q.  (By Mr. Spiliotis)  The Weatherford legal

18   department.

19     A.  I had no idea -- I had no -- I didn't know what

20   that meant, back in the day when I was working for them.

21     Q.  Okay.  Now, are you aware that someone actually

22   did make a complaint against Mr. Estrada at some point?

23             MR. TEETER:  Objection, form.

24     A.  I made a complaint against Mr. Estrada.

25     Q.  (By Mr. Spiliotis)  Okay.  What about, are you

Ricardo Arredondo, Jr.   4/22/2015

259

1   just we had enough, and we were just saying -- I think

2   one of the conversations we had was we were tired of him

3   doing, and we wanted to stop him from doing it to

4   anybody else.

5       Q.  Okay.  Did you ever tell him it was no big deal,

6   it was just a joke?

7       A.  No, I didn't.

8       Q.  Okay.  Do you have any evidence that Mr. Estrada

9   is homosexual?

10              MR. TEETER:  Objection, form.

11      A.  How can I have evidence if he's homosexual?

12      Q.  (By Mr. Spiliotis)  Well, do you know whether

13  he's homosexual, or have you heard rumors?

14      A.  No, man.

15      Q.  "No"?

16      A.  No.

17      Q.  Okay.  And you testified earlier there were no

18  females on your crew; is that correct?

19      A.  Just the one -- I told you one female.  She was

20  an engineer at the time.  But she was never around all

21  of us guys.  She was just inside the data van.

22      Q.  Okay.  So, you don't have any evidence that he

23  was treating males one way and females a different way?

24      A.  No.

25      Q.  Okay.  Do you know if he's married?

Ricardo Arredondo, Jr.    4/22/2015

260

1    A.    I have no idea what he does in his personal life.

2    Q.    Do you know whether he has kids?

3    A.    I think he has a son.

4    Q.    Did you ever, specifically, tell Mr. Estrada to

5  not make offensive statements towards you?

6    A.    Yes, I did.

7    Q.    Okay.  And when did you tell him that?

8    A.    When he first started.  When he first started his

9  gestures and all of that, I remember him telling me,

10  "Hey, man, what's up?"

11        "Fuck off."

12        He'd say, "What the fuck are you going to do,

13  bitch?"  I remember that being one of his replies, "What

14  are you going to do?"

15    Q.    Okay.  But you would tell him "Fuck off"?

16    A.    Yeah, I'd tell him, "Man, fuck off with your shit

17  already."

18    Q.    Okay.

19        MR. SPILIOTIS:  Why don't we -- let's go off

20  the record so that the videographer can change the tape.

21        THE VIDEOGRAPHER:  The time is 3:57 p.m.,

22  and we're off the record.

23        (Recess from 3:57 p.m. to 4:14 p.m.)

24        THE VIDEOGRAPHER:  The time is 4:14 p.m.,

25  and we are back on the record.

Ricardo Arredondo, Jr.    4/22/2015

1      A.   No, it's the way we talk to each other, man.

2    It's not, like -- I know the way you're taking it, and

3    the way you're trying to make it look; but, no, it's the

4    way we talk to each other back home, I mean, back in

5    the --

6      Q.   Right.  But you're not -- I mean -- I'll

7    apologize for the nature of some of my questions.

8      A.   That's fine, man.

9      Q.   You're not homosexual, are you?

10      A.   No, I'm not.

11      Q.   Okay.  And you're saying, let me guess, you miss

12    my chori already, and you're saying you miss my sausage.

13    You're missing my penis; is that right?

14      A.   In other words, that's me telling him you miss my

15    ass already, like, you miss me at home already.

16      Q.   Right.  But there's words in there that are

17    sexual on their face, but don't mean anything --

18              MR. TEETER:  Objection, form.

19      Q.   (By Mr. Spiliotis)  -- is that correct?

20      A.   Correct.  I mean --

21      Q.   I mean, you're trash talking, right?

22      A.   Yeah.

23      Q.   And this is just, you know, the kind of stuff

24    that would happen at Weatherford, right?

25      A.   Correct.

Ricardo Arredondo, Jr.   4/22/2015

272

```
 1        A.   That makes I take a lot of self pictures.
 2        Q.   Okay.   Are you still Facebook friends with Isaac
 3   Davila?
 4        A.   Yeah, that's -- yeah, I think so.
 5        Q.   Okay.   If you turn to the last page in the
 6   exhibit, Isaac Davila on January 22nd, 2014 --
 7        A.   Uh-huh.
 8        Q.   -- says, "Queer" --
 9        A.   Yeah.   Correct.
10        Q.   -- right, in response to, I guess this is another
11   selfie?
12        A.   Correct.
13        Q.   It says, "it looks like you need a couple of
14   slaps to take that look of your face!  Lol."
15             And then, Ruben Amaya responds and says, "U take
16   one side Isaac I'll take the other one."
17        A.   Correct.
18        Q.   And then, Jesus Trevino -- that's Adrian Trevino,
19   right?
20        A.   Yeah.
21        Q.   He says, "Todo joto pinche nanz," right?
22        A.   I see that.   Correct.
23        Q.   What does that mean?
24        A.   Like, all queer and nothing but nose.
25        Q.   And then, you respond to this and say, "Fuk y'all
```

Ricardo Arredondo, Jr.   4/22/2015

273

1    pussys lol damn Adrian Trevino still got that big mouth
2    for a lil man lol panochudo."
3        A.   Correct.
4        Q.   Okay.  What does "panochudo" mean?
5        A.   Big old pussy.
6        Q.   Okay.  So, you're calling him a pussy?
7        A.   10-4.
8        Q.   Okay.
9        A.   It's guy talk, man.  I mean, like, that --
10       Q.   And then, later, if you go down to the 6:11 p.m.
11   comment, Adrian Trevino says, "Nothing but love Popeye"?
12       A.   10-4.
13       Q.   Right?  And how do you respond to that comment?
14       A.   Coming from Adrian?
15       Q.   Yeah.
16       A.   Nothing but love.  I mean, we're friends, I
17   guess.  Friends --
18       Q.   And what --
19       A.   Nothing but humor.
20       Q.   Yeah, but what do you respond in this Facebook
21   response?
22       A.   I put, "I know I know."
23       Q.   You say, "I know I know" --
24       A.   Yeah.
25       Q.   -- right?  Meaning, I know, you don't mean any

Ricardo Arredondo, Jr.   4/22/2015

274

1   harm, correct?

2      A.   Yeah.  Correct.

3      Q.   And you said -- do you remember when Ruben Amaya

4   worked with you?

5      A.   I can't give you an exact date, but he was there

6   for at least a year while I was there.  He might have

7   left in 2011, I think.

8      Q.   Okay.  And he's not -- I think you said earlier,

9   he's not Ruben Garcia?

10     A.   No, that's --

11     Q.   That's two different --

12     A.   You're talking about Animal.

13                     (Exhibit 23 marked)

14     Q.   (By Mr. Spiliotis)  And let me hand you what's

15   marked as Exhibit 23 of your deposition.

16          These are some medical records from Dr. Jose

17   Lozano.  That's your treating physician; is that right?

18     A.   Correct.

19     Q.   Okay.  Let's just look at a couple of these.  On

20   Dr. Jose Lozano Document No. 34, that's Bates-labeled

21   Dr. Jose Lozano --

22     A.   You said --

23     Q.   -- No. 34.

24     A.   -- 34?

25     Q.   It's the small type.

Ricardo Arredondo, Jr.   4/22/2015

281

1    Q.  (By Mr. Spiliotis)  Okay.  And prior to filing

2   this lawsuit, you never talked to them about --

3    A.  Prior to filing the lawsuit?

4    Q.  Yes.

5        MR. TEETER:  And I'm going to instruct you

6   not to answer to the extent it was a joint

7   communication, and it was with counsel present.

8        THE WITNESS:  Yeah.

9        MR. TEETER:  So, I don't think he's asking

10  for that; but --

11   Q.  (By Mr. Spiliotis)  Yeah.  So, have -- did you

12  ever talk to -- just tell me this:  Like, whenever --

13  when did you first --

14       You left the company in January 2012, correct?

15   A.  That's correct.

16   Q.  And how long, after leaving the company, did you

17  then speak with -- next speak with Mr. Rabino?

18   A.  I couldn't even answer that.  I don't remember.

19   Q.  Okay.  Well, can you tell me how you came about

20  finding the Thomas J. Henry Law Firm or Jeffery

21  Goldberg?

22   A.  Yeah, I remember talking to Mr. Rabino and

23  telling him I had enough of what Joey was doing; and,

24  hopefully, we could get him stop, put an end to it, do

25  something about it.

Ricardo Arredondo, Jr.   4/22/2015

282

1     Q.  Okay.  And when was that?

2     A.  I don't remember the date.  I'd be lying to you

3  if I told you a date.

4     Q.  Okay.  And did Mr. Rabino say anything in

5  response to that?

6     A.  God, I don't remember what he said.  All I know

7  is that we found Mr. Henry's law firm and --

8     Q.  Okay.  Did you find the Mr. Henry's law firm, or

9  did Mr. Rabino find it?

10    A.  We both did.

11    Q.  Together?

12    A.  Together.

13    Q.  What about Mr. Torrez, did you --

14    A.  I don't know.

15    Q.  -- did you ever talk to Mr. Torrez --

16    A.  No.

17    Q.  -- after you left Weatherford, prior to the

18  filing of this lawsuit?

19    A.  No.

20    Q.  We talked about your discrimination claims and

21  your retaliation claims, correct?

22    A.  Correct.

23    Q.  Okay.  Do you have any kind of tape-recordings of

24  conversations with Weatherford employees?

25             MR. TEETER:  Objection, form.

1          PRO SE:
             Joey Estrada
2            561 FM 2508
             Alice, Texas  78332
3            Phone:  361.701.0853
             Email:  jose.estrada@ftsi.com
4

5          That the amount of time used by each party at the

6  deposition is as follows:

7

          Mr. Spiliotis -- 5 hours, 39 minutes
8          Mr. Teeter -- 12 minutes

9          I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties or

11 attorneys in the action in which this proceeding was

12 taken, and further that I am not financially or

13 otherwise interested in the outcome of this action.

14         Certified to by me this 4th day of May, 2015.

15

16

17         Dickie Zimmer, Texas CSR 1954
18         Expiration Date:  December 31, 2015
           Firm Registration No. 150
19         O'Neal*Probst*Wells
           P.O. Box 60769
20         Houston, Texas  77205
           713.521.1314
21

22

23

24

25



EXHIBIT

Arredondo



