# TORREZ DEPOSITION

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

RICARDO ARREDONDO, RICHARD )
RABINO AND MARIO TORREZ, )
     Plaintiffs, )
      )
VS. )CA NO. 2:14-cv-00170
      )
WEATHERFORD INTERNATIONAL, )
LLC and JOEY ESTRADA, )
     Defendants. )


ORAL AND VIDEOTAPED DEPOSITION OF

MARIO RAY TORREZ

April 23, 2015


     Oral and videotaped deposition of
MARIO RAY TORREZ was taken on April 23, 2015, in The Law
Office of Thomas J. Henry, 521 Starr Street, Corpus
Christi, Texas, from 2:33 p.m. to 7:51 p.m., before
Dickie Zimmer, Certified Shorthand Reporter, pursuant to
Notice and the Federal Rules of Civil Procedure and
under the following agreement of counsel for the
respective parties that:

     The deposition may be signed by the witness
before any Notary Public or officer authorized to
administer oaths.

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:
       The Law Office of Thomas J. Henry
 4     521 Starr Street
       Corpus Christi, Texas  78401
 5     Phone:  361.985.0600
       Fax:  361.985.0601
 6     Email:  gteeter@thomasjhenry.com
         By:  Greggory A. Teeter
 7

 8
     FOR THE DEFENDANT, WEATHERFORD INTERNATIONAL,
 9   LLC:
       Jackson Walker L.L.P.
10     1401 McKinney Street, Suite 1900
       Houston, Texas  77010
11     Phone:  713.752.4200
       Fax:  713.752.4221
12     Email:  agarcia@jw.com
         By:  Angeles Garcia
13            Nickolas G. Spiliotis

14

15   ALSO PRESENT:
       Richard Rabino
16     John Garza, Videographer

17

18      *   *   *   *   *   *   *   *   *   *   *

19

20

21

22

23

24

25
```

Mario Ray Torrez   4/23/2015

3

```
 1                        INDEX
 2  TESTIMONY OF:  MARIO RAY TORREZ
 3  EXAMINATION BY:                            PAGE
 4    Ms. Garcia.............................    4
 5                    EXHIBIT INDEX
 6  NO.              DESCRIPTION               PAGE
 7   1       Notice.............................    4
     2       Plaintiff Mario Torrez's First
 8           Supplemental Objections and Answers...   14
     3       Facebook Posts.....................   16
 9   4       Weatherford Employee Earnings for
             Torrez.............................   26
10   5       Enterprise Excellence Policy Employee
             Consent Form (Weatherford0001047).....   39
11   6       Enterprise Excellence Policy
             Harassment (Weatherford0000327-28)....   40
12   7       Handbook Acknowledgement - Employee
             Copy (Weatherford0001043)............   51
13   8       Weatherford Handbook For US Employees
             Dated 1-1-11 (Weatherford0001109-48)..   52
14   9       Code of Conduct Policy Acknowledgement
             Dated 1-11-12 (Weatherford0001041)....   63
15  10       Weatherford Code of Business Conduct
             (Weatherford0000001-36)..............   64
16  11       Weatherford EEO Policy Statement For
             Bulletin Board Posting...............   71
17  12       Listen Up Safe Communication
             (Weatherford0000332-33)..............   71
18  13       Handwritten Notes (Weatherford0000502)   78
    14       Discrimination or Harassment?  What
19           to do at Weatherford.................   81
    15       Plaintiffs' Amended Complaint........   91
20  16       Photos...............................  140
    17       Emails Dated 4-16&18-12
21           (Weatherford0000654-55)..............  147
    18       Initial Reporting of Allegations
22           (Weatherford0001155-59)..............  153
    19       Action Traffic Maintenance Records....  198
23
    Previously Marked
24  Rabino
    12       Video (ducttape.mpg 1, 2, 3)..........  130
25
```

 1   have nicknames?

 2      A.   Yeah.

 3      Q.   And were you ever assigned to a different fleet?

 4      A.   No, ma'am.

 5      Q.   Were you ever assigned to a different crew?

 6      A.   No, ma'am.

 7      Q.   But you may have worked for different service

 8   supervisors?

 9      A.   At one time or another, yes; but only -- only

10   pertaining to that crew.  Because I never left that

11   crew; so, whoever alternated in and out, that's who I

12   worked with.

13      Q.   And who did you understand to be service

14   supervisors on your crew?

15      A.   I just mentioned them to you.

16      Q.   So, that was Mr. Estrada, Trini, Joe I, Monaco

17   and Adrian?

18      A.   Yes.

19      Q.   No one else?

20              MR. TEETER:   Objection, form.

21      A.   Not to my recollection.

22      Q.   (By Ms. Garcia)  Okay.  When you first started at

23   Weatherford, did you undergo some new hire orientation?

24      A.   Yes, ma'am.

25      Q.   Was it a classroom environment?

Mario Ray Torrez   4/23/2015

37

1    A.  Yes, ma'am.

2    Q.  Were other new hires in the room with you?

3    A.  Yes, ma'am.

4    Q.  About how many?

5    A.  About a dozen, if I had to guess, give or take.

6    Q.  Fair enough.  Do you remember who they were?

7    A.  No, ma'am.

8    Q.  Where was the training held?  I'm sorry.  Where

9  was the orientation held?

10   A.  In the outdoor classroom, a little trailer, a

11 portable trailer.

12   Q.  Was this in Alice?

13   A.  Yes, at the -- yes.

14   Q.  Is that trailer different from the yard?

15   A.  It's in the trailer in the yard.  A portable

16 classroom, whatever you want to call it.

17   Q.  We can call it a trailer; is that good?

18   A.  Sounds good.

19   Q.  Do you remember how long the orientation lasted?

20   A.  No, ma'am.  I wouldn't -- no, ma'am.

21   Q.  Tell me what you remember.

22   A.  I remember --

23          MR. TEETER:  Objection, form.

24   A.  -- receiving papers.  I remember -- I don't

25 remember much of the orientation, to be honest.  It was

Mario Ray Torrez   4/23/2015

44

1    Q.  And do you remember where you put this policy?

2    A.  In my car; and then, in my house.

3    Q.  Would you still have it?

4    A.  No, ma'am.  It got lost in the move.

5    Q.  Okay.  Now, at the time you received this policy,

6    did you have any reason to believe that a human

7    resources manager, the vice president of human resources

8    or the corporate legal department would not investigate

9    a complaint of harassment promptly and thoroughly?

10   A.  I --

11           MR. TEETER:  Objection, form.

12   A.  I wouldn't know.  I really didn't understand HR.

13   Q.  (By Ms. Garcia)  Okay.  Would anything lead you

14   to believe that HR was untrustworthy?

15   A.  Yes.

16   Q.  Okay.  What is that?

17   A.  I believe -- let me think about this before I

18   state it.

19       I believe the higher-up authorities in that

20   company had too close of a relationship for it not to be

21   discussed amongst others.

22   Q.  Who do you mean by higher authorities?

23   A.  I mean supervisors and anybody with authority in

24   the office.  I don't believe anything was hush-hush.

25   Q.  Why --

Mario Ray Torrez    4/23/2015

1          Did you ever report anything to HR?

2     A.   No.

3     Q.   Are you including HR in your definition of higher

4  authorities?

5     A.   Yes, ma'am.

6     Q.   Okay.  So, you wouldn't actually know one way or

7  the other?

8               MR. TEETER:  Objection, form.

9     A.   As far as what?

10    Q.   (By Ms. Garcia)  Whether that was true, your

11 belief?

12              MR. TEETER:  Objection, form.

13    Q.   (By Ms. Garcia)  Let me rephrase.

14    A.   Fair enough.

15    Q.   You stated that you'd never reported anything to

16 human resources; is that correct?

17              MR. TEETER:  Objection, form.

18    A.   To my knowledge, no.

19    Q.   (By Ms. Garcia)  Okay.  So, if you'd never

20 reported anything to human resources --

21    A.   Uh-huh.

22    Q.   -- how would you know that they would not keep

23 information confidential?

24    A.   Just a gut feeling, I guess, if you want to put

25 it that way.  I just see how the relationship is inside

Mario Ray Torrez   4/23/2015

50

```
 1  policy?
 2              MR. TEETER:  Objection, form.
 3     A.  I wouldn't know.  I don't know what they done at
 4  this point.
 5     Q.  (By Ms. Garcia)  Okay.  So, you don't have any
 6  evidence to suggest whether that's the case?
 7              MR. TEETER:  Objection, form.
 8     A.  To support them that they have investigated; is
 9  that what you are asking?
10     Q.  (By Ms. Garcia)  Let me rephrase --
11     A.  Yeah.
12     Q.  Do you want me to rephrase?
13         Okay.  Do you have any evidence to suggest that
14  any of these people --
15     A.  Uh-huh.
16     Q.  -- would not promptly and thoroughly investigate
17  a violation of the sexual harassment policy?
18              MR. TEETER:  Objection, form.
19     Q.  (By Ms. Garcia)  It's a "yes" or "no."
20              MR. TEETER:  No, don't instruct him to
21  answer "yes" or "no."  You can -- he can answer the
22  question that you ask, Counsel.
23     A.  No, I don't have no evidence to support that.
24     Q.  (By Ms. Garcia)  Did you ever ask questions about
25  this sexual harassment policy?
```

Mario Ray Torrez    4/23/2015

73

1    Q.  What is the difference?

2    A.  The yard is in Alice, the field is at --

3    Q.  I'm sorry.  The yard is in?

4    A.  Alice.

5    Q.  Alice.

6    A.  And the field is in -- wherever the well is at.

7  It could be in Sinton.  It could be in Laredo.  It could

8  be in --

9    Q.  Okay.

10   A.  -- location.

11   Q.  Okay.  And you, previously, mentioned a trailer.

12  Is that in the yard?

13   A.  That's in the yard.

14   Q.  In Alice?

15   A.  In Alice.

16   Q.  Is that where human resources is located?

17            MR. TEETER:  Objection, form.

18   A.  I believe so.

19   Q.  (By Ms. Garcia)  Okay.  And where is dispatch?

20   A.  At the Alice yard.

21   Q.  At the yard?

22   A.  Yeah.

23   Q.  Okay.  So, saying "dispatch" and saying "the

24  yard" are saying the same thing?

25   A.  Yeah.

Mario Ray Torrez    4/23/2015

74

1    Q.   Okay.  Are there breakrooms in there?

2    A.   Actually, I don't know.  I never went as far as

3  the picnic tables.

4    Q.   Okay.  Do other people?

5    A.   I wouldn't know --

6             MR. TEETER:  Objection, form.

7    A.   -- because I wouldn't know if there's a

8  breakroom.  I really don't know if there's a breakroom.

9    Q.   (By Ms. Garcia)  Why didn't you go further than

10  the picnic tables?

11    A.   That is -- that's all I was required to go.

12    Q.   Okay.  All righty.  Were you allowed in the

13  trailer?

14    A.   After -- aside from orientation, I wouldn't even

15  know.  I never even attempted it.

16    Q.   Okay.  Were you allowed in dispatch?

17    A.   Yes, that's where the timeclock was at.

18    Q.   So, you reported to dispatch daily?

19    A.   Upon service, yeah, whenever I was called in.

20    Q.   Okay.  And what about in dispatch, did you ever

21  notice a bulletin there?

22    A.   No, I noticed the timeclock.

23    Q.   Okay.

24         All right.  Sir, I've just handed what was marked

25  as Exhibit No. 12, correct?

Mario Ray Torrez   4/23/2015

84

1    A.  I couldn't even -- I couldn't even guess.  Age
2  can be deceiving.
3    Q.  Okay.  Would you guys play pranks on each other?
4    A.  Not me in general.
5    Q.  When you say not you in general, would anybody
6  else?
7    A.  Yes, I've observed pranks.
8    Q.  And would you say that the guys on your crew were
9  fairly young?
10   A.  I couldn't tell you.
11   Q.  You couldn't tell me?
12   A.  I couldn't -- no, I'm terrible at ages.
13   Q.  Okay.  And what type of pranks would they play?
14   A.  I take it, from a firsthand point of view?
15   Q.  Uh-huh.
16   A.  Because, honestly, it's from my perspective.
17   Q.  Just --
18       Okay.  Let me -- let me clarify.  What I'm asking
19  for are examples of pranks that you saw.
20   A.  Actually, I -- that I saw, I don't recollect.  I
21  was thinking of pranks, basically, pulled on me.  I was
22  more of the victim than anything.
23   Q.  Okay.  What kind of pranks?
24   A.  I've had brake cleaner sprayed on my ass on my
25  overalls.  I've had all sorts of accessories glued to my

1   hardhat without my knowledge.  I've been duct taped on

2   multiple occasions.  That's not necessarily a prank,

3   it's more harassment.

4      Q.  You said duct tape, brake cleaner and things on

5   your hat --

6      A.  Yeah.

7      Q.  -- on your hardhat?

8      A.  Yeah.

9      Q.  And did you ever report any of this?

10           MR. TEETER:  Objection, form.

11     A.  No, ma'am, I didn't.

12     Q.  (By Ms. Garcia)  Okay.  And would you say those

13  pranks were harmless?

14     A.  No.

15     Q.  How often were people pranking each other?

16           MR. TEETER:  Objection, form.

17     A.  I can't recall.

18     Q.  (By Ms. Garcia)  Did people play pranks on other

19  people, besides you?

20           MR. TEETER:  Objection, form.

21     A.  I can't recall.

22     Q.  (By Ms. Garcia)  Okay.  What about roughhousing?

23  Do you understand what I mean by that?

24     A.  To an extent.

25     Q.  What do you understand roughhousing to mean?

Mario Ray Torrez    4/23/2015

87

1     A.   I don't -- I don't remember, ma'am.

2     Q.   And you worked at Weatherford for three months?

3     A.   I believe so.

4     Q.   Okay.

5     A.   I don't recall.

6     Q.   Okay.  And what about horseplay, do you

7  understand what horseplay is?

8     A.   No.  I put it in the same category as

9  roughhousing, basically.

10    Q.   Okay.  And what about somebody putting

11  somebody -- somebody putting sand in someone else's

12  boots --

13    A.   I do recall that.

14    Q.   -- did you see anything like that?

15    A.   I do recall an incident.  Who was directly

16  involved, I don't recall.

17    Q.   That's fine.  What would you categorize that as?

18    A.   What were your definitions, again?

19    Q.   Roughhousing, pranking or horseplay.

20    A.   Probably pranking, I would assume.  I would

21  guess.

22    Q.   Okay.

23         Okay.  And how often -- what about joking around,

24  anything like that?

25    A.   There was joking around constantly.

Mario Ray Torrez    4/23/2015

88

1    Q.   Constantly?

2    A.   Yeah.

3    Q.   What did that consist of?

4    A.   It was just -- yeah, there was just jokes.  Not

5    necessarily anything bad, just joking, just chit-chat,

6    basically.

7    Q.   Would they use vulgar language?

8    A.   I don't recall.

9    Q.   You don't recall ever hearing vulgar language?

10   A.   No, I would assume so.  It was a job site.  It

11   was construction.  I assume there was vulgar language.

12   Q.   Okay.  So, you never heard anything, like --

13   nothing?  You can't give me one example of the vulgar

14   language you might have heard or remember?

15   A.   No, I can't.

16   Q.   Okay.

17        Okay.  Now, with the exception of anything that

18   Joey Estrada did, do you think that pranking or

19   roughhousing was motivated by sexual attraction?

20   A.   Aside from Joey Estrada --

21   Q.   Right.

22   A.   -- correct?  Is that what you are saying?

23   Q.   Yes.

24   A.   I wouldn't know.  I don't know nobody else's

25   intentions.

Mario Ray Torrez   4/23/2015

90

1      A.  I wouldn't know.  I mean, obviously, when I would

2   assume someone is flirting with me, it's a female

3   aspect.

4      Q.  Do you think any of your supervisors were ever

5   flirting with you?

6           MR. TEETER:  Objection, form.

7      A.  Yes, ma'am.

8      Q.  (By Ms. Garcia)  Who?

9      A.  Joey Estrada.

10      Q.  What about other than Mr. Estrada?

11           MR. TEETER:  Objection, form.

12      A.  No.  Not that I'm aware, no, I don't think they

13   were flirting with me.

14      Q.  (By Ms. Garcia)  Okay.  Did you ever play a prank

15   on anyone else?

16      A.  Not that I recall.

17      Q.  Did you ever use vulgar language?

18      A.  I'm sure I did.

19      Q.  Did you ever roughhouse with anyone?

20      A.  Not that I recall.

21      Q.  Okay.  What about on Mr. Rabino, did you ever

22   prank him?

23      A.  Not that I recall.

24      Q.  Did you ever prank Mr. Arredondo?

25      A.  Not that I recall.

Mario Ray Torrez   4/23/2015

91

1    Q.   Did either of them ever prank you?

2    A.   Not to my knowledge.

3    Q.   Okay.   Who sprayed brake cleaner on your

4    coveralls?

5    A.   I have no idea.   I never found out who was at the

6    bottom of it.

7    Q.   Did you suspect anyone in particular?

8    A.   I suspected everybody in particular.

9    Q.   Even your friends?

10   A.   What's that?

11   Q.   Did you have any friends on the crew?

12   A.   At that point, it wasn't a friend perspective.

13   It was I had people I talked to more than others.

14   Q.   Okay.   And the brake cleaner situation, did it

15   upset you?

16   A.   No.   It was -- it did, but it was expected.   I

17   was pretty much a target.   I was an easy target for

18   everybody.

19   Q.   Okay.   Now, let's talk about -- let's talk about

20   your claims.

21              (Exhibit 15 marked)

22   Q.   (By Ms. Garcia)   I'm going to hand you what's

23   been marked as Exhibit 15.

24              MS. GARCIA:   Mr. Teeter.

25              MR. TEETER:   Thank you.

Mario Ray Torrez   4/23/2015

96

1     A.   Uh-huh.

2     Q.   Let's put aside the date.

3     A.   So, in general, are you asking have I ever seen

4  anybody be harassed sexually in general?

5     Q.   Sexually, verbally.  I want to know to everything

6  you saw --

7     A.   Yes, I did see it.

8     Q.   -- that you considered harassment at Weatherford.

9     A.   Yes, I have seen it.

10          MR. TEETER:  Objection, form.

11    A.   Exact dates and instances, no, I can't.

12    Q.   (By Ms. Garcia)  Okay.  Let's talk about --

13    A.   I -- I know --

14    Q.   I'm sorry.

15    A.   -- I did see it.  But three-and-a-half years ago,

16  asking me now, I don't recall the exact situations.

17    Q.   Okay.  What do you recall?

18    A.   I recall Joey on a regular basis always doing

19  that with his finger (indicating).

20    Q.   And that is --

21    A.   His finger was cut off, roughly, right above the

22  knuckle; and it was always his little threat -- and I

23  almost want to say it was his middle finger, don't quote

24  me -- but he was always -- that was always his little --

25  little threat to keep people on edge.

Mario Ray Torrez   4/23/2015

1        Like, "You want the nub?"  "You want the nub,

2   bitch?"  That's a -- it was a -- it was almost like one

3   of those things like a car alarm in Detroit.  It's

4   almost you're so used to hearing it, all of a sudden you

5   just don't acknowledgement it anymore; but it was always

6   there.

7        Q.  And for purposes of the written record, what you

8   were doing is putting your middle finger up against the

9   palm of your other hand and moving it in a circular

10  motion --

11       A.  Correct.

12       Q.  -- is that correct?

13       A.  That's correct.

14       Q.  And along with that gesture, he would say what?

15       A.  "You want the nub, bitch," or whatever

16  terminology he used, it always involved a threat with a

17  nub --

18       Q.  Okay.

19       A.  -- whatever word choice he used that day.

20       Q.  Would he say this to everyone?

21       A.  To everyone, I can't guarantee you did.  To the

22  majority, yes, I assure you he did.

23       Q.  And would he -- how often would he say it?

24       A.  I don't recall.  I recall to myself, maybe, two

25  or three times a day.

Mario Ray Torrez   4/23/2015

98

1 Q. Okay. And what about to other people?

2 A. I didn't really pay attention to his deals with

3 other people; but, like I said, it was always said.

4 It's just that at times it wasn't acknowledged.

5 Q. What else did he do?

6 A. Can you please ask the question, again?

7 Q. What else --

8 A. So, I can recall what I'm answering.

9 Q. Of course. Sure.

10 What else did Mr. Estrada do that was harassing

11 or verbally abusive?

12 A. As far as me, can I speak for --

13 Q. Everyone.

14 A. Everyone? Okay.

15 Q. Anything and everything.

16 A. It was a constant basis where I was belittled,

17 where I was never good enough. "Bitch," "asshole,"

18 "fucking" -- whatever you could think of. Whatever he

19 chose to belittle me that day. It was always made known

20 to me that I wasn't good enough, or I wasn't going to

21 amount to shit.

22 Q. Uh-huh.

23 A. Whatever terminology he chose to use, I have no

24 idea; but it was on a constant basis it was always put

25 in my face. And that wasn't even by just Mr. Estrada,

Mario Ray Torrez   4/23/2015

 1    A.  Yes, ma'am.

 2    Q.  Okay.  Now, what did you see him doing to other

 3  people?

 4    A.  Other people, well, as far as the vulgar

 5  language, that was on a regular -- regular basis.  It

 6  was.  It was just -- I didn't directly see it, but I

 7  could hear it.  It was one of those voices you could

 8  just hear in the background, and you would acknowledge

 9  whose it was.  You were just kind of waiting the time --

10  waiting to hear it.  Do you know what I mean?  Like, you

11  would -- you would just assume he's going to start

12  talking shit, and that was it.  It was -- yeah, a

13  specific timeline, no.  I don't know specific times or

14  incidents, but the voice was always -- it was always

15  there.

16    Q.  Okay.  So, he was verbally abusive to other

17  people on a regular basis; is that right?

18          MR. TEETER:  Objection, form.  Misstates

19  testimony.

20          MS. GARCIA:  I'm asking him whether that's

21  his testimony.

22    A.  Say it -- rephrase?

23    Q.  (By Ms. Garcia)  Was he verbally abusive to other

24  people on a regular basis?

25    A.  Yes.

Mario Ray Torrez   4/23/2015

103

1   to.

2      Q.  And if I asked you -- I know you're bad with

3   timelines, but if I asked you whether what we've talked

4   about is true from February 2012 incident to April

5   incident for other people, would you say it was pretty

6   consistent?

7      A.  Yes.

8            MR. TEETER:  Objection, form.

9      Q.  (By Ms. Garcia)  Okay.  So, I want to talk about

10  the February incident.  Do you recall the date you --

11     A.  You're talking about the February incident?

12     Q.  Uh-huh.

13     A.  No, I don't recall the date.  It was in February.

14     Q.  Got it.  Can you explain what happened?

15     A.  That day, in general, we were transporting trucks

16  from one location to another.  The exact location, I

17  don't know.  I know we were transporting trucks from one

18  location to another.  I wasn't able to drive a truck at

19  the time.  On one specific trip from moving from the old

20  location to the new one, we had arrived there earlier

21  by, like, 20 or 30 minutes than the people we were

22  waiting for.  Joey always made me ride with him.  So, we

23  were arrived at the location.

24          In the time period that we were waiting,

25  Nugget -- I don't know his -- Nugget is his name,

Mario Ray Torrez    4/23/2015

1    nickname.  I recall him chasing me down, trying to grab

2    me, which I broke loose the first time; and I kept

3    running.  At that point -- I had ran short of breath, he

4    caught me.  At that point, three or four other

5    individuals came and grabbed me, too.  I heard Joey yell

6    for the duct tape.  They got the duct tape; and they

7    began taping me from my ankles at every joint to where I

8    was totally, you know, useless.  I mean, I was totally

9    duct taped.  At that point they put me on the tailgate

10   of the truck, stuck a cigarette in my mouth, and left me

11   there for some period of time.

12       Q.  Was the truck moving?

13       A.  No, ma'am.

14       Q.  Why did they give you a cigarette?

15       A.  I think it was just part of the little joke.  I

16   think it was to play along with what they thought would

17   be funny.

18       Q.  And what happened after you were left there for a

19   period of time?

20       A.  Eventually, they came back.  And who in

21   particular did it, I have no idea; but came back and

22   started laughing about it.  Are you ready -- you know,

23   this and that; and cut the duct tape loose and let me

24   loose.  And --

25       Q.  Who cut the duct tape loose, do you remember?

Mario Ray Torrez    4/23/2015

106

1    Q.  Okay.  So, maybe others?

2    A.  There were definitely others.

3    Q.  There were definitely others?

4    A.  Yeah.

5    Q.  And were the others actively involved?

6    A.  Yes.  Yes, because it took more than three guys

7  to hold me down.  And I know Joey wasn't the one holding

8  me down, and I know Trey Barton wasn't the one holding

9  me down.  So, besides Nugget, there was at least three

10  or four other people holding me.

11    Q.  Okay.  And were there people who were witnessing

12  the incident, but not participating?

13    A.  Yes.

14    Q.  Who was that?

15    A.  I have no idea.

16    Q.  And apart from Mr. Estrada, were any service

17  supervisors present?

18    A.  Not that I recall.

19    Q.  And where did this happen?

20    A.  I don't recall.  It was on -- it was on site.

21  What site, I have no clue.

22    Q.  And you said it started with Joey Estrada

23  yelling?

24    A.  It -- it started with Nugget chasing me down and

25  trying to grab me.  At that point I had no reason -- I

Mario Ray Torrez   4/23/2015

 1   had no idea why he was trying to grab me.  It was the

 2   first time it happened.  I was new to the crew, and I

 3   didn't know what was going on.  I really didn't know

 4   what was going on.

 5       Q.  Okay.  Did you run away?

 6       A.  Oh, yeah, I tried running.  I broke loose the

 7   first time, and he caught me after I lost my wind.

 8       Q.  Okay.  And how long did it last?  Approximately,

 9   how long did it last?

10       A.  From start to finish?

11       Q.  Yes.

12       A.  At least an hour and a half, I would guess.  Over

13   an hour.

14       Q.  Was there anything sexual about the incident?

15            MR. TEETER:  Objection, form.

16       A.  Not on my end.

17       Q.  (By Ms. Garcia)  I mean --

18       A.  If they enjoyed touching me, that's up to them.

19   I have no idea.

20       Q.  Okay.  What about Mr. Estrada, what exactly did

21   he do?

22       A.  Actually, Mr. Estrada just ordered someone to get

23   the duct tape; and he just, basically, sat there and

24   talked shit in front of my face the whole time.  Just,

25   basically, poking jabs at me is what he was doing.

Mario Ray Torrez    4/23/2015

108

1    Q.  Like, what?

2    A.  And then, he actually did pull out his nub.  At

3  that time I think he just stuck it in my ear -- got it

4  wet and stuck it in my ear.

5    Q.  And what kind of things was he saying to you?

6    A.  "Come on, bitch."  "Come on, bitch, get loose."

7  "Get loose, bitch."  Blah, blah, blah, blah, blah, blah.

8  "Fucking duct tape his arms to his waist."  Because they

9  had already duct taped me like that, and they ended up

10  duct taping me to where I was, like, right here; and I

11  couldn't break that loose (indicating).  And that's what

12  they wanted to do.  But he was just, basically,

13  ordering -- he was, basically, the commander-in-chief;

14  and they were just -- they were just doing exactly what

15  he ordered.

16    Q.  Did you ever complain about it?

17    A.  To workers, yes.  To anybody higher up than Joey,

18  no.  It was definitely -- it was definitely known of by

19  the higher ups, but nothing was ever done about it.

20    Q.  And why didn't you complain about it?

21    A.  Because I was in fear of my job.  I was new.  I

22  didn't -- I didn't want to burn my bridge.  I couldn't

23  afford to lose my job.

24    Q.  Did you think it crossed the line?

25    A.  Oh, definitely.  It crossed the line as soon as

Mario Ray Torrez   4/23/2015

1   he put his hands on me.

2      Q.  And did it ever -- did you ever think "I should

3   complain about it"?

4      A.  Yes.

5      Q.  Okay.  And you didn't?

6      A.  No, out of -- no, out of intimidation, out of

7   fear, no, I didn't.

8      Q.  And it's because you were new?

9            MR. TEETER:  Objection, form.

10     A.  I was scared.

11     Q.  (By Ms. Garcia)  Okay.

12     A.  I was scared for multiple reasons.

13     Q.  Okay.  And so --

14        Okay.  And did you say anything during the

15   incident?

16     A.  Yeah, I said, "Get off" -- I said, "Get off me,

17   fuckers."  I was, like -- when he started -- when he

18   first started chasing me and I broke loose, I remember

19   telling him, "Get the fuck away from me"; and I kept

20   running.  But then, I was already out of steam.  And

21   then, once I was out of steam, I was basically -- I

22   couldn't do nothing, if I wanted.  I was already so

23   burned out from running.  It was at the end of the day,

24   keep in mind.  And I'm not used to the Texas heat,

25   anyway; and, yeah, I was burned out in an instant.

Mario Ray Torrez   4/23/2015

1   "Is that fucking funny?"

2          And he said, "To everyone but you."

3          And Marty and him started laughing; and then,

4   that pretty much dispersed the whole conversation.  It

5   just kind of went to something else.  Him and Joey

6   started talking about probably work and walked away.

7          So, I mean, yeah, it was definitely known about

8   at Weatherford.  I doubt the owner knew about it, but

9   I'm sure everybody else did.

10   Q.  And did you tell Rudy or Marty that you found the

11   duct taping to be offensive?

12          MR. TEETER:  Objection, form.

13   A.  How do you tell somebody who's laughing about it

14   that it's offensive?  I mean, obviously, at that moment

15   is when I knew they don't care.

16          MS. GARCIA:  Objection, nonresponsive.

17   Q.  (By Ms. Garcia)  Did you tell Rudy or Marty ever

18   that you found the duct taping offensive?

19          MR. TEETER:  Objection, form.

20   A.  No, I thought it spoke --

21   Q.  (By Ms. Garcia)  So --

22   A.  -- for itself.

23   Q.  Okay.  How were you supposed to know unless --

24          Okay.  Let's take a look at Paragraph 19.  And

25   the second-to-last sentence on this page says, "Torrez's

```
 1   one that occurred just before you went to Michigan.
 2        Do you understand?
 3   A.   Yes, I understand.
 4             MR. TEETER:  Objection, form.
 5   Q.   (By Ms. Garcia)  Okay.  Do you recall the exact
 6   date that happened?
 7   A.   No, ma'am.
 8   Q.   I'll represent to you that it was April the 11th,
 9   2012.  Okay?
10   A.   Okay.
11   Q.   Explain to me what happened from your
12   perspective.
13   A.   This is to the best of my knowledge --
14   Q.   Uh-huh.
15   A.   -- that I remember.  I remember being under the
16   canopy tent where there's picnic tables set up.  And I
17   remember everybody making their way -- gathering under
18   the canopy tent.  I remember me sitting next to my
19   mentor, Animal.  And as we're sitting there,
20   conversation is going on, people are doing it amongst
21   theirself.
22        I remember hearing David Gonzalez in the
23   background saying, "We should give Mario a good-bye
24   present," or -- and I believe he said -- I believe he
25   said, "Joey, we should give Mario a good-bye present."
```

Mario Ray Torrez    4/23/2015

1   the duct tape.  The duct tape came out of nowhere.  I

2   don't know how -- what the situation was, but the next

3   thing I know -- it was a pointless struggle.  There was

4   no point in even struggling.  I had -- I had probably a

5   dozen hands on me, just coming from one way or the

6   other; and I was tired to begin with.

7          They started duct taping me from my ankles to my

8   knees, the same thing -- the same procedure they did on

9   location.  At that point they then duct taped me to the

10  pole of the canopy tent.  So, not only was I duct taped,

11  I was also duct taped to a pole now where I couldn't go

12  nowhere; and I had individuals on each side of me

13  holding me and wherever.  There was -- there was hands

14  touching me everywhere.

15         And I remember -- I remember telling, like,

16  "Fucking, let me go."  "Let me go," blah, blah, blah.

17  Just trying to get -- you know, thinking it was a joke

18  at first.  Just, basically, trying to get -- just get

19  away from the situation.  I thought it was going to

20  happen -- stop as fast as it happened.

21         Well, then, at one point I realized this is --

22  this is more than I'm thinking it is.  It's not a joke

23  no more.  It's -- they are actually going to do through

24  with whatever they are intending to do, because I was

25  already duct taped, I was already immobile, I couldn't

Mario Ray Torrez    4/23/2015

123

```
 1    yelling --
 2        A.   David Gonzalez.
 3        Q.   Okay.  That was the "good-bye present" comment?
 4        A.   Yeah, "We should give Mario" -- "We should give
 5    Mario a good-bye present, Joey, like we did" -- you
 6    know, whatever.  Basically, like they did before is what
 7    they were saying.
 8        Q.   Okay.  Did you ever work at Weatherford again
 9    after that day?
10        A.   I believe I worked the next day.
11        Q.   You did?
12             And when did you go to Michigan, do you know, how
13    many days later?
14        A.   No, I don't recollect how many days later.  It
15    wasn't long.
16        Q.   So, could it have been one more day of work; and
17    then, you were leaving?
18        A.   You can assume that, yeah.
19        Q.   Okay.  And you said Nugget was there, right?
20        A.   Yep.
21        Q.   You said Adrian?
22        A.   No, you said Adrian.
23        Q.   Oh, I'm sorry, I got that confused.
24             David Gonzalez; is that right?
25        A.   Yes.
```

Mario Ray Torrez   4/23/2015

128

1   Q.  About his waist level, then?

2   A.  I don't recall.  He put his hand in there with no

3   problem; so, whatever -- wherever they had to be for him

4   to do it, that's where they were at.

5   Q.  Did you actually see him touch himself?

6   A.  I could see the motion where his nuts are outside

7   of his pants touching -- definitely maneuvering his hand

8   around his genitals.

9   Q.  Okay.  So, I know it might be difficult to

10  remember; but what happened after you -- after that?

11  You were still taped to the pole.  What happened?

12  A.  I drew a blank.  Like I said, I don't even

13  remember somebody taking the duct tape off.  I just

14  remember at one point being done -- yeah, I just

15  remember it being done.  I don't even remember the van

16  ride back that day.  I couldn't recall anything after

17  that incident.  I don't remember anybody having a

18  conversation with me.  I don't remember anything brought

19  to my attention.  I recall nothing.

20  Q.  Were you injured during the incident?

21          MR. TEETER:  Objection, form.

22  Q.  (By Ms. Garcia)  I'm sorry.  Let me be clear.

23      Were you injured during the April incident?

24          MR. TEETER:  Objection, form.

25  A.  Emotionally, mentally.

O'Neal Probst Wells - 713-521-1314
Houston/Galveston   Dallas/Fort Worth   Austin/San Antonio   Bryan/College Station   Corpus Christi

Mario Ray Torrez   4/23/2015

129

1    Q.   (By Ms. Garcia)  And did you report the incident?

2    A.   No, ma'am, I didn't have time.

3    Q.   Okay.  Any physical injuries at all?

4    A.   Just a bad taste in my mouth.

5    Q.   Did you get any kind of medical treatment?

6    A.   No, ma'am.

7    Q.   Okay.  And were you aware that Rabino was

8  recording the incident?

9    A.   Not till after the incident.  I had no idea he

10  was doing it during the incident.  I had no idea about

11  anything other than Joey at the time.

12    Q.   Did you talk to Mr. Rabino after?

13    A.   Yes.

14    Q.   What did you guys talk about?

15    A.   I don't -- I don't know.  I remember him being in

16  my presence.  I remember -- I couldn't even tell you

17  what we talked about.  I just remember Rabino more than

18  anybody.  I think he was the first one that actually

19  came to my aid; and I remember him, that he was there.

20  I don't -- I couldn't even recall the conversation, what

21  we talked about.  I couldn't even tell you if he showed

22  me the video.  I just know that I remember his face.

23    Q.   And have you seen the video before?

24    A.   Once.

25    Q.   Okay.  I'm going to show you the video.

Mario Ray Torrez   4/23/2015

135

1    Q.   Okay.  And --

2    A.   I didn't know it was Joey.  I can't see behind my

3  head.

4    Q.   Okay.  And you can't tell who said, "Damn, dude,

5  that's fucked up"?

6    A.   No, because I can't tell with the voice on the

7  computer.  Because, actually, the other one I thought

8  was Trini; but Trini, when I looked at the picture, he

9  wasn't saying nothing with his lips; so, it couldn't

10  have been Trini.

11    Q.   Uh-huh.  So, I think -- is it possible it was

12  Rabino?

13            MR. TEETER:  Objection, form.

14    A.   Is it possible it's Rabino?  I guess, it could be

15  a possibility.  I have no idea.

16    Q.   (By Ms. Garcia)  Okay.  And what about, "Damn,

17  dude, that's fucked up"?

18    A.   I have no idea.

19    Q.   Okay.  And --

20    A.   I haven't -- I haven't talked to these guys in

21  three-and-a-half years --

22    Q.   I understand.

23    A.   -- I don't even remember what they sound like.

24    Q.   And then, you say, "Rabino, you're supposed to be

25  my friend."

Mario Ray Torrez    4/23/2015

136

1        Do you recall watching that?

2    A.  No.

3    Q.  Do you want me to replay it?

4    A.  You can.

5            (Mr. Richard Rabino entered the room)

6                (Video started)

7    Q.  (By Ms. Garcia)  No, go.

8        (Inaudible).  Who says that?

9                (Video stopped)

10   Q.  (By Ms. Garcia)  "Look at Joey, he's fucking

11   savoring it?"

12                (Video started)

13   Q.  (By Ms. Garcia)  Did you hear that?

14   A.  Uh-huh.

15                (Video stopped)

16   Q.  (By Ms. Garcia)  So, the words are, "Look at

17   Joey, he's fucking savoring it."  And then, is it you

18   that says, "Rabino, you're supposed to be my friend"?

19   A.  According to the video, yeah.

20   Q.  And who said -- can you tell now who said, "Look

21   at Joey, he's fucking savoring it"?

22   A.  No.

23   Q.  Okay.  So, were you under the impression that

24   Rabino was actively participating in this?

25                MR. TEETER:  Objection, form.

Mario Ray Torrez   4/23/2015

137

1    A.   Was I?   I was never under the impression that he

2    had any involvement in it.

3    Q.   (By Ms. Garcia)   But why did you say, "You're

4    supposed to be my friend"?

5    A.   Well, as far as putting his hands on me, he never

6    touched me at all.   When people do this, it's almost

7    common that someone has a camera on them.   I mean,

8    everybody has a smart phone.   And at the end of the day,

9    it never goes to that extent.

10    Q.   Uh-huh.

11    A.   I'm sure Rabino doing that, he never thought it

12    was going to go to that extent.

13    Q.   Uh-huh.   I have just --

14         Okay.   And what about the other people in this

15    video, did you think they were your friends?

16    A.   No.

17    Q.   Did you think that they would know that it was

18    going to get that far?

19    A.   No, I don't think -- no, no.   I don't -- I don't

20    think they really care if it going to get that far.   If

21    Joey wanted something done, it was going to be done.

22    They wouldn't have cared to what extent it got done, as

23    long as they looked good in Joey's eyes, that's all they

24    cared about.   That's pretty much how it was.

25    Q.   Would that include Rabino?

Mario Ray Torrez   4/23/2015

139

1   recording these types of incidents?

2       A.  I'm clueless to that.  I have no idea.  I have no

3   idea.  I've seen two incidents recorded, and they both

4   involved me.

5       Q.  Uh-huh.

6       A.  So, to say, in general, that every incident is

7   recorded would be a lie on my part, because I don't

8   know.

9       Q.  Uh-huh.

10      A.  I know my two incidents, in general, were

11  recorded.

12      Q.  Uh-huh.  And would Joey Estrada watch the videos?

13      A.  I'm clueless to that.  I wouldn't know.

14      Q.  Okay.  I just have one more question about the

15  video --

16      A.  Uh-huh.

17      Q.  -- if that's okay.  It's at the very end.

18              (Video started and stopped)

19      Q.  (By Ms. Garcia)  Who says that?  At the end, who

20  says, "Hey, 50,000 for the video"?

21      A.  I'm assuming Richard.

22      Q.  Rabino?

23      A.  (Witness nods head.)

24      Q.  Okay.

25              MR. TEETER:  Okay.  Is this a good time for

Mario Ray Torrez   4/23/2015

140

 1  a break?

 2            MS. GARCIA:  I'm sorry.

 3            MR. TEETER:  Do you want a break?

 4     Q.  (By Ms. Garcia)  I'm sorry.  I just need to

 5  clarify something for the record.

 6         When I asked you if -- you said -- you said, "I'm

 7  assuming," and I said -- you said, "I'm assuming it was

 8  Richard."  And I said, "Rabino."  You nodded your head.

 9  Was that a "yes," just for purposes --

10     A.  "Yes," that we're talking about the same person?

11     Q.  -- of the written record?

12     A.  Yes.

13     Q.  Okay.

14            MS. GARCIA:  Okay.  We can take a break.

15            THE VIDEOGRAPHER:  The time is 5:49 p.m.,

16  and we're off the record.

17            (Recess from 5:49 p.m. to 6:05 p.m.)

18            THE VIDEOGRAPHER:  The time is 6:05 p.m.,

19  and we are back on the record.

20     Q.  (By Ms. Garcia)  Okay.

21         All right.  Mr. Torrez, I'm going to show you

22  some photos that were produced to us by your attorney.

23  Okay?

24                 (Exhibit 16 marked)

25     Q.  (By Ms. Garcia)  And I'm handing you what's been

Mario Ray Torrez   4/23/2015

141

```
 1  marked as Exhibit 16.
 2          Is that you in the picture?
 3      A.  Yes, ma'am, it is.
 4      Q.  Okay.  And you are tied up?
 5      A.  Yes, ma'am.
 6      Q.  And what is the person to the left of the photo
 7  doing?
 8      A.  Duct taping me.
 9      Q.  Duct taping you?
10      A.  I'm not sure if he's duct taping -- I'm assuming
11  he is.  I can't tell what he's doing.  Is he duct taping
12  me or cutting me loose?
13      Q.  I'm not sure.  One of the two, right?
14      A.  Yeah.
15      Q.  And who is that?
16      A.  That's Isaac.
17      Q.  Okay.  And who is in the -- do you see this
18  person we can only see their head?
19      A.  That's Animal.
20      Q.  Okay.  And what about on the other -- on the
21  other side of you?
22      A.  The headless one?
23      Q.  Yes.
24      A.  I couldn't tell you.  I can't see his head.
25      Q.  Oh, I'm sorry.  No, on the other side of you
```

Mario Ray Torrez   4/23/2015

142

```
 1   sitting down, it looks like he's touching you or doing
 2   something.
 3       A.  That's Trini.
 4       Q.  Okay.  Was this after the April 11th incident?
 5   Let me ask you this --
 6       A.  No, ma'am, I believe this is the April 11th
 7   incident.
 8       Q.  Oh, okay.  And is this -- does this look like the
 9   tent area that we saw in the video?
10       A.  Yes, ma'am.
11       Q.  And if you'd look at the next picture, that's
12   you, again; is that right?
13       A.  Yes, ma'am.
14       Q.  And now -- and you're holding a cigarette in your
15   hand?
16       A.  Yes, ma'am.
17       Q.  And are you smiling?
18       A.  Yes, ma'am.
19       Q.  And who is next to you standing up?
20       A.  Directly next to me?
21       Q.  Yes.
22       A.  Trini.
23       Q.  Can you figure out anybody else in the picture?
24       A.  I believe that's David Gonzalez behind Trini to
25   his left -- to his left.
```

Mario Ray Torrez  4/23/2015

144

1    Q.  I mean, do you recall your prior testimony?

2    A.  Yes.

3    Q.  And once you were in Michigan, what happened?

4        Did anybody call you?

5    A.  I don't recall.

6    Q.  Did you talk to anybody from Weatherford at all?

7    A.  Yes, I did.  I don't recall whether I was still

8  in Texas or in Michigan.

9    Q.  And when was the first time you spoke to Lisa

10 Mora?

11   A.  I don't recall.  After that incident, maybe.  I

12 don't recall.

13   Q.  Okay.  Do you recall whether she called you?

14   A.  Yeah, she called me.

15   Q.  And what did she tell you?

16   A.  She asked me if there was an incident that

17 happened on the jobsite.

18   Q.  And she asked you --

19   A.  Yes.

20   Q.  -- you said?

21       What did you say?

22   A.  I said, "Yes."

23   Q.  And did you ask her how she knew?

24   A.  Later on in the conversation I did.

25   Q.  And what did she say?

Mario Ray Torrez    4/23/2015

145

```
 1      A.  She wouldn't tell me who told her.

 2      Q.  Do you know who reported it to her?

 3      A.  No, I don't to this -- no.

 4      Q.  Okay.  And did you -- how many times did you

 5  speak to Lisa Mora?

 6      A.  One, for sure.  I'm not sure after that.  One,

 7  for sure.

 8      Q.  Do you remember if you were in communication with

 9  Mr. Rabino at the time?

10      A.  Well, I'm always in communication with

11  Mr. Rabino, regardless of that incident or not.  We

12  always talk.

13      Q.  Okay.  And what did you talk about, after that

14  incident?

15      A.  I don't recall.  I couldn't tell you if it was

16  about my kids or what it was about, I couldn't tell.

17      Q.  Did you tell him that Lisa called you?

18      A.  I don't remember if I did or not.

19      Q.  Did y'all discuss hiring an attorney?

20      A.  I don't remember the context of the conversation.

21  I don't remember what was talked about.

22      Q.  But at some point you discussed hiring an

23  attorney?

24      A.  Yes, at some point I imagine we did, yeah.

25      Q.  And did you ever tell him about your conversation
```

Mario Ray Torrez    4/23/2015

150

1    A.  Yes.

2    Q.  What did he say?

3    A.  He said -- I don't know the exact conversation.

4  He said -- I -- I don't know the exact conversation.  I

5  recall him saying, "Shit is getting bad here."  And I

6  remember -- I recall him saying that he was told that

7  he's going to be next.

8    Q.  When did he say that to you?

9    A.  In a phone call.  The exact date, I have no idea.

10   Q.  And what did you tell your cousin about the

11  incident?

12   A.  I told him exactly step by step how it happened.

13   Q.  Uh-huh.

14   A.  I believe, if I'm not mistaken, he came on

15  location the next day.  And me, him and Rabino broke

16  down the situation of what happened.

17   Q.  And what did you guys -- tell me about that

18  conversation.

19   A.  That was, basically, the conversation.

20   Q.  You just re --

21   A.  No, I'm sure there was more.  I just don't recall

22  what was actually said besides that.  I know -- I know I

23  was directed that I needed to do something about it.

24   Q.  Uh-huh.

25   A.  That I can't let them get away with that.

Mario Ray Torrez   4/23/2015

151

1      Q.   Uh-huh.

2      A.   And he does this shit all the time.

3      Q.   Uh-huh.  And did you report it to the company?

4      A.   No.

5      Q.   And were you -- when you went to Michigan, were

6   you going to come back?

7      A.   After that incident, no, I knew I wasn't coming

8   back.

9      Q.   Okay.

10     A.   Up until that incident, I planned on coming back.

11     Q.   Okay.  And turn to the next page, if you will.

12   This is still from Lisa Mora.  Do you see that at the

13   bottom?

14     A.   Uh-huh.

15     Q.   And it says, "I will be calling Mario today to

16   confirm this report and initiate an investigation into

17   this allegation.  I will keep you posted but wanted to

18   let you know immediately due to the sensitivity of this

19   claim."

20          Do you see that?

21     A.   Uh-huh.

22     Q.   So, it looks like she wants to do something --

23   she's telling somebody she's doing something quick,

24   right?

25          MR. TEETER:  Objection, form.

Mario Ray Torrez   4/23/2015

157

1          Do you see that?

2    A.   Yes, I do see that.

3    Q.   And did Ms. Mora tell you -- indicate that the

4    person who recorded the video would be in trouble --

5              MR. TEETER:  Objection --

6    Q.   (By Ms. Garcia)  -- Mr. Torrez?

7              MR. TEETER:  Objection, form.

8    A.   I don't remember -- no, I don't remember.

9    Q.   (By Ms. Garcia)  So, then --

10   A.   I don't remember -- I don't remember one way or

11   the other whether she did or didn't.  I can't remember

12   the conversation.

13   Q.   And this doesn't refresh your recollection?

14   A.   I definitely remember talking to her.  The exact

15   details, though, or my emotion and her emotion during

16   the conversation, I don't remember.

17   Q.   Would you have wanted to protect Mr. Rabino from

18   getting in trouble?

19   A.   Would I have wanted to?

20   Q.   Uh-huh.

21   A.   Yeah, I would have.  I definitely wouldn't want

22   him to get in trouble.

23   Q.   And then, it says that, "After a few phone calls

24   back and forth to assure confidentiality, Mario told me

25   that the employee who video recorded it on his cell

Mario Ray Torrez   4/23/2015

161

1   He was in fear on the site.

2       Q.   Okay.  And so, you told Ms. Mora that he needed

3   to be taken off, correct?

4       A.   Yes, I did.

5       Q.   Okay.  And did you trust her to do that?

6       A.   Had she not, I would have went to another

7   authority.

8       Q.   Okay.  And next -- at the next paragraph, it

9   says, "Both Mario Torrez and Richard Rabino indicated

10  they may take legal action against those involved."

11          Do you see that?

12      A.   Yeah.

13      Q.   Did you tell Ms. Mora that you were going to take

14  legal action against the people involved in the April

15  2012 incident?

16      A.   No.

17      Q.   You didn't?

18      A.   I don't recall, no.

19      Q.   You don't recall, or you didn't?

20      A.   I don't recall anything legal being involved in

21  the situation at that point.

22      Q.   Do you recall at least hinting it?

23          MR. TEETER:  Objection, form.

24      A.   I don't recall the conversation, but I don't even

25  know why I would have hinted it.

Mario Ray Torrez  4/23/2015

162

```
 1      Q.  (By Ms. Garcia)  Okay.  Do you recall whether
 2   it's possible if you hired a lawyer on or about
 3   April 16th, 2012?
 4      A.  That I did?
 5      Q.  Uh-huh.
 6      A.  No, I don't think it's possible that I hired a
 7   lawyer.
 8      Q.  Do you think that Mr. Rabino did?
 9           MR. TEETER:  Objection, form.
10      A.  That's Mr. Rabino.  I have no idea.
11      Q.  (By Ms. Garcia)  He wouldn't have done it on your
12   behalf?
13      A.  He may have.
14      Q.  Did he come -- did you come down to Texas to hire
15   a lawyer?
16      A.  No, ma'am, I didn't.
17      Q.  Then, how did you hire a lawyer in Texas?
18      A.  I didn't hire a lawyer.
19      Q.  How do you have a lawyer representing you in this
20   case?
21      A.  That wasn't through me.  I didn't initiate that.
22      Q.  So, who initiated it?
23      A.  I'm guessing, Mr. Rabino.
24      Q.  Did he tell you?
25      A.  Did he tell me?
```

Mario Ray Torrez   4/23/2015

182

1    A.   Yes, I remember.

2    Q.   Okay.  So, let's talk for a minute about

3  reporting this kind of behavior, assault, battery, that

4  kind of thing.

5         You agree Weatherford had a mechanism in place

6  whereby you could report this type of behavior, correct?

7    A.   According to this paperwork, yes.

8    Q.   And there were several different people you

9  personally could have reported Estrada's actions to,

10  right?

11              MR. TEETER:  Objection, form.

12    A.   According to the paperwork, yes.

13    Q.   (By Ms. Garcia)  So, you could have told a

14  different supervisor.  Sir, was that an option?

15    A.   No, I don't believe I could have.

16    Q.   Okay.  And you could have told human resources --

17              MR. TEETER:  Objection, form.

18    Q.   (By Ms. Garcia)  -- correct?

19    A.   No, I don't believe I could have.

20    Q.   And why not?

21    A.   I don't believe anybody cared.

22    Q.   Okay.  And according the policy we looked at, you

23  could have told Weatherford's legal department, as well,

24  correct?

25              MR. TEETER:  Objection, form.

Mario Ray Torrez   4/23/2015

183

1    A.  According to the paperwork, I could have; but I

2  have no idea how I would even contact them --

3    Q.  (By Ms. Garcia)  Okay.

4    A.  -- or if I even would have.

5    Q.  And now, we also talked about the Listen Up

6  program, correct?

7              MR. TEETER:  Objection, form.

8    A.  Yes, you showed me the paperwork.

9    Q.  (By Ms. Garcia)  Okay.  And you could have called

10  and made an anonymous complaint through that program,

11  correct?

12             MR. TEETER:  Objection, form.

13   A.  I had no idea who Listen Up was.

14   Q.  (By Ms. Garcia)  Okay.  But you have no reason to

15  believe that that third party would not have kept your

16  identity confidential, correct?

17             MR. TEETER:  Objection, form.

18   A.  I don't believe I would have trusted to call

19  them, either.

20   Q.  (By Ms. Garcia)  Okay.  Did you even want an

21  investigation to take place?

22   A.  Yes.  However, if it would have been safe for me,

23  I have no idea.

24   Q.  Okay.  And you're now aware that eventually

25  someone did make a complaint about Estrada to human

```
 1          PRO SE:
              Joey Estrada
 2            561 FM 2508
              Alice, Texas  78332
 3            Phone:  361.701.0853
              Email:  jose.estrada@ftsi.com
 4

 5          That the amount of time used by each party at the

 6   deposition is as follows:

 7

            Ms. Garcia -- 4 hours, 20 minutes
 8

 9          I further certify that I am neither counsel for,

10   related to, nor employed by any of the parties or

11   attorneys in the action in which this proceeding was

12   taken, and further that I am not financially or

13   otherwise interested in the outcome of this action.

14          Certified to by me this 4th day of May, 2015.

15

16

17          _____
            Dickie Zimmer, Texas CSR 1954
18          Expiration Date:  December 31, 2015
            Firm Registration No. 150
19          O'Neal*Probst*Wells
            P.O. Box 60769
20          Houston, Texas  77205
            713.521.1314
21

22

23

24

25
```